UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
|  | ) | VIOLATIONS: **05 - 1 0 0 1 9 RGS** |
| v. | ) |  |
|  | ) | 18 U.S.C. §371 (conspiracy to defraud United States) |
| DANIEL W. McELROY, | ) | 18 U.S.C. §1341 (Mail Fraud) |
| AIMEE J. KING McELROY, and | ) | 26 U.S.C. §7206(2) (procuring false tax return) |
| XIEU VAN SON, | ) | 26 U.S.C. §7203 (failure to supply tax information) |
|  | ) | 18 U.S.C. §2 (aiding and abetting) |
| defendants. | ) |  |

## INDICTMENT

The Grand Jury Charges that:

### ALLEGATIONS COMMON TO ALL COUNTS

1.    At all times pertinent to this Indictment, defendant DANIEL W. McELROY ("McELROY") was an individual who resided in Sharon, Massachusetts. McELROY owned and operated corporations through which he conducted a temporary employment agency business that specialized in providing workers to various businesses, including manufacturing and food processing concerns.

2.    At all times pertinent to this Indictment, defendant AIMEE J. KING McELROY ("KING"), the spouse of defendant McELROY, was an individual who resided in Sharon, Massachusetts. Together with defendant McELROY, KING owned and operated corporations through which she conducted a temporary employment agency business that specialized in providing workers to various businesses, including manufacturing and food processing concerns.

1

3.      At all times pertinent to this Indictment, Charles J. Wallace ("Wallace") was an individual who resided in East Bridgewater, Massachusetts. Wallace provided various accounting services to McELROY and KING's temporary employment agency business.

4.      At all times pertinent to this Indictment, McELROY and KING operated their temporary employment agency business under the name of Daily A. King Labor, Inc., a Massachusetts corporation. At various times, McELROY and KING also operated their business through, and under the names of, other corporations and individuals, including Pro Temp. Company ("Pro Temp."), Dich Trieu, PTC and Precission Temp. Corp ("Precission").

5.      At all times pertinent to this Indictment, defendant XIEU VAN SON was an individual who resided at Lowell, Massachusetts. XIEU VAN SON was formally listed as the President of Precission Temp. Corp, but he exercised little or no control over that business entity, which functioned as part of McELROY and KING's temporary employment agency business.

6.      At times pertinent to this Indictment, Daily A. King Labor, Inc. maintained business offices in Taunton, Massachusetts, at 24 Norfolk Avenue, Easton, Massachusetts, and later at 14 E,G Bristol Drive, Second Floor, South Easton, Massachusetts, with additional offices in Chelsea, Lowell and New Bedford, Massachusetts.

TEMPORARY EMPLOYMENT SERVICES (GENERALLY)

7.      The term "temporary employment agency" refers to a business whereby the agency provides client companies with workers, ordinarily on a short-term basis. Typically, the agency handles the administrative and accounting tasks associated with the hiring and employment process, while the client company directs the day-to-day work activities of the temporary employees.

2

8.    In temporary employment agency arrangements, the agency is ordinarily responsible for issuing paychecks to the employees, for paying state and federal employment taxes, and for processing payroll deductions for taxes, social security obligations, health care benefits and/or union dues. The agency is also responsible for meeting certain other fiduciary responsibilities of employers, including maintaining workers compensation insurance for the employees. For these services, client companies pay fees to the agency.

9.    Fees paid to temporary employment agencies may be calculated in various ways. Commonly, fees are calculated based on a fixed hourly rate. For example, the agency might charge a client company $10.00 per hour for the services of each temporary employee. Included in that rate are the actual wages paid to the worker, additional expenses such as employment taxes, unemployment insurance and workers compensation insurance (sometimes referred to as "fringes"), as well as any profit margin for the temporary employment agency.

FEDERAL EMPLOYMENT (PAYROLL) TAXES

10.    Federal tax laws require employers, including temporary employment agencies, to file Form 941, Employers Federal Quarterly Tax Return, which is used to report and pay all Federal employment taxes, which consist of Social Security Tax and Medicare Tax, as well as income taxes withheld from employees. Employers are required to file Form 941 four times per year, one for each quarter ending March 31st; June 30th; September 30th; and December 31st.

11.    The Federal Insurance Contributions Act (F.I.C.A.) tax rate is 15.3 % of an employee's wages. Each employee is liable for only one half (1/2) of this 15.3%, or 7.65%. Employers are liable for the other half, also 7.65%, of each employees' wages. Employers are required by federal tax law to withhold the employees' share of federal employment taxes from their employees' pay. In filing their Form 941 with the IRS, employers are required to report

3

their total payments to employees and to report both the employees' and the employers' share of federal employment taxes. At the same time, employers are required to deliver to the IRS the employee's share of the F.I.C.A. taxes and to pay the employer's share.

12.     Under federal law, employers are also required to withhold taxes from employees' wages to be credited toward the employees' federal income tax obligations. These withholdings too are shown on Form 941.

<u>THE WORKERS COMPENSATION INSURANCE SYSTEM IN MASSACHUSETTS</u>

13.     At all times pertinent to this Indictment, the laws of the Commonwealth of Massachusetts required employers to obtain workers compensation insurance coverage so that employees who suffer work-related injuries will be compensated in accordance with the workers compensation laws of Massachusetts.

14.     As with other forms of insurance, employers obtain workers compensation insurance by paying fees, known as premiums, to insurance companies, which issue insurance policies that cover the employers' obligations to pay for on-the-job injuries.

15.     Commonly, workers compensation insurance is obtained for a fixed period, often one-year, known as the insurance policy term.

16.     As with other forms of insurance, premiums for workers compensation insurance are based in part on factors related to the degree of risk the insurance company is assuming. The following factors commonly are used in calculating a particular employer's workers compensation insurance premium: (1) the total wages of the employees to be covered (known as "payroll"); (2) the nature of the employees' work activities (known as "classification"); and (3) the employer's past history of work-related injuries.

