UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 05-10019-RGS |
| | ) | |
| DANIEL W. McELROY, | ) | |
| AIMEE J. KING McELROY, and | ) | |
| XIEU VAN SON | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
DEFENDANTS DANIEL W. McELROY AND AIMEE J. KING McELROY
FOR AN ORDER AUTHORIZING THE ISSUANCE OF SUBPOENAS DUCES TECUM
PURSUANT TO FED. R. CRIM. P. 17(c) TO DICH TRIEU AND CHARLES WALLACE
FOR PRETRIAL PRODUCTION OF COPIES OF DELINQUENT PERSONAL
FEDERAL TAX RETURNS**

Pursuant to Rule 17(c) of the Federal Rules of Criminal Procedure, defendants Daniel W.

McElroy ("Mr. McElroy") and Aimee J. King McElroy ("Ms. King") request that this Court

enter an Order authorizing the issuance of subpoenas *duces tecum* to Dich Trieu and Charles

Wallace for the production of all delinquent personal federal tax returns that were filed by Mr.

Trieu after August 7, 2001 and Mr. Wallace after October 1, 2001, the dates they signed proffer

letter agreements and became government cooperating witnesses. Mr. McElroy and Ms. King

submit that the production of this highly probative evidence involving key government witnesses

is essential in the preparation of their defense, as it would cast doubt on the credibility of the

witnesses' testimony and their motive for cooperating with the government. Evidence that

Charles Wallace and Dich Trieu filed delinquent personal federal tax returns only after becoming

government witnesses in 2001 has a direct bearing on their credibility and creates an obvious

implication that they filed their tax returns in exchange for some type of inducement or so that

their failure to file tax returns would not be grounds for impeachment if they subsequently testified for the government. In addition, the returns may show sources of income inconsistent with their statements to the government. Accordingly, pursuant to the Federal Rules of Criminal Procedure and controlling case law set forth below, this Court should grant the motion of Mr. McElroy and Ms. King for an Order authorizing issuance of subpoenas *duces tecum* to Dich Trieu and Charles Wallace for the pretrial production of delinquent personal federal tax returns filed by Mr. Trieu after August 7, 2001 and by Mr. Wallace after October 1, 2001.

## PROCEDURAL HISTORY

On January 26, 2005, the Grand Jury of the United States District Court, District of Massachusetts, returned indictments against Mr. McElroy and Ms. King charging them with one count of conspiracy (18 U.S.C. §371), three counts of mail fraud (18 U.S.C. §1341), and fourteen counts of procuring false tax returns (26 U.S.C. §7206).

The government served its automatic discovery letter on March 15, 2005. On July 12, 2005, counsel for Mr. McElroy, Ms. King and Xieu Van Son submitted a discovery letter to the government pursuant to Local Rule 116.3 and the Scheduling Order entered by Magistrate Judge Collings on April 6, 2005, requesting specific information and materials critical to the preparation of the defense of this case. Paragraph 36 of the defendants' discovery letter specifically requested that the government "[p]rovide copies of all delinquent personal federal tax returns that were filed by Charles Wallace and/or Dich Trieu after they became government cooperating witnesses." Defendants' Discovery Letter at ¶36. Discovery provided by the government revealed that Mr. Trieu and Mr. Wallace signed proffer letter agreements with the government in connection with this case on August 7, 2001 and October 1, 2001, respectively.

The government's affidavit in support of its application for a search warrant dated June 25, 2001, stated that Dich Trieu "has not filed Individual Tax returns, Form 1040, for the years 1998, 1999 & 2000." See Government's Affidavit at ¶24. In addition, the affidavit stated that Charles Wallace was convicted of income tax evasion in 1988 and that "IRS records reveal that he has not filed a tax return since 1991." Id. at page 18, ¶v., and page 19, ¶w.

The government orally responded to the defendants' discovery letter and stated that it was not in possession of the requested tax returns and could not obtain them from the IRS, but would have produced delinquent tax returns filed by Mr. Wallace and Mr. Trieu to the defense if they had them. Counsel for the government also stated that he would neither oppose nor assent to the defendants' motion for an Order authorizing issuance of pretrial subpoenas pursuant to Fed. R. Crim. P. 17(c). Mr. McElroy and Ms. King submit that they have exhausted all reasonable means in attempting to procure the requested tax returns and have no alternative but to seek an Order from the Court.