4

17.    In some cases, insurance companies and employers may agree to a method of pricing workers compensation insurance, known as Retrospective Rating, whereby the insurance premium is determined after the policy term has ended, based in part on the actual losses (i.e. amounts paid to workers injured while working for the employer) during the policy term. When such pricing agreements are in place, the employer's total payroll is commonly used in calculating maximum and minimum premium limits (for example, a Retrospective Rating policy may require an employer to pay a premium of not less than 10% and not more than 200% of a base premium determined by multiplying the employer's payroll by a standard rate, with the final amount of the premium being determined based on actual losses incurred during the policy term).

18.    Ordinarily, at the beginning of a policy term, an employer is required to provide its workers compensation insurance company with estimates of its anticipated payroll during the upcoming policy term, as well as information regarding the job classifications of its employees. These payroll estimates are then used to determine an estimated premium, which the employer may be required to pay, in part or in full, before or during the policy term.

19.    After the close of a policy term, the insurance company providing workers compensation insurance commonly conducts an "audit" of the employer's actual payroll during the policy term. Interim audits may also be conducted, during the policy term, to check the accuracy of the employer's payroll estimates and, if necessary, to adjust the amount of any installment payments the employer may be obligated to pay. Such audits may be highly informal--such as obtaining information through a telephone call--or they may involve a more detailed review of records. During such audits, the employer is required to report to the insurance company its actual payroll during the policy term. The employer may also be required to furnish records, such as employment tax withholding records, to verify its payroll figures.

20.     Actual payroll figures are used to determine the final amount of the employer's premium for the policy term. Although the factors used to compute premiums differ for standard and Retrospective Rating arrangements, actual payroll figures are ordinarily required for both kinds of arrangements.

## DAILY A. KING LABOR, INC. INSURANCE POLICIES

21.     Beginning in or about February 1993, McELROY and KING operated Daily A. King Labor, Inc. as a temporary employment agency.

22.     Between on or about February 17, 1993, and on or about July 26, 1996, Daily A. King Labor, Inc. obtained workers compensation insurance policies from Liberty Mutual Insurance Group ("Liberty Mutual").

23.     Between on or about July 26, 1996, and on or about July 26, 2000, Daily A. King Labor, Inc. obtained workers compensation insurance coverage through Reliance National Indemnity Company, a Reliance Group Holdings Company ("Reliance").

24.     Between on or about July 26, 1996 and  on or about July 26, 2000, the workers compensation insurance agreements between Daily A. King Labor, Inc. and Reliance provided for the use of a retrospective rating plan in pricing the Daily A. King Labor, Inc.'s insurance coverage. For each of three one-year policy terms, Daily A. King Labor, Inc.'s agreements with Reliance provided for minimum and maximum premiums that were calculated based on multiplying agreed-upon rates times the amount of Daily A. King Labor, Inc.'s payroll during each policy term.

25.     Between in or about July 26, 2000 and July 26, 2001, Daily A. King Labor, Inc. obtained workers compensation insurance coverage through A.I.M. Mutual Insurance Company ("A.I.M.").

## PRO TEMP. AND PRECISSION TEMP. CORP. INSURANCE POLICIES

26.     Beginning in or about 1993 and continuing until on or about June 26, 2001,

McELROY and KING operated their employment agency, in part, under the names Dich Trieu,

Pro Temp. and Precission Temp. Corp.

27.     Prior to and in or about the periods set forth below McELROY, KING and others

caused workers compensation policies to be obtained in the names of Pro Temp. and Dich Trieu,

from the following insurance companies:

| Approximate Coverage Periods | Insurance Carrier |
| --- | --- |
| 9/14/1993  -  9/14/1996 | American Policyholders' Insurance Company |
| 9/14/1996  -  9/14/1997 | A.I.M. Mutual Insurance Company |
| 9/14/1997  -  11/15/1997 | Granite State Insurance Company |
| 11/15/1997 -  11/15/1998 | American Home Assurance Company |
| 1/22/1999  -  1/22/2000 | Reliance National Indemnity Company, |
| 1/22/2000  -  1/22/2001 | Gulf Insurance Company |

28.     In or about May 2000, McELROY and others caused Precission Temp. Corp. to

be added as an additional insured on the insurance policy then in force issued to Pro Temp. by

Gulf Insurance Company.

## USE OF MAILS BY INSURERS

29.     At times pertinent to this Indictment, it was the regular business practice of each

of the insurers that provided workers compensation insurance coverage to entities through which

McELROY and KING operated their temporary employment agency business, to send various

items relating to pricing and billing for insurance policies by the U.S. Postal Service, including

notices reflecting interim and final bill amounts and invoices for payment.

## COUNT ONE

### CONSPIRACY (18 U.S.C. §371)

30.    The Grand Jury realleges and incorporates by reference paragraphs 1-29 of this Indictment, and further charges that:

31.    Beginning some time prior to January 1, 1993 and continuing until on or about June 26, 2001, at Taunton, Easton and South Easton in the District of Massachusetts and elsewhere,

DANIEL W. McELROY,<br>
AIMEE J. KING McELROY, and<br>
XIEU VAN SON,

defendants herein, together with others known and unknown to the Grand Jury, knowingly and unlawfully conspired and agreed with each other:

to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue; to wit, employment and income taxes; and

to commit offenses against the United States, to wit, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, to place and cause to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, in violation of Title 18, United States Code, Section 1341 (Mail Fraud).

## OBJECTIVES OF THE CONSPIRACY

32.     A major purpose and objective of the conspiracy was to enable McELROY and KING to fraudulently avoid paying a portion of the federal employment taxes that were owed in connection with the operation of their temporary employment agency business.

33.     A second major purpose and objective of the conspiracy was to enable McELROY and KING to fraudulently reduce the premiums for workers compensation insurance for their temporary employment agency business.

34.     A further purpose and objective of the conspiracy was to enable McELROY and KING to avoid collecting and paying to the IRS income tax withholding amounts for employees of their temporary employment agency business.

35.     A further purpose and objective of the conspiracy was to enable XIEU VAN SON to be paid $800 per week for his services as nominal president of a shell company that was used to disguise the true operations of McELROY and KING's temporary employment agency business.