## ARGUMENT

**I. THE REQUEST FOR AN ORDER AUTHORIZING THE ISSUANCE OF SUBPOENAS DUCES TECUM TO DICH TRIEU AND CHARLES WALLACE FOR COPIES OF DELINQUENT PERSONAL FEDERAL TAX RETURNS SHOULD BE GRANTED BECAUSE THE REQUEST SATISFIES THE REQUIREMENTS FOR PRODUCTION PURSUANT TO FED. R. CRIM. P. 17(c)**

Federal Rule of Criminal Procedure 17(c) governs the issuance of a subpoena *duces tecum* in federal criminal proceedings. Rule 17(c) provides that the court may authorize a subpoena for the production of documents prior to trial. A party seeking pretrial production of documents pursuant to Rule 17(c) must satisfy four requirements in order to obtain a subpoena *duces tecum*. First, the documents or objects sought must be relevant and admissible. United States v. Nixon, 418 U.S. 683, 699 (1974). Second, the documents must not otherwise be

procurable reasonably in advance of trial by the exercise of due diligence. Id. Third, the party must not be able to properly prepare for trial without the production and inspection of the documents in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial. Id. Fourth, the application must be made in good faith and must not be intended as a general "fishing expedition." Id. As the Court observed in Nixon, these criteria result in three required showings: "(1) relevancy; (2) admissibility; and (3) specificity." Id. at 700.

The request of Mr. McElroy and Ms. King for production of copies of delinquent personal federal tax returns of Charles Wallace and Dich Trieu meets these criteria. Discovery provided by the government indicates that Dich Trieu did not file his individual tax returns for the years 1998, 1999, and 2000, and that following his conviction for tax evasion in 1988, Charles Wallace did not file his tax returns for the years 1991 through 2000. Evidence that Charles Wallace and Dich Trieu filed their delinquent tax returns *after* they became cooperating government witnesses in 2001 is clearly relevant and essential for the defense in exposing the witnesses' lack of credibility, motive to testify against Mr. McElroy and Ms. King, and their bias in favor of the government. This evidence supports the argument that Mr. Wallace and Mr. Trieu filed their delinquent tax returns as a direct consequence of their cooperation with the government. This evidence would also suggest that Mr. Wallace and Mr. Trieu were induced into cooperating with the government in exchange for some promise of leniency for failing to file their individual tax returns. In fact, when Charles Wallace was confronted by government agents on June 26, 2001, the date that the search warrant in this case was executed, FBI Special Agent Nancy McCormick told Mr. Wallace that they were "offering him an opportunity to cooperate in the investigation", that she was aware of his previous conviction for tax evasion, and that "he

would not be in a good position if he had tax issues all over again." <u>See</u> IRS Memorandum of Interview of Charles Wallace dated June 26, 2001, attached hereto as Exhibit 1.

The defendants' request for copies of delinquent tax returns is clearly not a "fishing expedition" and is sufficiently specific as to the documents sought - delinquent personal federal tax returns filed by Charles Wallace and Dich Trieu after they became government cooperating witnesses in 2001. Mr. McElroy and Ms. King are not requesting entire files of documents for impermissible and vague discovery purposes. Rather, they seek copies of specific delinquent tax returns of two key government witnesses that are relevant and admissible to establish the witnesses' lack of credibility and evidence to contradict the witnesses on issues material to their testimony in this case, for example, their sources of income during the relevant period as reflected in the above-referenced indictment and their relationships with the business entities related to the indictments. This evidence is essential in the preparation of the defense in this matter and cannot be obtained by Mr. McElroy and Ms. King without an Order from the Court. In addition, the government has recognized that the requested tax returns are exculpatory evidence which it would have produced to the defense if it had them.

## CONCLUSION

For the above reasons, the defendants, Daniel W. McElroy and Aimee J. King McElroy, request that this Court grant their motion for an Order authorizing the issuance of subpoenas *duces tecum* pursuant to Fed. R. Crim. P. 17(c) to Dich Trieu and Charles Wallace to produce copies of all delinquent personal federal tax returns that were filed by Mr. Trieu after August 7, 2001, and Mr. Wallace after October 1, 2001.

Respectfully Submitted,

DANIEL W. McELROY                          AIMEE J. KING McELROY

By his Attorneys,                          By her Attorney,


/s/ Stephen R. Delinsky (mrm)              /s/ Jack Zalkind (mrm)
_____           _____
Stephen R. Delinsky  (BBO #119120)         Jack I. Zalkind (BBO #538840)
Andrew R. McConville (BBO #632804)         One International Place, 18th Floor
ECKERT, SEAMANS, CHERIN & MELLOTT, LLC     Boston, Massachusetts 02110
One International Place, 18th Floor    Telephone: (617) 227-3950
Boston, Massachusetts 02110                Facsimile:  (617) 342-6899
Telephone No.:  (617) 342-6800
Facsimile No.    (617) 342-6899