## MANNER AND MEANS OF THE CONSPIRACY

36.     The manner and means by which the conspirators accomplished the goals of the conspiracy included, among others, the following:

### Off-The-Books Cash Payments to Employees

37.     It was part of the conspiracy that McELROY, KING, XIEU VAN SON, Wallace, Dich Trieu and others arranged to pay employees of the temporary employment agency business in cash, without keeping appropriate records of the employees' social security numbers and other

9

information necessary for reporting such cash payments to the Internal Revenue Service or to the workers compensation insurers for their business.

38.    It was part of the conspiracy that McELROY, KING and Wallace administered the office procedures of the temporary employment agency business in such a way that records of cash payments to employees were not maintained in the computerized books and ledgers that were used to record and calculate payroll data for purposes of federal tax reporting and payment.

39.    It was part of the conspiracy that XIEU VAN SON and others, including Dich Trieu, in their capacity as employees of the temporary employment agency business operated under the names Daily A. King Labor, Inc., Pro Temp. Company, Dich Trieu, PTC and Precission Temp. Corp, arranged to hire individuals to work for the business, without maintaining records of those individuals' true social security numbers and other identifying information, which XIEU VAN SON, Dich Trieu and others well knew were required for purposes of supplying information to United States tax authorities.

40.    It was part of the conspiracy that XIEU VAN SON and others, including Dich Trieu, intentionally failed to forward workers' social security numbers to McELROY and Wallace for entry into the computerized books and ledgers that were used to record and calculate payroll data for purposes of federal tax reporting and payment.

Setting up Separate Business Entities

41.    It was part of the conspiracy that McELROY, KING, XIEU VAN SON, Wallace and others arranged to continue paying employees of the temporary employment agency business in cash, even after KING had signed an August 18, 1994, judgment in a civil lawsuit brought against her by the United States Department of Labor, which permanently enjoined her, and her

10

"agents, servants, employees, and all persons acting or claiming to act" in her behalf, from

violating the record keeping provisions of the Fair Labor Standards Act and from paying "any

employees by means of cash payments . . .."

42.     It was part of the conspiracy that from late-1994 through May 2000, McELROY,

KING and Wallace arranged for Dich Trieu to hold himself out as doing business under the name

Pro Temp. Co. for purposes of hiring employees and submitting tax returns, in order to create the

appearance that Pro Temp. Co. was a separate and independent business.

43.     It was part of the conspiracy that beginning in or about May 2000, McELROY,

KING and Wallace arranged for XIEU VAN SON to hold himself out as president of Precission

Temp. Corp. and arranged for Precission Temp. Corp. to hold itself out as doing business for

purposes of hiring employees and submitting tax returns, in order to create the appearance that

Precission Temp. Corp. was a separate and independent business.

44.     It was part of the conspiracy that McELROY, KING and Wallace paid XIEU

VAN SON approximately $800 per week for his duties, which included holding himself out as

president of Precission Temp. Corp., signing checks on behalf of Precission Temp. Corp.,

cashing those checks and giving the cash to McELROY and Wallace.

45.     It was part of the conspiracy that KING would and did instruct employees in the

offices of the temporary employment agency business to answer the office telephone "Daily A.

King" and to deny knowledge of Pro Temp. Co. and Precission Temp. Corp. KING would and

did instruct employees to tell callers who were seeking Pro Temp. Co. and Precission Temp.

Corp. that those entities were located at a different address and to provide the callers with a

telephone number for those entities.

11

46.     It was part of the conspiracy that McELROY arranged to obtain a private mailbox at a mailing service, in the name of Pro Temp. Co., in order to create the appearance that Pro Temp. Co. maintained a separate business office.

47.     It was part of the conspiracy that McELROY and Wallace controlled the operations of Pro Temp. Co., which functioned as a part of the temporary employment agency business operated by McELROY and KING.

48.     It was part of the conspiracy that McELROY and Wallace arranged to lease office space in the name of Precission Temp. Corp., in order to create the appearance that Precission Temp. Corp. operated as a separate business.

49.     It was part of the conspiracy that McELROY and Wallace controlled the operations of Precission Temp. Corp., which functioned as a part of the temporary employment agency business operated by McELROY and KING.

Administering the Cash Payroll

50.     It was part of the conspiracy that McELROY and Wallace calculated, on a weekly basis, the total amount of cash needed for the off-the-books cash payments to employees of the temporary employment agency business.

51.     It was part of the conspiracy that McELROY, KING, XIEU VAN SON, Wallace, Dich Trieu and others would and did obtain cash on a weekly basis, in amounts ranging up to $200,000 to $300,000 per week, in order to meet the off-the-books payroll of the temporary employment agency business.

52.     It was part of the conspiracy that McELROY, KING, XIEU VAN SON, Wallace Dich Trieu and others would and did obtain cash, totaling more than $30,000,000.00 during the

12

years 1997 through the first half of 2001 for use in paying the off-the-books payroll of the
temporary employment agency business.

53.     It was part of the conspiracy that, at various times, McELROY, KING, Wallace
and others would and did arrange to structure some of their cash transactions to avoid federal
Currency Transaction Report filing requirements.  That is, they arranged to obtain amounts of
cash in excess of $10,000 through multiple transactions, each below the $10,000 reporting
threshold.

54.     It was part of the conspiracy that McELROY, KING, Wallace and others would
and did cause checks to be written from Daily A. King Labor, Inc. to individuals and entities,
including XIEU VAN SON, Dich Trieu, Pro Temp. Co. and Precission Temp. Corp., in order to
obtain cash for use in making off-the-books payments to employees of the temporary
employment agency business.

55.     It was part of the conspiracy that McELROY and Wallace directed and supervised
XIEU VAN SON, Dich Trieu and others as they traveled to banks to cash checks and then
brought the cash back to the offices of the temporary employment agency business.

Filing False Tax Returns and Willful Failure to File Returns

56.     It was part of the conspiracy that Wallace would and did prepare and file
employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Daily
A. King Labor, Inc., which returns were false in that they failed to include off-the-books cash
payments to employees of the temporary employment agency business.

57.     It was part of the conspiracy that Wallace would and did prepare and file
employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Pro

13

Temp. Co., which returns were false in that they failed to include off-the-books cash payments to employees of the temporary employment agency business.

58.    It was part of the conspiracy that McELROY, KING and Wallace failed to file employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Dich Trieu and Pro Temp. Company for the calendar quarter ending June 30, 2000, which return was due on July 31, 2000.

59.    It was part of the conspiracy that McELROY, KING, XIEU VAN SON, Wallace and others failed to file employment tax returns, including Form 941, Employers Federal Quarterly Tax Return, for Precission Temp. Corp.

Defrauding Workers Compensation Insurers

60.    It was part of the conspiracy that beginning some time prior to January 1, 1993, and continuing through March 31, 2001, defendants McELROY and KING, together with Wallace and others known and unknown to the Grand Jury, arranged fraudulently to reduce the premiums for workers compensation insurance for their temporary employment agency business.

61.    It was part of the conspiracy that McELROY, KING and Wallace arranged to and did fraudulently understate the payroll of defendants' temporary employment agency business, thereby reducing their insurance premiums, which were calculated on the basis of that payroll.

62.    It was part of the conspiracy that McELROY, KING and Wallace arranged to and did fraudulently represent that such entities as Daily A. King Labor, Inc., Dich Trieu, Pro Temp. Co. and Precission Temp. Corp., were separately operated businesses, thereby preventing any comprehensive review of the payroll of their temporary employment agency business by insurance company auditors.

14

63.     It was part of the conspiracy that McELROY, KING and Wallace arranged to and did fraudulently conceal the fact that employees of defendants' temporary employment agency business were paid cash under the table, so that the true payroll of the business was not reflected in the books and records of Daily A. King Labor, Inc., Precission Temp. Corp. or Pro Temp. Company.

64.     It was part of the conspiracy that McELROY, KING and Wallace arranged to and did fraudulently report false and fictitious payroll figures to the insurance companies that provided workers compensation insurance to Daily A. King Labor, Inc., Dich Trieu, Pro Temp. Company and Precission Temp. Corp.

65.     It was part of the conspiracy that McELROY and Wallace arranged to and did fraudulently report false and fraudulent payroll figures to insurance companies as "estimates," used to calculate the initial premium due at the inception of each insurance policy term. In some instances, these estimates were directly caused to be submitted by defendant McELROY and Wallace, who well knew that the figures provided grossly understated the actual payroll of the temporary employment agency business. In other instances, the fraudulently understated estimates were derived from false figures that had been supplied in previous years.

66.     It was part of the conspiracy that, in order to mislead insurance company auditors, McELROY and Wallace arranged to and did provide the auditors with forged tax forms, which purported to be copies of Form 941, Employers Federal Quarterly Tax Return, for Daily A. King Labor, Inc. and Pro Temp. Co. These forged tax returns were designed to "verify" the false payroll figures that defendant McELROY and Wallace had provided to the insurance companies.

67.     It was part of the conspiracy that for the purpose of executing their scheme to defraud McELROY and KING routinely sent and received and caused others to send and receive,

items for delivery by the United States Postal Service, including correspondence to and from

insurance companies that provided workers compensation insurance to their temporary

employment agency business.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

68.    In furtherance of the conspiracy, the following individuals did the following:

69.    On or about the following dates, KING signed checks, drawn on accounts of Daily

A. King Labor, Inc., payable to the following individuals and entities:

| Date | Ck# | Amnt | Payee | Payor | Bank | Acc't # |
|------|-----|------|-------|-------|------|---------|
| 04/28/1997 | 2492 | $4,925 | Dich Trieu | Daily a King Labor Inc | Citizens | 1103097501 |
| 04/29/1997 | 2493 | $4,871 | Dich Trieu | Daily A. King Labor. | Citizens | 1103097501 |
| 04/29/1997 | 2496 | $7,258 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/01/1997 | 2499 | $4,960 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/02/1997 | 5336 | $4,000 | Dich Trieu | Daily A. King Labor Inc. | Fleet | 9100918 |
| 05/02/1997 | 5337 | $1,894 | Xieu V. Son | Daily A. King Labor Inc. | Fleet | 9100918 |
| 05/05/1997 | 2500 | $4,720 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/06/1997 | 2502 | $4,950 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/07/1997 | 30518 | $6,214 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/07/1997 | 30519 | $3,000 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/13/1997 | 30522 | $6,070 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/14/1997 | 2506 | $4,972 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/15/1997 | 2507 | $4,298 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/15/1997 | 2512 | $4,914 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 2508 | $2,983 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 2509 | $4,971 | Sotha Khuth | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 2511 | $4,984 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/16/1997 | 5342 | $3,000 | Dich Trieu | Daily A. King Labor Inc. | Fleet | 9100918 |
| 05/16/1997 | 2510 | $4,989 | Hui Ly | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/19/1997 | 2513 | $4,945 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/20/1997 | 2515 | $9,210 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/20/1997 | 30552 | $7,359 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/21/1997 | 2519 | $4,920 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/22/1997 | 2520 | $4,986 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/22/1997 | 2521 | $9,310 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/23/1997 | 2522 | $3,427 | Xieu V. Son | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/23/1997 | 2523 | $3,000 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/23/1997 | 2524 | $7,075 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/27/1997 | 2525 | $9,879 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/28/1997 | 2526 | $4,916 | Dich Trieu | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/28/1997 | 2527 | $9,810 | Mike Powers | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/28/1997 | 30565 | $6,659 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |
| 05/29/1997 | 2528 | $9,794 | Charles Wallace | Daily A. King Labor Inc. | Citizens | 1103097501 |

70.     On or about the following dates, KING signed checks, drawn on accounts of Daily

A. King Labor, Inc., payable to Pro Temp. Co.:

| Date | Ck# | Amount | Payor | Payee | Bank | Acc't# |
|------|-----|--------|-------|-------|------|--------|
| 06/27/97 | 2554 | $30,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 09/26/97 | 3095 | $65,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 04/24/98 | 3141 | $28,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 12/11/98 | 3244 | $65,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 02/05/99 | 3279 | $70,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 02/05/99 | 3280 | $10,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |
| 10/22/99 | 3342 | $70,000 | Daily A. King Labor, Inc. | Pro Temp. Co. | Fleet | 9100918 |

71.     On or about the following dates, Wallace prepared checks, drawn on an account of

Pro Temp. Co., payable to Dich Trieu:

| Date | Ck# | Amnt | Payor | Payee | Bank | Acc't# |
|------|-----|------|-------|-------|------|--------|
| 06/30/97 | 2249 | $ 9,876 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 06/30/97 | 2250 | $ 9,906 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 09/26/97 | 2541 | $65,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/21/98 | 2983 | $70,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/22/98 | 7323 | $20,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 12/11/98 | 3652 | $100,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 02/05/99 | 3773 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 10/22/99 | 4797 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |

72.     On or about the following dates, Dich Trieu cashed the following checks:

| Date | Ck# | Amnt | Payor | Payee | Bank | Acc't# |
|------|-----|------|-------|-------|------|--------|
| 06/30/97 | 2249 | $ 9,876 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 06/30/97 | 2250 | $ 9,906 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 09/26/97 | 2541 | $65,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/21/98 | 2983 | $70,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 04/22/98 | 7323 | $20,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 12/11/98 | 3652 | $100,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 02/05/99 | 3773 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |
| 10/22/99 | 4797 | $120,000 | Pro Temp. Co. | Dich Trieu | Fleet | 9363455961 |

73.    On or about the following dates, KING signed checks, drawn on accounts of Daily

A. King Labor, Inc., payable to Precission Temp. Corp.:

| Date | Ck# | Amnt | Payee | Bank | Acc't # |
|------|-----|------|-------|------|---------|
| 8/30/00 | 13322 | $25,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 09/13/00 | 13354 | $150,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 11/02/00 | 1032 | $60,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 01/11/01 | 1051 | $50,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |
| 01/25/01 | 1057 | $75,000 | Precission Temp. Corp. | Rockland Trust | 9100918 |

74.    On or about the following dates, Wallace prepared checks, drawn on accounts of

Precission Temp. Corp., payable to XIEU VAN SON:

| Date | Ck# | Amnt | Payee | Bank | Acc't # |
|------|-----|------|-------|------|---------|
| 09/14/00 | 1197 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 09/15/00 | 1201 | $100,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/01/00 | 1319 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/03/00 | None | $93,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/11/01 | 1511 | $40,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/12/01 | 1530 | $72,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/26/01 | 1562 | $105,000 | Xieu Van Son | Eastern | 9417782133 |

75.    On or about the following dates, XIEU VAN SON cashed the following checks:

| Date | Ck# | Amnt | Payee | Bank | Acc't # |
|------|-----|------|-------|------|---------|
| 09/14/00 | 1197 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 09/15/00 | 1201 | $100,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/01/00 | 1319 | $150,000 | Xieu Van Son | Eastern | 9417782133 |
| 11/03/00 | None | $93,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/11/01 | 1511 | $40,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/12/01 | 1530 | $72,000 | Xieu Van Son | Eastern | 9417782133 |
| 01/26/01 | 1562 | $105,000 | Xieu Van Son | Eastern | 9417782133 |

76.    On or about the following dates Wallace prepared and McELROY and KING

caused to be filed employment tax returns, Form 941, Employers Federal Quarterly Tax Return,

for Daily A. King Labor, Inc.:

| Form | Period Covered | Date Signed | Wages Reported | Preparer |
|---|---|---|---|---|
| 941 | 1st Quarter 1997 | 04/30/1997 | 2,452,200.96 | C. Wallace |
| 941 | 2d Quarter 1997 | 07/31/1997 | 2,959,760.59 | C. Wallace |
| 941 | 2d Quarter 1998 | 07/15/1998 | 2,744,046.12 | |
| 941 | 3d Quarter 1998 | 10/27/1998 | 2,661,238.95 | C. Wallace |
| 941 | 4th Quarter 1998 | 01/28/1999 | 2,055,938.33 | C. Wallace |
| 941 | 1st Quarter 1999 | 04/28/1999 | 1,344,209.66 | C. Wallace |
| 941 | 2d Quarter 1999 | 07/26/1999 | 1,617,354.38 | C. Wallace |
| 941 | 3d Quarter 1999 | 10/27/1999 | 1,698,328.31 | C. Wallace |
| 941 | 4th Quarter 1999 | 01/30/2000 | 1,579,487.61 | C. Wallace |
| 941 | 1st Quarter 2000 | 04/25/2000 | 1,367,086.59 | C. Wallace |
| 941 | 2d Quarter 2000 | 07/25/2000 | 1,613,437.30 | C. Wallace |
| 941 | 3d Quarter 2000 | 10/30/2000 | 1,568,039.31 | C. Wallace |
| 941 | 4th Quarter 2000 | | 1,471,124.03 | |

77.    On or about the following dates Wallace prepared and McELROY and KING

caused to be filed employment tax returns, Form 941, Employers Federal Quarterly Tax Return,

for Pro Temp. Co.:

| Form | Period Covered | Date Signed | Wages Reported | Preparer |
|---|---|---|---|---|
| 941 | 1st Quarter 1995 | 04/29/1995 | 89,497.97 | C. Wallace |
| 941 | 2d Quarter 1995 | 07/31/1995 | 29,451.04 | C. Wallace |
| 941 | 3d Quarter 1995 | 10/30/1995 | 100,725.20 | C. Wallace |
| 941 | 4th Quarter 1995 | 05/27/1997 | 241,028.15 | C. Wallace |
| 941 | 1st Quarter 1996 | 05/27/1997 | 172,512.24 | C. Wallace |
| 941 | 2d Quarter 1996 | 05/27/1997 | 211,007.65 | C. Wallace |
| 941 | 3d Quarter 1996 | 05/27/1997 | 307,370.63 | C. Wallace |
| 941 | 4th Quarter 1996 | 05/27/1997 | 434,958.80 | C. Wallace |
| 941 | 1st Quarter 1997 | 05/27/1997 | 283,933.21 | C. Wallace |
| 941 | 2d Quarter 1997 | 07/31/1997 | 239,530.94 | C. Wallace |
| 941 | 3d Quarter 1997 | 10/31/1997 | 211,903.31 | C. Wallace |
| 941 | 4th Quarter 1997 | 01/31/1998 | 261,478.50 | C. Wallace |
| 941 | 1st Quarter 1998 | 04/27/1998 | 225,036.55 | C. Wallace |
| 941 | 2d Quarter 1998 | 07/30/1998 | 251,798.95 | C. Wallace |
| 941 | 3d Quarter 1998 | 10/27/1998 | 412,749.63 | C. Wallace |

| 941 | 4th Quarter 1998 | 01/31/1999 | 422,738.23 | C. Wallace |
| 941 | 1st Quarter 1999 | 04/30/1999 | 136,044.10 | C. Wallace |
| 941 | 2d Quarter 1999 | 07/26/1999 | 170,960.18 | C. Wallace |
| 941 | 3d Quarter 1999 | 10/31/1999 | 196,271.63 | C. Wallace |
| 941 | 4th Quarter 1999 | 01/30/2000 | 148,711.04 | C. Wallace |
| 941 | 1st Quarter 2000 | 05/01/2000 | 180,240.05 | C. Wallace |

78.    On various dates between on or about June 4, 1993 and on or about October 4, 1996, McELROY and Wallace provided false payroll data to Liberty Mutual Insurance Group, intending that such information be used for purposes of determining workers compensation insurance premiums for Daily A. King. Inc.

79.    On or about September 25, 1997, July 13, 1998, March 5, 1999 and October 4, 1999, McELROY and Wallace provided and caused others to provide false payroll data to Reliance National Indemnity Company and its representatives, intending that such information be used in determining workers compensation insurance premiums for Daily A. King. Inc.

80.    On or about the dates set forth below, McELROY and Wallace provided and caused others to provide to Reliance National Indemnity Company and its representatives documents that purported to be copies of Payroll Tax Withholding Records (IRS Form 941) and other records of Daily A. King Labor, Inc. Those records appeared to confirm McELROY's and Wallace's representations regarding the actual payroll of Daily A. King Labor, Inc. In actuality, as McELROY and Wallace well knew, the documents were forgeries which falsely understated the company's actual payroll:

| Audit Date | Policy Term | Payroll Reported to Insurer |
|---|---|---|
| 9/25/97 | July 26, 1996 - July 25, 1997 | $ 2,800,871 |
| 7/13/98 | July 26, 1996 - July 25, 1997 | $ 2,800,871 |
| 3/5/99 | July 26, 1997 - July 25, 1998 | $ 2,489,873 |
| 10/4/99 | July 26, 1998 - July 25, 1999 | $ 3,160,431 |

21

81.     On or about January 26, 1999, Wallace provided to American Home Assurance Company and its representatives documents that purported to be copies of Payroll Tax Withholding Records (IRS Form 941) and other records of Pro Temp. Company. Those records appeared to confirm McELROY's and Wallace's representations that the payroll of Pro Temp. Company during the policy term November 15, 1997 through November 15, 1998 was $953,580. In actuality, as McELROY and Wallace knew, the $953,580 figure falsely understated the company's actual payroll and the supporting documents were forgeries.

82.     On or about November 15, 2000, Wallace provided to A.I.M. and its representatives payroll records of Daily A. King Labor, Inc. Those records appeared to confirm McELROY's and Wallace's representations that the payroll of Daily A. King Labor, Inc. during the policy term July 26, 2000 through July 26, 2001, included only those amounts reflected on the computerized books and records of Daily A. King Labor, Inc. In actuality, as McELROY and Wallace knew, this figure falsely understated the company's actual payroll.

83.     On or about February 6, 2001, Wallace provided to A.I.M. and its representatives payroll records of Daily A. King Labor, Inc. Those records appeared to confirm McELROY's and Wallace's representations that the payroll of Daily A. King Labor, Inc. during the policy term July 26, 2000 through July 26, 2001, included only those amounts reflected on the computerized books and records of Daily A. King Labor, Inc. In actuality, as McELROY and Wallace knew, this figure falsely understated the company's actual payroll.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO - FOUR

### MAIL FRAUD (18 U.S.C. §1341)

84.    The Grand Jury realleges and incorporates by reference paragraphs 1-29 and 32-83 of this Indictment, and further charges that:

85.    On or about the dates set forth below, at Taunton, Easton and South Easton in the District of Massachusetts and elsewhere,

### DANIEL W. McELROY and

### AIMEE J. KING McELROY

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, including false representations regarding the payroll of their temporary employment agency business, and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a Post Office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: insurance documents which reflected premium calculations that were based upon false and fraudulent pretenses and representations:

| Count | Mailing Date | Item Mailed |
|-------|-------------|-------------|
| 2 | 3/3/2000 | Workers Compensation and Employers Liability Insurance Policy Information Page<br>Dich Trieu d/b/a Pro Temp Company<br>Gulf Insurance Company, Policy No. WC0599901 |
| 3 | 1/24/2001 | Workers Compensation and Employers Liability Insurance Policy Information Page,<br>Precission Temp Corp.<br>Gulf Insurance Company, Policy No. WC0694637 |
| 4 | 2/13/2001 | Amendment of Information Page<br>Daily A. King Labor, Inc.<br>A.I.M. Mutual Insurance Co., Policy No. WM08002201012000 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

23

## COUNTS FIVE - TWELVE

## PROCURING FALSE TAX RETURNS (26 U.S.C. §7206(2))

### [Daily A. King Labor, Inc.]

86.    The Grand Jury realleges and incorporates by reference paragraphs 1-12, 32-59 and 68-77 of this Indictment, and further charges that:

87.    On or about the dates set forth below, at Taunton, Easton and South Easton in the District of Massachusetts and elsewhere,

DANIEL W. McELROY and

AIMEE J. KING McELROY

defendants herein, being residents of Sharon, Massachusetts, did willfully aid, assist in and procure the preparation and presentation of Federal employment tax returns Form 941, Employers Federal Quarterly Tax Return, for Daily A. King Labor, Inc., for the periods set forth below, which said tax returns were fraudulent and were false as to material matters in that on line 2 of each said tax return, total wages and tips plus other compensation were reported in the amounts listed, whereas, as defendants then and there well knew and believed, total wages and tips plus other compensation for each of the periods substantially exceeded the amounts reported:

| COUNT | DATE | PERIOD | TOTAL WAGES AND TIPS PLUS OTHER COMPENSATION REPORTED ON LINE 2 |
|-------|------|--------|----------------------------------------------------------------|
| 5 | 1/28/99 | 4th Qtr. 1998 | $ 2,055,938.33 |
| 6 | 4/28/99 | 1st Qtr. 1999 | $ 1,344,209.66 |
| 7 | 7/26/99 | 2nd Qtr. 1999 | $ 1,617,354.38 |
| 8 | 10/27/99 | 3rd Qtr. 1999 | $ 1,698,328.31 |
| 9 | 1/30/00 | 4th Qtr. 1999 | $ 1,579,487.61 |

24

| COUNT | DATE | PERIOD | TOTAL WAGES AND TIPS PLUS OTHER COMPENSATION REPORTED ON LINE 2 |
|-------|------|--------|----------------------------------------------------------------|
| 10 | 4/25/00 | 1st Qtr. 2000 | $ 1,367,086.59 |
| 11 | 7/25/00 | 2nd Qtr. 2000 | $ 1,613,437.30 |
| 12 | 10/30/00 | 3rd Qtr. 2000 | $ 1,568,039.31 |

All in violation of Title 26, United States Code, Section 7206(2).

## COUNTS THIRTEEN – EIGHTEEN

### PROCURING FALSE TAX RETURNS (26 U.S.C. §7206(2))

### [Pro Temp. Co.]

88.　　The Grand Jury realleges and incorporates by reference paragraphs 1-12, 32-59 and 68-77 of this Indictment, and further charges that:

89.　　On or about the dates set forth below, at Taunton, Easton and South Easton in the District of Massachusetts and elsewhere,

### DANIEL W. McELROY and

### AIMEE J. KING McELROY

defendants herein, being residents of Sharon, Massachusetts, did willfully aid, assist in and procure the preparation and presentation of Federal employment tax returns Form 941, Employers Federal Quarterly Tax Return, for Pro Temp. Co., for the periods set forth below, which said tax returns were fraudulent and were false as to material matters in that on line 2 of each said tax return, total wages and tips plus other compensation were reported in the amounts listed, whereas, as defendants then and there well knew and believed, total wages and tips plus other compensation for each of the periods substantially exceeded the amounts reported:

| COUNT | DATE | PERIOD | TOTAL WAGES AND TIPS PLUS OTHER COMPENSATION REPORTED ON LINE 2 |
|-------|------|--------|------------------------------------------------------------------|
| 13 | 1/31/99 | 4th Qtr. 1998 | $ 422,738.23 |
| 14 | 4/30/99 | 1st Qtr. 1999 | $ 136,044.10 |
| 15 | 7/26/99 | 2nd Qtr. 1999 | $ 170,960.18 |
| 16 | 10/31/99 | 3rd Qtr. 1999 | $ 196,271.63 |
| 17 | 1/30/00 | 4th Qtr. 1999 | $ 148,711.04 |
| 18 | 5/1/00 | 1st Qtr. 2000 | $ 180,240.05 |

All in violation of Title 26, United States Code, Section 7206(2).

## COUNT NINETEEN

## WILLFUL FAILURE TO KEEP TAX RECORDS AND SUPPLY TAX INFORMATION

## (26 U.S.C. §7203)

90.     The Grand Jury realleges and incorporates by reference paragraphs 1-12, 32-59 and 68-77 of this Indictment, and further charges that:

91.     At all times pertinent to this Indictment, the temporary employment agency business operated under the names Daily A. King Labor, Inc., Pro Temp. Company, Dich Trieu, PTC and Precission Temp. Corp, was required by law to keep records of payments to employees, together with identifying information for those employees, to supply that information to the Internal Revenue Service and, after the close of each calendar quarter and on or before the last day of the month following each calendar quarter, to make an Employer's Quarterly Federal Tax Return, Form 941, to the Director, Internal Revenue Service or other proper office of the United States.

92.     Beginning in or about 1994 and continuing until on or about June 26, 2001, XIEU VAN SON, in his capacity as an employee of the temporary employment agency business operated under the names Daily A. King Labor, Inc., Pro Temp. Company, Dich Trieu, PTC and Precission Temp. Corp, arranged to employ, and to pay cash to, multiple individuals without maintaining records of those individuals' social security numbers and other identifying information, which information XIEU VAN SON well knew was required for purposes of supplying information to United States tax authorities.

27

93.    Beginning in or about 1994 and continuing until on or about June 26, 2001, at South Easton and Lowell, in the District of Massachusetts and elsewhere,

## XIEU VAN SON,

defendant herein, acting on behalf of an employer of labor that was required by law to keep records of payments to individual employees, together with records of those individuals' social security numbers and other identifying information, and to supply such information to the Internal Revenue Service of the United States, did willfully fail to keep such records and did willfully fail to supply such information, at the time or times required by law and regulation.

All in violation of Title 26, United States Code, Section 7203 and Title 18, United States Code, Section 2.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS January 26, 2005

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk    1:00PM

29

JS 45 (5/97) - (Revised USAO MA 3/25/02) **05 - 1 0 0 1 9 RGS**

**Criminal Case Cover Sheet**                          **U.S. District Court - District of Massachusetts**

**Place of Offense:**                 **Category No.** II          **Investigating Agency** IRS, FBI

**City** South Easton               **Related Case Information:**

**County** Bristol                  Superseding Ind./ Inf. _____   Case No. _____
                                    Same Defendant _____   New Defendant _____
                                    Magistrate Judge Case Number _____
                                    Search Warrant Case Number   2001 M 0455 RBC
                                    R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   DANIEL W. McELROY                    Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address   8 Cowhill Road, Sharon, Massachusetts 02067

Birth date: **/*/1951   SS#: ***/**/1103   Sex: M   Race: White   Nationality: US

**Defense Counsel if known:**  Stephen R. Delinsky, Esq.      Address: One International Place, 18th Floor
                                                                       Boston, MA 02110
Bar Number:

**U.S. Attorney Information:**

AUSA   Paul G. Levenson, Seth P. Berman          **Bar Number if applicable**   553946

**Interpreter:**   ☐ Yes   ☒ No          **List language and/or dialect:** _____

**Matter to be SEALED:**   ☐ Yes   ☒ No

         ☐ **Warrant Requested**       ☒ **Regular Process**       ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____ **in** _____ .
☐ **Already in State Custody** _____  ☐ **Serving Sentence**   ☐ **Awaiting Trial**
☐ **On Pretrial Release:**   **Ordered by** _____ **on** _____

**Charging Document:**   ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:**   ☐ Petty ____   ☐ Misdemeanor ____   ☒ Felony   18

**Continue on Page 2 for Entry of U.S.C. Citations**

☒      I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
       accurately set forth above.

**Date:** January 26, 2005          **Signature of AUSA:** _____

05-10019 RGS

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant    DANIEL W. McELROY** _____

### U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| **Set 1**  18 U.S.C. §371 | Conspiracy | 1 |
| Set 2   18 U.S.C. §1341 | Mail Fraud | 2-4 |
| Set 3   26 U.S.C. §7206(2) | Procuring False Tax Returns | 5-18 |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____

js-45 Mcelroy.wpd - 3/13/02

JS 45 (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet**                     **U.S. District Court - District of Massachusetts**

**Place of Offense:**                     Category No. __II__          **Investigating Agency** __IRS, FBI__

**City** __South Easton__                 **Related Case Information:**

**County** __Bristol__                    Superseding Ind./ Inf. _____     Case No. _____
                                          Same Defendant _____     New Defendant _____
                                          Magistrate Judge Case Number _____
                                          Search Warrant Case Number __2001 M 0455 RBC__
                                          R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __AIMEE J. KING McELROY__          Juvenile [ ] Yes  [x] No

Alias Name _____

Address __8 Cowhill Road, Sharon, Massachusetts 02067__

Birth date: __**/*/1956__   SS#: __***/**/0482__   Sex: __F__   Race: __White__          Nationality: __US__

**Defense Counsel if known:** __Jack I. Zalkind, Esq.__          Address: __One International Place__
                                                                          __Boston, MA 02210__
Bar Number: _____

**U.S. Attorney Information:**

AUSA __Paul G. Levenson, Seth P. Berman__          **Bar Number if applicable** __553946__

**Interpreter:** [ ] Yes  [x] No          **List language and/or dialect:** _____

**Matter to be SEALED:** [ ] Yes  [x] No

          [ ] **Warrant Requested**     [x] **Regular Process**          [ ] **In Custody**

**Location Status:**

**Arrest Date:** _____

[ ] **Already in Federal Custody as** _____ in _____ .
[ ] **Already in State Custody** _____  [ ] **Serving Sentence**  [ ] **Awaiting Trial**
[ ] **On Pretrial Release:**  Ordered by _____ on _____

**Charging Document:**     [ ] Complaint     [ ] Information     [x] Indictment

**Total # of Counts:**     [ ] Petty _____     [ ] Misdemeanor __18__     [x] Felony _____

**Continue on Page 2 for Entry of U.S.C. Citations**

[x]     I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
        accurately set forth above.

**Date:** January 26, 2005          **Signature of AUSA:** _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**    **AIMEE J. KING McELROY** _____

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C. §371 | Conspiracy to Defraud United States | 1 |
| Set 2 | 18 U.S.C. §1341 | Mail Fraud | 2-4 |
| Set 3 | 26 U.S.C. §7206(2) | Procuring False Tax Returns | 5-18 |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

js-45 King.wpd - 3/13/02

JS 45 (5/97) - (Revised USAO MA 3/25/02)

**05 - 1 0 0 1 9 RGS**

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** | **Category No.** II | **Investigating Agency** IRS, FBI |

**City** South Easton                    **Related Case Information:**

**County** Bristol

| | |
|---|---|
| Superseding Ind./ Inf. _____ | Case No. _____ |
| Same Defendant _____ | New Defendant _____ |
| Magistrate Judge Case Number _____ | |
| Search Warrant Case Number | 2001 M 0455 RBC |
| R 20/R 40 from District of _____ | |

**Defendant Information:**

Defendant Name  XIEU VAN SON                    Juvenile  ☐ Yes    ☒ No

Alias Name _____

Address  64 Carol Street, Apt. #2, Lowell, MA 01851

Birth date: **/*/1957    SS#: ***/**/2703    Sex: M    Race:  Asian    Nationality:  Cambodian

**Defense Counsel if known:**  Charles Rankin, Esq.    Address:  1 Commercial Wharf North
                                                                              Boston, MA 02110

Bar Number: _____

**U.S. Attorney Information:**

AUSA  Paul G. Levenson, Seth P. Berman    **Bar Number if applicable**  553946

**Interpreter:**  ☒ Yes    ☐ No    **List language and/or dialect:**    Cambodian (Khmer)

**Matter to be SEALED:**  ☐ Yes    ☒ No

    ☐ **Warrant Requested**    ☒ **Regular Process**    ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____ **in** _____ .
☐ **Already in State Custody** _____    ☐ **Serving Sentence**    ☐ **Awaiting Trial**
☐ **On Pretrial Release:**    **Ordered by** _____ **on** _____

**Charging Document:**  ☐ Complaint    ☐ Information    ☒ Indictment

**Total # of Counts:**  ☐ Petty _____    ☐ Misdemeanor _____    ☒ Felony  2

**Continue on Page 2 for Entry of U.S.C. Citations**

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:**  January 26, 2005    **Signature of AUSA:**

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant** ___**DICH TRIEU**_____

### U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| **Set 1** | 18 U.S.C. §371 | Conspiracy to Defraud United States | 1 |
| Set 2 | 26 U.S.C. §7203 | Willful Failure To Supply Tax Information | 19 |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____