DATED:  August 29, 2005

# EXHIBIT 1

# Internal Revenue Service
# Criminal Investigation Division

## Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | CHARLES WALLACE | **Location:** | Residence |
| **Investigation #:** | 040130207 | | 253 Harvard ST |
| **Date:** | June 26, 2001 | | East Bridgewater, MA |
| **Time:** | 8:30 a.m. to 8:40 a.m. | | |
| **Participant(s):** | Charles Wallace, Accountant, Daily A King Labor, Pro Temp CO & Precission Temp. CO. | | |
| | Nancy McCormick, FBI, Special Agent | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, IRS, Special Agent | | |

On the above time and date, Special Agent McCormick, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 253 Harvard ST, East Bridgewater, MA to interview CHARLES WALLACE. WALLACE initially was not at his residence. WALLACE was contacted by phone by his wife and spoke to investigator Dipaolo before returning home. Upon his return, Agent McCormick, Agent Demeo and Investigator DiPaolo introduced themselves to WALLACE and displayed their credentials. Agent McCormick explained that they are assisting in a grand jury investigation. Agent McCormick asked WALLACE if he knew why we were there. WALLACE gave the following information:

1. He did not know why we were visiting him but someone told him that temporary employment agencies are being investigated for hiring illegal employees. WALLACE could only recall two temporary employment agencies being investigated, Millennium 2000 Temps and Baystate Temps, of the six companies that were provided to him on a sheet of paper from an unknown source.

2. Agent McCormick told WALLACE that we were there to discuss PRO TEMP, DAILY A KING LABOR, PRECISSION TEMP and PTC. WALLACE stated that PRO TEMP is no longer in business and that PRECISSION TEMP replaced PRO TEMP. PTC is PRECISSION TEMP.

3. Agent McCormick told WALLACE that we were offering him an opportunity to cooperate in the investigation of the aforementioned companies. Agent McCormick discussed that we were aware that workers compensation insurance premiums had been understated by DAILY A KING LABOR as evidenced by the false quarterly employment tax returns form 941 and 1120S which had been provided to various insurance auditors. Agent McCormick stated that the tax returns provided to the IRS did not match the quarterly employment tax returns form 941 and 1120S provided to insurance auditors. In addition, agent McCormick explained that with respect to PROTEMP, we were aware that the quarterly employment tax returns filed with the IRS were not accurate. WALLACE did not respond.

4. Agent McCormick stated that we were aware of his previous conviction. WALLACE stated that it was "no hidden issue." McCormick told WALLACE that he would not be in a

good position if he had tax issues all over again.   WALLACE replied "Of Course Not."

5. WALLACE was asked whether he would agree to contact DAILY A KING employees and record the conversation. WALLACE stated that he would like to talk to an attorney before deciding anything. Agent McCormick replied "O.K. that's Fine" and stopped asking questions.

6. WALLACE then asked what opportunity was being presented. Agent McCormick explained to WALLACE that the FBI & IFB were investigating insurance issues and the IRS was investigating employment tax issues. Referring to his request for an attorney, Agent McCormick stated "I don't want to cross any lines". WALLACE replied that the insurance was based on a Retro Plan and past claims. WALLACE continued to explain that there shouldn't be an employment tax issue because they paid subcontractors and deducted them on the return. Agent McCormick commented on the cash payroll to which WALLACE made no response.

7. Agent McCormick told WALLACE, she could show him some of the records, including a draft indictment naming WALLACE and others. In response WALLACE stated "I don't need to know who the others are." WALLACE was not shown any documents.

8. WALLACE stated his attorney was located in Boston but, it was too early to reach him. WALLACE did not give a name because he was unsure as to which of two possible attorneys he was going to use.

9. Agent McCormick stated that this was WALLACE'S chance to "spread the blame", that we were looking for his assistance in determining who else was involved. She stated that we were not going away even if the company paid off Reliance as it did Liberty. The investigation was continuing with or without his assistance.

10. Agent McCormick issued WALLACE subpoenas to which Wallace responded, "All I have are the (1120's) tax returns". Then Agent McCormick, Agent Demeo and Investigator DiPaolo thanked WALLACE for his time and asked him to contact his attorney and then contact us, preferable within the next few hours. The interview concluded at approximately 8:40a.m.

11. At approximately 9:20a.m., WALLACE paged Agent McCormick. Agent McCormick called WALLACE who stated that he spoke to his attorney and that his attorney referred him to another attorney whom would not be in until the early afternoon.

12. At approximately 9:30a.m., Agent McCormick called WALLACE back and informed him that a search warrant was being executed on DAILY A KING LABOR. She told him that if he was contacted by anyone about the search, he was free to "do what you want."

No further contact was made for the remainder of the day.

Thomas Demeo
Special Agent

I prepared this memorandum on July 03, 2001, after refreshing my memory from notes made during and immediately after the interview with Charles Wallace.

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Charles Wallace on June 26, 2001.

Nancy McCormick
FBI Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Charles Wallace on June 26, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator