# EXHIBIT 1

# Internal Revenue Service
## Criminal Investigation Division



# Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | CHARLES WALLACE | **Location:** | Residence |
| **Investigation #:** | 040130207 | | 253 Harvard ST |
| **Date:** | June 26, 2001 | | East Bridgewater, MA |
| **Time:** | 8:30 a.m. to 8:40 a.m. | | |
| **Participant(s):** | Charles Wallace, Accountant, Daily A King Labor, Pro Temp CO & Precission Temp. CO. | | |

**Participant(s):** Charles Wallace, Accountant, Daily A King Labor, Pro Temp CO & Precission Temp. CO.
Nancy McCormick, FBI, Special Agent
Anthony DiPaolo, Insurance Fraud Bureau Investigator
Thomas Demeo, IRS, Special Agent

On the above time and date, Special Agent McCormick, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 253 Harvard ST, East Bridgewater, MA to interview CHARLES WALLACE. WALLACE initially was not at his residence. WALLACE was contacted by phone by his wife and spoke to investigator Dipaolo before returning home. Upon his return, Agent McCormick, Agent Demeo and Investigator DiPaolo introduced themselves to WALLACE and displayed their credentials. Agent McCormick explained that they are assisting in a grand jury investigation. Agent McCormick asked WALLACE if he knew why we were there. WALLACE gave the following information:

1. He did not know why we were visiting him but someone told him that temporary employment agencies are being investigated for hiring illegal employees. WALLACE could only recall two temporary employment agencies being investigated, Millennium 2000 Temps and Baystate Temps, of the six companies that were provided to him on a sheet of paper from an unknown source.

2. Agent McCormick told WALLACE that we were there to discuss PRO TEMP, DAILY A KING LABOR, PRECISSION TEMP and PTC. WALLACE stated that PRO TEMP is no longer in business and that PRECISSION TEMP replaced PRO TEMP. PTC is PRECISSION TEMP.

3. Agent McCormick told WALLACE that we were offering him an opportunity to cooperate in the investigation of the aforementioned companies. Agent McCormick discussed that we were aware that workers compensation insurance premiums had been understated by DAILY A KING LABOR as evidenced by the false quarterly employment tax returns form 941 and 1120S which had been provided to various insurance auditors. Agent McCormick stated that the tax returns provided to the IRS did not match the quarterly employment tax returns form 941 and 1120S provided to insurance auditors. In addition, agent McCormick explained that with respect to PROTEMP, we were aware that the quarterly employment tax returns filed with the IRS were not accurate. WALLACE did not respond.

4. Agent McCormick stated that we were aware of his previous conviction. WALLACE stated that it was "no hidden issue." McCormick told WALLACE that he would not be in a

good position if he had tax issues all over again.   WALLACE replied "Of Course Not."

5. WALLACE was asked whether he would agree to contact DAILY A KING employees and record the conversation. WALLACE stated that he would like to talk to an attorney before deciding anything. Agent McCormick replied "O.K. that's Fine" and stopped asking questions.

6. WALLACE then asked what opportunity was being presented. Agent McCormick explained to WALLACE that the FBI & IFB were investigating insurance issues and the IRS was investigating employment tax issues. Referring to his request for an attorney, Agent McCormick stated "I don't want to cross any lines". WALLACE replied that the insurance was based on a Retro Plan and past claims. WALLACE continued to explain that there shouldn't be an employment tax issue because they paid subcontractors and deducted them on the return. Agent McCormick commented on the cash payroll to which WALLACE made no response.

7. Agent McCormick told WALLACE, she could show him some of the records, including a draft indictment naming WALLACE and others. In response WALLACE stated "I don't need to know who the others are." WALLACE was not shown any documents.

8. WALLACE stated his attorney was located in Boston but, it was too early to reach him. WALLACE did not give a name because he was unsure as to which of two possible attorneys he was going to use.

9. Agent McCormick stated that this was WALLACE'S chance to "spread the blame", that we were looking for his assistance in determining who else was involved. She stated that we were not going away even if the company paid off Reliance as it did Liberty. The investigation was continuing with or without his assistance.

10. Agent McCormick issued WALLACE subpoenas to which Wallace responded, "All I have are the (1120's) tax returns". Then Agent McCormick, Agent Demeo and Investigator DiPaolo thanked WALLACE for his time and asked him to contact his attorney and then contact us, preferable within the next few hours. The interview concluded at approximately 8:40a.m.

11. At approximately 9:20a.m., WALLACE paged Agent McCormick. Agent McCormick called WALLACE who stated that he spoke to his attorney and that his attorney referred him to another attorney whom would not be in until the early afternoon.

12. At approximately 9:30a.m., Agent McCormick called WALLACE back and informed him that a search warrant was being executed on DAILY A KING LABOR. She told him that if he was contacted by anyone about the search, he was free to "do what you want."


No further contact was made for the remainder of the day.

*[signature]*

Thomas Demeo
Special Agent

I prepared this memorandum on July 03, 2001, after refreshing my memory from notes made during and immediately after the interview with Charles Wallace.

*[signature]*

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Charles Wallace on June 26, 2001.

Nancy McCormick
FBI Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Charles Wallace on June 26, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 2

# Internal Revenue Service
# Criminal Investigation Division

# Memorandum of Interview



| | | | |
|---|---|---|---|
| **In Re:** | DAILY A KING LABOR INC | **Location:** | Residence |
| **Investigation #:** | 040130259 | | 22 Iron Drive |
| **Date:** | July 18, 2001 | | West Warwick, RI 02893 |
| **Time:** | 8:00 a.m. to 8:50 a.m. | | |
| **Participant(s):** | HUI LY, Interviewee | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, IRS, Special Agent | | |

On the above time and date, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 22 Iron Drive, West Warwick, RI 02893 to interview HUI LY. LY did not open the door until the local police arrived and confirmed his safety. Agent Demeo and Investigator DiPaolo introduced themselves to LY and displayed their credentials. Agent Demeo explained that they are assisting in a grand jury investigation. LY gave the following information:

1. His name is Hui LY. His social security number is 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. His current residence is 22 Iron Drive, West Warwick RI. He is married to Sophin and has three children; Lyathane, Lysatha and Rhonda.

2. Virak In is his brother in law and is married to Stephanie. They reside on Greenbush Ave in Warwick, RI.

3. LY stated that he started working at DAILY A KING (DAK) in June of 2000. LY stated that he was not working previously because of a disability from a gunshot wound in 1994. LY stated that Aimee King hired him as a driver. LY stated that his supervisors are Aimee King, Dan McElroy and Charlie Wallace.

4. LY stated that is was his job to pick up and drop off employees at certain client sites. In addition, LY stated that he would pick up payroll checks from the DAK office located in Easton on Thursdays or Fridays to disburse among the employees that he was in charge of transporting.

5. LY stated that George Wallace would give him weekly payroll checks to be delivered and a sign out sheet. George Wallace took over for a woman called Meredith. Charlie Wallace would give him envelopes containing cash to be delivered to employees at DAI in Dedham where his wife, Sophin is a supervisor of the temporary employees at DAI. Sophin receives a payroll check.

6. LY would receive a phone call via Nextel requesting a certain number of employees to be transported to a client. LY stated that in turn he would contact two other drivers, Charm and Sophan to assist him. Sophan just moved back to Cambodia. Charm lives in

Providence and is married to a Spanish lady. Charm transports mostly Spanish employees. LY was unsure of Charms last name but said he was Asian.

7. After a dispute, LY did not speak to Charm. LY works out of his house. LY stated that he approached Charlie Wallace requesting additional work for fear of being laid off. Charlie Wallace told LY to come to the office once a week and cash a check for him. LY was and is paid a weekly salary of $550.00 via payroll check from DAK.

8. Once a week LY would go to Charlie Wallace, at DAK and pick up a check to be cashed. The check was usually in the name of Precission. LY would go to Eastern Bank located a block from the DAK office and cash the check. LY stated that the check amounts were always less than $10,000.00 probably to avoid the filing of any forms. LY had personal knowledge of the filing requirements as a result of winning various Baccarat Tournaments at Foxwoods Casino, RI.

9. LY stated that immediately after cashing the check he would give the currency to Charlie. Michelle would accept the currency if Charlie were absent.

10. LY was not allowed to spend much time in the office. Employees were kept from the office in fear of overhearing the amount of income being generated and therefore starting their own temporary employment agency as former employees Mike Powers, John Mahan, Mark Russo and Joe of New Bedford.

11. LY stated there were other drivers but he could not remember their names. Agent Demeo asked LY if he new Sotha Khuth, Alfredo Pratts, Robert Munrayos and Richard Casemiro. LY stated that he did not recognize these people.

12. LY stated that there was an office in Chelsea but he did not know who worked there. LY stated that he has seen a heavyset woman outside DAK on Fridays who he thinks works for the Chelsea office. After being mentioned, LY stated that Marta was the woman's name. LY stated that Marta usually arrived on Thursday or Fridays in a Lincoln Town Car or a Van.

13. LY'S responsibilities decreased to virtually none. LY, in fear of losing a job asked Charlie for additional work and suggested getting clients in Rhode Island. Charlie Wallace told LY that DAK did not have a license to work in Rhode Island. Charlie than asked LY to cash a weekly check.

14. LY stated that a lady named Meredith in billing, Brian Ferrar and Michelle Ferrar are former employees.

15. LY stated that in March of 2000 while living at 392 Webster Ave, Cranston RI, he was the victim of a home invasion. LY stated that $30,000.00, jewelry and legal documents were all stolen from a safe in his home. LY stated that he saved the $30,000.00 over the past 10 years.

16. LY stated that a few months later his was the victim of another home invasion. This time only a few thousand dollars and some jewelry were taken but he and his family were tied up

and the house was burned.  The suspects were caught and LY is currently in the middle of court proceedings.

The interview was concluded.  LY had to go to court.  LY stated that he did not want Charlie Wallace to know that he spoke to Agent Demeo and Investigator DiPaolo.  Agent Demeo stated that he had no intention to inform Charlie Wallace of the interview.


Thomas Demeo
Special Agent


I prepared this memorandum on July 27 & 30, 2001, after refreshing my memory from notes made during and immediately after the interview with Hui Ly.


Thomas Demeo
IRS Special Agent


I certify that this memorandum contains all pertinent facts discussed during the interview with Hui LY on July 18, 2001.


Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 3

# Internal Revenue Service
## Criminal Investigation Division

## Memorandum of Interview



---

**In Re:** DAILY A KING LABOR INC        **Location:** Residence
**Investigation #:** 040130259                                   19 Davis St.
**Date:** July 30, 2001                                         Taunton, MA  02780
**Time:** 1:10 p.m. to 3:30 p.m.
**Participant(s):** Heather Blackwell, Interviewee
Anthony DiPaolo, Insurance Fraud Bureau Investigator
Thomas Demeo, Special Agent

On the above time and date, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 19 Davis St., Taunton, MA  02780 to interview Heather BLACKWELL. Agent Demeo and Investigator DiPaolo introduced themselves to BLACKWELL and displayed their credentials. Agent Demeo explained that they are assisting in a grand jury investigation and would like to ask her some questions. BLACKWELL gave the following information:

1. Her name is Heather BLACKWELL. Her current residence is 19 Davis Street, Taunton MA. Her home telephone number is (508) 880-7351. She is married to Bruce and has two children.

2. BLACKWELL stated that she started working at DAILY A KING (DAK) in September of 1996. She previously worked out of the same office but worked for Mariah's, a chain of gift shop stores owned by Aimee KING. Her friend Jennifer Wilson Bradley referred her to KING in September of 1994. Bradley currently lives in Texas with her husband. Their cell phone number is (512) 250-9411.

3. BLACKWELL started working for Mariah's as a file clerk at $6.50 per hour. Her manager was Jennifer Bradley. BLACKWELL eventually took over for Karen Farrell, in charge of the client accounts and received a raise to $15.00 per hour.

4. Mariah's gift shops were operated by the gift shop managers and they hired their own employees. No temporary employees were provided to Miriahs. BLACKWELL stated that she prepared income and expense spreadsheets for the gift shops. The spreadsheets she prepared did not match the figures that WALLACE computed. When questioned WALLACE said not to worry.

5. Only a few of the thirteen Mariah's gift shops generated a profit. In concern for her job BLACKWELL asked KING how long she planed on continuing her hobby, Mariahs gift shops. Shortly thereafter, at various times throughout 1996 Mariahs gift shops were sold. BLACKWELL took a pay cut and went to work at a local animal hospital.

6. After a few months at the animal hospital, BLACKWELL spoke to KING, the President of DAK. KING hired BLACKWELL to work for DAK in September of 1996. Her duties were to prepare payroll for various client accounts. During 1998 BLACKWELL went on maturity leave. In August of 1998 she returned part-time. After a few weeks BLACKWELL was asked to increase her availability. BLACKWELL chose to be unemployed.

7. One of BLACKWELL'S first duties was to file Immigration form I-9's for new employees. BLACKWELL stated that she was instructed to sign and file these forms. Eventually, BLACKWELL learned that her signature verifies that the employee presented two forms of identification for her inspection. Upon this discovery, BLACKWELL stopped randomly signing the forms I-9. All forms I-9 without signatures were given back to the recruiter for signature. The recruiter would return shortly with a signed form I-9 stating he/she has seen two forms of identification for the employee.

8. BLACKWELL stated the forms I-9 were not accurate. Many forms had the same address or a similar name. She stated that the form represented an employee, a human being but the identification was not correct. BLACKWELL believes this was done because the employees were illegal immigrants.

9. BLACKWELL stated that she was in charge of preparing payroll sheets for a few DAK clients. Over time she started preparing payroll sheets for PROTEMP. Most of the payroll sheets for the DAK clients were prepared and dumped to the main server.

10. BLACKWELL was instructed by KING'S husband, DANIEL MCELROY or WALLACE to prepare a few of DAK payroll sheets and all of the PROTEMPS payroll sheets on excel or off the system. None of the payroll sheets prepared off the system were saved. BLACKWELL would print the weekly payroll in duplicate. The accountant, Charles WALLACE, would get a copy and a copy would be sent to the client for billing.

11. BLACKWELL stated that the employees identified, on the excel payroll sheets were paid in either cash or some form of barter. BLACKWELL stated that the total amount of compensation identified on the payroll sheets was for employees' wages only.

12. On three separate occasions, BLACKWELL stated that a manila envelope was accidentally placed on her desk. BLACKWELL stated that she opened the manila envelope and found various white envelopes inside. BLACKWELL stated that she could see cash through the white envelopes and an amount with an employee's name was printed on the outside of the envelope. The manila envelope was resealed and given to Bob Hunt or Bob Ballestri for delivery to employees.

13. On various occasions Mike Powers, WALLACE'S assistant told BLACKWELL that she was not allowed in his office. BLACKWELL stated that MCELROY, WALLACE and Powers would stuff the envelopes in Powers's office. BLACKWELL stated that she was not allowed to stuff envelopes.

14. BLACKWELL stated that various people would arrive on Friday, met with MCELROY, WALLACE or Powers and shortly leave with a satchel of cash. BLACKWELL stated that

Hui Ly, Sotha Khuth, Marta Rodriguez, Marco Rodriguez, Dich Trieu and Xieu Van Son are some of their names. BLACKWELL knows that the satchels contain cash because on occasion Ly will ask for an empty envelope box to hold the cash.

15. BLACKWELL stated that Marco's is married to Marina and Marta is his daughter. They run the Chelsea office. BLACKWELL stated that sometimes Marco uses the name Ronnie and Marina uses the name Candida.

16. Ly and a partner ran the Rhode Island office. Ly's partner shot Ly over a gambling situation and is now in jail. Khuth covers employees from the Fall River area. Trieu and Van Son are partners. Trieu is the owner of PROTEMP.

17. A computer sales man named Rick Goldman was hired to teach BLACKWELL how to use one write plus. Goldman was a wealth businessman that KING and MCELROY chose to be friends with because of his status.

18. KING was the only one allowed access to the computer until sometime in 1996. The billing was done on disk and given to WALLACE or Powers. KING was involved in everyday transactions. Michelle Pauliks, KING'S daughter took over for KING but, Pauliks does not do anything with out KING'S approval.

19. DAK depends on Khuth to provide employees from Fall River. BLACKWELL stated that the rumor that Khuth accidentally falling off the roof was really a threat from KING and MCELROY to Khuth regarding a dispute.

20. In 1996 KING and MCELROY had a party at their residence on Cow Hill Rd, Sharon. All business associates were invited. There were three bartenders hired for the evening. BLACKWELL stated that KING only wants to be seen with prosperous people. The party was to show her associates she was prosperous.

21. BLACKWELL stated that KINGS residence has many renovations including a pool. BLACKWELL described KING and MCELROY as very secretive. BLACKWELL stated that KING and MCELROY had a shredder in their locked bedroom.

22. Investigator DiPaolo explained workman's compensation insurance to BLACKWELL. BLACKWELL explained that she did not prepare any workpapers for worker's compensation insurance or any workpapers for an audit of worker's compensation insurance. BLACKWELL was unsure if DAK had an insurance audit. BLACKWELL did know that auditors came by but she was not sure what they were auditing.

23. BLACKWELL stated that the employees were not allowed to answer the phone or say anything about PROTEMP. They would state that PROTEMP was a different company than DAK and they do not have the telephone number for PROTEMP. KING wanted to keep DAK more pure than PROTEMP. Therefore, she paid most of the employees requesting to be on the payroll from the DAK account and paid the cash payroll from PROTEMPS account. In addition, KING had a payroll system for DAK but used disks for the PROTEMP payroll.

24. BLACKWELL knew that many professionals met with WALLACE but she did not know why. BLACKWELL did state that she overheard the words "Getting ready for" the day before WALLACE and/or Powers met with the professionals.

25. BLACKWELL took over some of PROTEMPS accounts that Powers could not get too. To help Powers, BLACKWELL imputed the coding on the insurance claims. BLACKWELL would sort through the pile of claims, remove any duplicates and open the bills from the clinics.

26. BLACKWELL stated that she would generate weekly list of payables for Mariahs. BLACKWELL thought it was strange that KING bragged about having a large cash flow but would instruct her not to pay certain bills each month ultimately generating finance charges.

27. After Powers left, Pauliks assisted WALLACE with PROTEMP. Pauliks turned KING into the Department of Labor for not paying her employees' minimum wage and for not paying extra for overtime in the early 1990's.

28. BLACKWELL stated that WALLACE, MCELROY and KING all knew the extent of the cash payroll. BLACKWELL stated that WALLACE was the financial man but answers to MCELROY and there is a power trip between KING and MCELROY.

29. Since training Pauliks, KING only works a few hours a day. Mainly KING prepares the administrative or office payroll. BLACKWELL stated that KING is always going to a personal appointment i.e. facial, massage, hair dressers or spinning class. MCELROY just started playing golf and does not belong to a country club. BLACKWELL stated that all three of KING'S daughters confided in BLACKWELL regarding MCELROY making a pass to them. KING is in denial about the issue.

30. BLACKWELL stated that employees that receive a payroll check have an employee number assigned when their job application is processed. BLACKWELL was unsure if the employees paid in cash filed a job application.

31. BLACKWELL stated that the weekly time sheets are reviewed by the clients and signed. Once the time sheets are signed the client is not allowed to dispute the number of employees and the number of hours worked for that week.

32. BLACKWELL recalled on occasion, a client would complain about over billing. She was unsure of the number of times and frequency of the complaints.

33. BLACKWELL provided Agent Demeo a list of employee contact telephone numbers, a billing schedule for clients, whose temp employees are paid in cash, a letter to BLACKWELL from KING, and an employee evaluation of BLACKWELL signed by KING.

Agent Demeo told BLACKWELL to call if she recalls any additional information. Agent Demeo and investigator DiPaolo thanked BLACKWELL for her time and cooperation. The interview concluded at approximately 3:30 p.m.

*[signature]*

Thomas Demeo
Special Agent

I prepared this memorandum on August 2, & 6 2001, after refreshing my memory from notes made during and immediately after the interview with Heather Blackwell.

*[signature]*

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Heather Blackwell on July 30, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 4

# Internal Revenue Service
## Criminal Investigation Division



# Memorandum of Interview

| | | | |
|---|---|---|---|
| **In Re:** | DAILY A KING LABOR INC | **Location:** | Residence |
| **Investigation #:** | 040130259 | | 45 Crescent St. |
| **Date:** | July 27, 2001 | | Franklin, MA 02038 |
| **Time:** | 9:08 a.m. to 11:40 a.m. | | |
| **Participant(s):** | Meredith Scanlon, Interviewee | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, Special Agent | | |

On the above time and date, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 45 Crescent ST, Franklin, MA 02038 to interview Meredith Scanlon. Agent Demeo and Investigator DiPaolo introduced themselves to SCANLON and displayed their credentials. Agent Demeo explained that they are assisting in a grand jury investigation and would like to ask her some questions. SCANLON gave the following information:

1. Her name is Meredith SCANLON. Her current residence is 45 Crescent Street, Franklin, MA. Her home telephone number is (508) 520-4110.

2. SCANLON started working at DAILY A KING (DAK) in September of 1996. Aimee KING hired SCANLON to run payroll. SCANLON was friends with KING'S daughter Aimee. SCANLON replaced Kim Brown.

3. SCANLON stated that Michelle Pauliks, KING'S daughter, trained her. KING was her supervisor from 1996 until 1999 or 2000 when Pauliks took over for KING.

4. KING worked everyday from 8:00 a.m. to 5:00 p.m. Then KING started babysitting her grandchild over the past two years. Currently, KING does not have a set schedule.

5. SCANLON stated that Mike Powers helped train her. Powers was computer literate. Powers was the assistant to the controller until Powers left in May of 1998.

6. Charles WALLACE is the controller. Dan MCELROY, KING'S husband walked around the office to monitored what went on. MCELROY was not involved with the employees but constantly talked to WALLACE.

7. SCANLON stated that PRECISSION TEMP was a sister company of DAK which, is not in WALLACE'S name but he controls everything.

8. The workload decreased as DAK was losing accounts and SCANON was eventually laid off.

9. WALLACE sent out a letter to all of DAK'S accounts stating the minimum wage was increasing. Therefore, their rates will be adjusted. One of DAK'S biggest accounts, North Coast Seafood was upset and stopped doing business with DAK in October of 2000. SCANLON stated that approximately 100 temporary employees were provided to North Coast. North Coast found their own workers and sent the employees' employment applications and identification to DAK for processing.

10. Miguel, a DAK employee was a recruiter who provided a set of about 50 workers to Homer Wharf Seafood, New Bedford. SCANLON stated that Miguel would send employment applications and identification to DAK for the workers.

11. SCANLON stated her duties included working on certain accounts. Hours would be faxed in and she would input them into the computer and produce an invoice. The information would be then downloaded to the main computer that is located in Pauliks office.

12. Young Aimee and Pauliks processed the payroll checks. SCANLON would get the payroll checks for her accounts. SCANLON would put the checks into envelopes, verify the amount and make a sign sheet. George Wallace would bring the payroll to each company on various dates and return the sign sheets. SCANLON stated that the sign sheets were stored in a file cabinet in the storage area.

13. SCANLON stated that a backup copy of all accounts were made using Quickbooks software. An accounts receivable overage report was prepared by SCANLON and reported to Pauliks, Young Aimee and MCELROY.

14. SCANLON stated that in May of 1998 Mike Powers and John Mahan left DAK and started Commonwealth Temps. Powers left DAK on bad terms. SCANLON stated that KING and MCELROY are very bitter at Powers and said he is stealing their clients.

15. Two other ex-employees, Bob Ballesterci and Bob Hunt started their own temporary employment agency, BJ Temps in early 1998. BJ Temps operates out of the New Bedford Area.

16. SCANLON entered hours worked by employees for each client onto DAK'S computer system. The hours worked were use to generate invoices. SCANLON stated she would occasionally help Pauliks input data for PRECISSION onto floppy disks and hand the disks to WALLACE. Pauliks assisted WALLACE with the books and records of PRECISSION. Michelle Ferrara took over for Pauliks while she was on maturity leave.

17. SCANLON stated that PRO TEMP, PTC and PRECISSION are the same business. Sometime in the year 2000 PRO TEMP became PRECISSION. SCANLON stated that Dich Trieu was name associated with PRO TEMP and Xieu Van Son was the name associated with PRECISSION. WALLACE operates both entities for KING and MCELROY.

18. SCANLON stated that the office workers answered the phones for DAK but denied any knowledge of PRO TEMP and PRECISSION. All calls for PRO TEMP and PRECISSION were directed to a different phone number. The office workers told callers, especially calls

relating to workers compensation issues, that WALLACE worked for another temp agency. PRECISSION maintained a cell phone number addressed to 448 Turnpike ST Stoughton.

19. SCANLON stated that the day before a worker's compensation insurance audit people would scurry around the office and met in secrecy, doors were always locked. The audit took place with WALLACE and MCELROY behind closed doors.

20. SCANLON stated that MCELROY is "the man behind the curtain. Nothings done with out MCELROY or KING knowing." SCANLON stated that MCELROY may have the title of vice president but he does not take any calls or interact with the office staff regularly. MCELROY keeps his name unknown.

21. PRO TEMP provided employees to clients in Rhode Island but DAK did not. PRO TEMP stopped servicing Rhode Island before it changed to PRECISSON. PRECISSION did not operate in Rhode Island. PRECISSION had more clients than DAK. PRECISSION and DAK used the same employees. Only Christine from Northern Wind and Rich from Gateway Seafoods knew that DAK and PRECISSION were related and that WALLACE worked for both.

22. SCANLON stated that every Friday WALLACE and MCELROY would met Trieu, Van Son, Sotha Khuth and Charm. WALLACE would escort either Trieu or Van Son to the bank to get cash. SCANLON stated that MCELROY would meet WALLACE in the conference room or in WALLACE'S office when WALLACE returned from the bank with the cash. Charm and Khuth did not go to the bank.

23. SCANLON stated that John Warren is a salesman for DAK and has signed as vice president but he has no decision-making authority.

24. SCANLON stated that J.Baker is a client of DAK that has a cash payroll except for Hubert Vesquez. George Wallace delivers the payroll to J.Baker.

25. SCANLON stated that the payroll records for PRECISSION are stored on floppy disks. Each disk contains one client. SCANLON stated that PRECISSION payroll was primarily cash. She was unsure if any payroll checks were prepared.

26. Agent Demeo showed SCANLON a few documents. SCANLON identified WALLACE'S handwriting on the yellow sheets provided. SCANLON stated that WALLACE prepared spreadsheets that contained hidden columns.

27. SCANLON stated that Candida a/k/a Marina and Marco a/k/a Ronnie Rodriguez are married and run the Chelsea DAK office. SCANLON stated that Marco and Candida use different names on their payroll checks and also receive cash. Marta Rodriguez is Marco's daughter. She runs an office in Chelsea for PRO TEMP. Marta drives to DAK in S. Easton on Fridays to pick up payroll.

28. SCANLON stated that Hui Ly has worked for MCELROY and KING for over 10 years. Ly worked for the DAN Agency and DAILY Agency. Ly traveled to New York once a week. SCANLON stated she saw Ly folding a check and put it into his pocket as he was

exiting WALLACE'S office. Ly has been seen in MCELROYS office.

29. Ly operated an office in Rhode Island with a man named Harry. Harry had a gambling problem and used Ly's name for gambling. In an effort to erase his gambling debt Harry shot Ly 5 times.

30. In January of 2000 Ly was the victim of a home invasion. A gang of kids stole $100,000.00. A second invasion was made in March of 2000 and $30,000.00 was stolen.

31. SCANLON stated that Ly's wife works for DAK at Sarah Michael's and thinks her name is Rhonda. Rhonda Ly gets paid by check.

32. SCANLON stated that KING and MCELROY met in Providence RI. KING was MCELROY'S secretary. They got married sometime in 1995. SCANLON stated that KING and MCELROY have a timeshare in Aruba and Florida and they are investors in the Rack Ltd. A pool hall in Boston.

Agent Demeo told SCANLON to call if she recalls any additional information. Agent Demeo and investigator DiPaolo thanked SCANLON for her time and cooperation. The interview concluded at approximately 11:40 a.m.

Thomas Demeo
Special Agent

I prepared this memorandum on September 27, 2001, after refreshing my memory from notes made during and immediately after the interview with Meredith SCANLON.

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Meredith SCANLON on July 27, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 5

FD-302 (Rev. 10-6-95)



- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    4/26/00

        MICHAEL F. POWERS, JR., date of birth June 1, 1964,
Social Security Account Number 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, and residing at 59
Tickle Road, Westport, Massachusetts (MA) 02790, telephone number
(508) 951-0981, was interviewed at the UNITED STATES ATTORNEY'S
OFFICE in the presence of his attorney, GEORGE GARFINKLE.
Participating in the interview were Assistant United States
Attorney (AUSA) PAUL LEVINSON and INSURANCE FRAUD BUREAU OF
MASSACHUSETTS Deputy Chief of Investigations, ANTHONY DIPAOLO.
POWERS was advised of the official identities of the interviewing
parties.  Further, he was provided with an Immunity Letter which
he read and signed.  AUSA LEVINSON went through the Immunity
Letter, paragraph by paragraph, to ensure all points were
understood by POWERS, after which POWERS provided the following
information:

        POWERS has a Business Administration/Management Degree
from STONEHILL COLLEGE.  In 1996, POWERS was an Administrator for
an ambulatory clinic.  The clinic's accountant was CHARLIE
WALLACE.  In May, 1996, WALLACE approached POWERS about going to
work for one of WALLACE's other clients located on the South
Shore, closer to POWERS' home.  POWERS, tired of his commute to
the ambulatory clinic, met with the client's principals, AIMEE
KING and DAN MCELROY.  During this meeting, POWERS learned that
KING and MCELROY were WALLACE's prime clients and operated a
temporary labor service, as well as a gift shop and dry cleaner.
Although the job represented a cut in pay for POWERS, he accepted
the position as it would be a shorter commute and more "family
friendly."  POWERS began working for KING and MCELROY, doing
business as DAILY A. KING LABOR, INC. (DAK), on June 3, 1996.

        By way of background, POWERS advised that MCELROY
originally owned a temporary labor agency known as the DAN
AGENCY.  The DAN AGENCY had customers in Rhode Island and New
Jersey.  The company got "into trouble" and closed up.  MCELROY
met and married KING and opened a successor company known as the
DAILY AGENCY.  The company used a Lowell Post Office Box as its
address.  The DAILY AGENCY also ran into trouble and closed up.
Subsequently, the company reopened under the name of DAILY A.
KING LABOR, INC.  A subsidiary or shell company by the name of
PRO TEMP was opened up in the name of DICK TRIEAU.  Despite the
fact that TRIEAU is listed as the "Principal" of PRO TEMP and

Investigation on   4/10/00   at Boston, Massachusetts

File #  196B-BS-86742                         Date dictated   4/24/00

by   SA NANCY L. MCCORMICK:alc

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___MICHAEL F. POWERS, JR.___ , On 4/10/00 , Page 2

KING as the "Principal" of DAK, MCELROY actually "calls all the shots" for both agencies.

POWERS' initial duties were not too difficult. He was mainly responsible for data input of invoices. The administrative staff was very disorganized, possibly due to the nepotism of the company. At that time, there were three clerical employees doing the billing for DAK. KING had a very hands-on role. WALLACE was also involved in billing and administrative actions for PRO TEMP. POWERS assisted WALLACE in entering time sheet data associated with PRO TEMP. Over time, POWERS became more involved in all aspects of DAK's business. He met with customers and performed a sales function as well. He continued having a hand in the billing process and also in PRO TEMP's business.

POWERS advised DAK had problems with LIBERTY INSURANCE at the time he began his employment. LIBERTY had canceled DAK's insurance and had sent cancellation notices to DAK's customers. DAK sent form letters to customers holding Certificates of Insurance through LIBERTY INSURANCE, advising their customers that DAK would have the appropriate insurance coverage despite the cancellation notices. DAK set up a contingency plan to move its employees from DAK to PRO TEMP.

POWERS recalled speaking with WALLACE in the Fall of 1996, regarding LIBERTY MUTUAL. LIBERTY Auditor RICH DIORIO of LIBERTY's Westwood, MA, office, conducted the 1995 audit for DAK's policy. DIORIO wanted to correlate an injury claim to DAK's payroll list. The injured employee's name did not appear on the payroll. DIORIO attempted to set up a meeting with DAK, wherein he could review their bank records and 941's. POWERS commented that this would have been more comprehensive than most audits. POWERS recalled a conversation with WALLACE, wherein WALLACE told POWERS that they had "played around with trying to secure the auditors cooperation with a bribe." The decision was made not to attempt to bribe the auditor, due to his good reputation. Instead, WALLACE prepared week-by-week worksheets which he gave to DIORIO. DIORIO did not accept these as a substitute to the bank records and 941's.

At the same time, DAK was referred to an insurance agent by the name of HAROLD KNIGHT, who specialized in hard-to-

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___MICHAEL F. POWERS, JR._____ , On 4/10/00 , Page ___3___

insure risks.  KNIGHT found insurance coverage for DAK with
RELIANCE NATIONAL INSURANCE (RELIANCE) and an insurance program,
wherein premium was based on the company's actual losses times a
thirty-seven percent profit multiplier.  POWERS also believed
that DAK started another corporation by the name of D.W.M., INC.,
which could serve as a "safe harbor" because they believed they
were "in a box."

In 1997, litigation and discovery with LIBERTY MUTUAL
was on-going.  DAK retained BURNS and LEVINSON to represent them
in their case with LIBERTY.  MCELROY is good friends with GEORGE
TOBIA (phonetic), who recommended BURNS and LEVINSON because of
an attorney there who is very knowledgeable in insurance matters.
DAK settled it's case with LIBERTY for the estimated premium
amount of $735,000.  POWERS believed DAK was required to pay
LIBERTY $700,000 of the $735,000, in an agreed upon installment
plan.  It was costly litigation for DAK.

POWERS never participated in any LIBERTY audits and was
unsure if DAK ever provided LIBERTY with any 941's.  An auditor
from LIBERTY called DAK looking for information.  WALLACE
provided the auditor with some information, but not all of it.
WALLACE withheld information regarding a $200,000 customer known
as AVID THERMAL TECH.  POWERS called the LIBERTY auditor after he
left DAK to report this information.  PRO TEMP also had insurance
coverage with LIBERTY's New Hampshire office.  New Hampshire
shares information with DET and the Workers' Compensation Board.

POWERS had an "inclination" that there were problems at
DAK, particularly with their financial statements, when DAK was
asking for a $250,000 Letter of Credit (LOC) from the bank.
POWERS observed two sets of financial statements, each with
different numbers.  The numbers used for the bank were high, so
that the company would be approved for their LOC.  The numbers
used for insurance purposes were low, so as to keep premiums low.
In connection with obtaining the LOC, WALLACE asked POWERS to
draft up some stationery for him with WALLACE's name followed by
"CPA" on it.

POWERS was not sure if the financial records presented
to the bank were accurate, but the ones presented to DAK's
insurance carriers were not.  WALLACE altered and prepared
financial records for the insurance auditors based upon the

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___MICHAEL F. POWERS, JR._____ , On 4/10/00 , Page ___4___

amount of money DAK wanted to pay for workers' compensation
insurance premiums. The premium amount was "backed into" by
putting together a spreadsheet containing only partial
information from DAK's true payroll. The premium amounts changed
from year to year.

Ninety-five percent of DAK's business was in the fish
processing industry. The fish industry is a notoriously high
risk industry with low payoffs. A number of DAK's deals with
fish industry customers were completely nonsensical, as there
would have been no way DAK could have legitimately or legally
completed the job based upon the dollar amount of the contract.
DAK was accepting jobs with customers that were only a $1.25 over
minimum wage. That $1.25 was insufficient to cover workers'
compensation expenses, let alone all the other expenses.

POWERS' first insurance audit at DAK occurred after the
company switched to RELIANCE. RELIANCE Auditor GARY SCRANTON set
up an appointment to come to DAK's office and review their
records, including 941's. The night before SCRANTON's visit,
POWERS, WALLACE and MCELROY spent the night at DAK's office
"selectively culling payroll records" in preparation for their
meeting with SCRANTON. Fabricated and/or incomplete 941's were
provided to SCRANTON during his visit. Other "real" spreadsheets
and records were offered to SCRANTON auditor merely to add
legitimacy to what had been provided. True records were never
actually provided to SCRANTON. POWERS advised he did not "lose
sleep" over their actions because the premium was based on DAK's
loss history and claims and not on their payroll.

DAK employs many ethnic minorities. W-3's are
prepared, but are most likely not being forwarded to Social
Security. POWERS recalled receiving blank 941's, some of which
may have been completed and filed. DAK made lots of "off-the-
books" payments and cash payments to their employees. The
majority of DAK's and PRO TEMPS' payroll was in cash. POWERS
estimated that DAK paid between $150,000 and $200,000 per week in
payroll. He estimated yearly clerical payroll at approximately
$100,000.

The various Cambodian, Puerto Rican and other ethnic
minorities who work for DAK are often transported to job sites in
vans. POWERS described the van drivers as "entrepreneurial",

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of   MICHAEL F. POWERS, JR.        .On 4/10/00   , Page    5

getting paid a certain dollar amount per mile for gas and also collecting five dollars per passenger from the riders. POWERS described the Cambodian community as "very tight-lipped."

DAK kept bank withdrawal amounts to a minimum, normally under $10,000, to avoid the generation of suspicious activity reports (SARs) by the bank. This was a cumbersome activity which POWERS was chosen to complete. POWERS cashed numerous checks for the company at the bank. KING did not handle cash because of a signed agreement she had with the DEPARTMENT OF WAGE AND LABOR. KING had been in trouble before for paying employees in cash. As part of this agreement, she agreed not to no longer pay her employees with cash. MCELROY handled cash and cash disbursements and maintained a "little ledger" to document cash transactions.

DAK formerly did their banking with QUINCY SAVINGS BANK. There were employees of QUINCY SAVINGS BANK who would allow DAK to cash checks in excess of $10,000 without filing currency transaction reports (CTRs). QUINCY SAVINGS BANK was subsequently taken over by CITIZENS BANK. DAK was still able to cash checks with CITIZENS BANK. The bank is now operated by FLEET BANK and POWERS is unsure as to whether or not the same arrangement still exists. The branch used by DAK is located in the STONEHILL COLLEGE area.

POWERS advised that funds were gathered throughout the week as DAK's customers paid their bills. On either Thursday evenings or Fridays, MCELROY filled envelopes with cash for disbursement to the employees. MCELROY did not distribute the cash himself, but had "Lieutenants" to do that for him. A Cambodian by the name of HUI LEE from Providence, Rhode Island (RI), was one of these Lieutenants and SOTHA KHUTH from Fall River, MA, was another. POWERS advised that LEE was a recent victim of a home invasion and KHUTH was recently charged with Statutory Rape of a fourteen year old. WALLACE was responsible for distributing cash to MARCO RODRIGUEZ at DAK's Chelsea facility. POWERS believed that the Chelsea facility was raided by the IMMIGRATION AND NATURALIZATION SERVICE (INS) in 1998.

DAK also did work in New Jersey. To get the cash to these employees, LEE drove money to an individual in New York who in turn, brought the to New Jersey. POWERS estimated the overall cash payments by DAK to be in the vicinity of $150,000 to

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of    MICHAEL F. POWERS, JR.                          , On  4/10/00      , Page      6

$160,000 per week on a low week, and $250,000 to $260,000 per week on a high week.

At the end of 1997, POWERS noticed a lot of cash being paid out for other reasons and commented to WALLACE that the business did not appear to be profitable because of all of these cash payments. In early 1998, KING had a line of gift shops at various hotels throughout the country. The bills for these shops were not being paid. POWERS made a decision to leave DAK after "two shake down events." One was the reconciling of the 1997 books, after which it appeared that the blame was being placed on POWERS. KING "bitched out" POWERS and WALLACE for the gift shop bills which were not being paid. The second was a call from the Massachusetts DEPARTMENT OF REVENUE (DOR) regarding withholdings which had not been paid for two months in 1996 and all of 1997, resulting in over $600,000 in unpaid withholdings. No one seemed to care.

In May, 1998, POWERS told MCELROY and KING that he was leaving. They did nothing to stop him from leaving and gave him four paychecks. POWERS contacted someone from Massachusetts DOR after he left DAK. He also called GARY SCRANTON at RELIANCE to advise him that RELIANCE needed to take a longer look at DAK. After POWERS had given his notice and had left DAK to pursue other employment opportunities, he was approached by a sales associate about starting a temporary service agency of their own. POWERS and his partner now operate their own temporary agency but do not get involved in work within the fish industry.

POWERS helped WALLACE with data input for tax purposes in 1998. WALLACE had an old computer which he gave to POWERS in lieu of payment. POWERS advised that he later did an inventory of the hard drive and found information relating to DAK. The records include Excel worksheets and invoices regarding cash payments to customers not on any 941's. POWERS kept one of the hard drives and gave the second, along with the computer, to his mother. POWERS advised that with a subpoena, he would provide the computer hard drive and any other records regarding DAK, in his possession.

KING and MCELROY live in a house owned by the "COW HILL TRUST", which they purchased for $350,000 cash. They conveyed this property to their daughter, HEATHER KUKSTIS. When it came

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___MICHAEL F. POWERS, JR._____ , On _4/10/00_ , Page ___7___

time to purchase the home, MCELROY told WALLACE that he needed
cash and told him to do whatever he needed to do to make that
cash available. Both KING and MCELROY have a license to carry a
handgun. WALLACE also carries a gun, which POWERS has observed.

At one point, the INTERNAL REVENUE SERVICE (IRS) began
making inquiries of PRO TEMP's alleged owner DICK TRIEAU. TRIEAU
owed approximately $500,000 in back payments to the IRS. The
repayment plan required TRIEAU to make $10,000 per week payments
to the IRS. TRIEAU's partner, XIEU VAN SON, set up a second
company known as PTC COMPANY, to replace PRO TEMP in the event it
had to fold quickly. A new bank account was established in the
name of PTC COMPANY. At the same time this was occurring, DAK
tried to "appease" TRIEAU by purchasing his home at 41 Clair
Street, Lowell, MA, for him.

MCELROY also operates a company known as POWER-IT, a
battery recharge product, and a dry cleaning business. POWER-IT
charges $59.00 for a product which costs them only $8.00 to
produce. They do this by using "Do Not Recharge" batteries and
repackaging them.

DAK paid WALLACE $3,000 per month, but WALLACE most
likely received additional cash payments. WALLACE was formerly
employed at ABRAHAM COHEN, CPA. WALLACE has a rather radical
appearance and had the reputation for turning a lot of people
off. WALLACE has a Federal Criminal Record.

POWERS suggested matching up DAK's tax information to
their reports. Although they never claimed cash, cash payments
would be found on the line item entitled "Contract Labor". This
was done so that DAK could take a deduction. The line item known
as "Outside Service Agencies" reflected cash and/or payments to
PRO TEMP. Although this information is present on DAK's filed
tax records, it will not show up on the records presented in
connection with their workers' compensation insurance. Because
the IRS is not interested in insurance issues, DAK and PRO TEMP
were able to get away with the conflicting reports/numbers.

POWERS claimed that the financial statements supplied
to the RELIANCE auditor in December, 1996, were "pure fiction",
created from made-up numbers and strictly for the consumption of
DAK's targeted audience. To lend credibility to the financial

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of    MICHAEL F. POWERS, JR.                    , On 4/10/00    , Page    8

statements, DAK was able to show copies of 941's created to match the financial data.   DOR and DET records are the most accurate.

Records pertaining to the companies are stored in two self-storage facilities, EASY MINI STORAGE, located on Route 140 in Taunton, and SELF STORAGE U.S.A., located on Route 138 in Easton.   There is also storage within the DAK facility.   The office space at 24-D Norfolk Street, Easton, MA, houses DAK, POWER-IT and PRO TEMP.   Boxes of records are maintained on the mezzanine level of that office space.   Personal tax records are maintained in the home of WALLACE.

DAK and PRO TEMP have an arrangement with METRO MEDIC WALK-IN to treat employees who get hurt on the job.   This arrangement allows DAK to circumvent RELIANCE and the submission of injury claims.   POWERS believed that DAK spent approximately $50,000 on bills to METRO MEDIC WALK-IN.

ROBERT BALESTRACI, the Operational Chief of the "fishing world" in New Bedford, and ROBERT HUNT, a former New Bedford State Senator, formed their own temporary service agency called B.J.'S SERVICES.   B.J.'S SERVICES is also "in tight with" METRO MEDIC WALK-IN.

DAK and PRO TEMP "used" each other when they got audited by their insurance carriers.   DAK used PRO TEMP to explain their lack of employees and low payroll; PRO TEMP claimed DAK as their subcontractor.

POWERS advised that it may be difficult to tie MCELROY to the various companies.   POWERS has at least one contract with SARAH MICHAELS, the maker of bath items, which MCELROY signed. MCELROY has also represented himself as the Principal of DAK, to ALAN LEPPO of HONOR ROLL, INC., Liberty Street, Brockton.

POWERS advised that MCELROY grew up in Dorchester and is a "street kid".   MCELROY has donated/invested money into the Boston bar known as "THE RACK".   One of the salesmen for MCELROY's company, POWER-IT, is JOE SAMPSON.   SAMPSON is the nephew of JERRY ANGUILO.   MCELROY often bragged about having an open ticket to Aluthra, a small island in the Bahamas.

# EXHIBIT 6

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  8/30/01

     DICH TRIEU, date of birth: May 31, 1948, Social
Security Account number: 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, residing at 36 Clare
Street, Lowell, Massachusetts 01854, telephone number: (978) 453-
9017, was interviewed at the United States Attorney's Office in
the presence of his attorney, JOHN PALMER, and after reviewing
and signing a proffer letter.  Participating in the interview
were Special Agent (SA) NANCY L. MCCORMICK, Assistant United
States Attorney (AUSA) PAUL LEVENSON, AUSA JENNIFER BOAL,
Internal Revenue Service (IRS) SA TOM DEMEO, Insurance Fraud
Bureau of Massachusetts Investigator ANTHONY DIPAOLO, and United
States Attorney's Office law clerk, REBECCA GREGORY.  After being
advised of the official identities of the interviewing parties,
and after reviewing the proffer letter, signing it, and
acknowledging that he understood the implications of the letter,
TRIEU provided the following information:

     TRIEU is a Cambodian who was born in Vietnam, but
escaped to the United States through the Philippines.  TRIEU
spent approximately four months in the Philippines before coming
to the United States (U.S.) in November of 1981.  He stayed with
friends in the U.S. whom he had known in Cambodia, and found work
through a Cambodian refugee program.  He was laid off from his
position at this program approximately three years later.  He
accepted work and moved to Lowell, Massachusetts in approximately
1990.  Friends in the Lowell area helped him find work at a
number of different places, including the NATIONAL INSTITUTE OF
LOWELL, where he worked for approximately 1 ½ years; CMMA, the
Cambodian Association where he worked for approximately 1 ½
years, and finally the DAILY AGENCY (later named DAILY A. KING
LABOR) where he has worked for the past six to seven years.
TRIEU was introduced to the DAILY AGENCY by XIEU VAN SON.  VAN
SON was also born in Vietnam, and was familiar with TRIEU and his
family.

     The DAILY AGENCY was operated by DAN MCELROY.  MCELROY
worked out of the 24 Norfolk Street location.  TRIEU first met
MCELROY in Lowell while MCELROY was in Lowell visiting with some
of TRIEU's friends, including VAN SON.  VAN SON had advised
MCELROY that he could introduce him to many people in the Lowell
area who were available to work.  TRIEU was one of those
individuals, and MCELROY offered TRIEU more money than he was

---

Investigation on  8/7/01  at  Boston, Massachusetts

File #  196B-BS-86742  Date dictated  8/15/01

by  SA NANCY L. MCCORMICK/krs

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of   DICH TRIEU                          , On 8/7/01    , Page    2

making with the Cambodian Association.  Therefore TRIEU accepted a position, and began working for the DAILY AGENCY.

TRIEU's starting salary at the DAILY AGENCY was $250.00 per week.  He was responsible for contacting people to work for the temporary employment agency.  TRIEU gave applications to the potential workers, and arranged for them to be brought to work in vans.  TRIEU also located the van drivers to perform this task. In addition to locating employees, TRIEU also completed paperwork on behalf of the employees which he submitted to either MCELROY or CHARLIE WALLACE.

Salesmen associated with the DAILY AGENCY were responsible for locating the client companies.  TRIEU maintained a waiting list of workers from which he could draw when he received orders from the salesmen for workers to be sent to various companies.  TRIEU also visited the client companies and interacted with the supervisors.  After arranging for workers to fill each day's/week's staffing requirement, TRIEU either went home or to a DAILY AGENCY office located in Lowell on 287 Appleton Street.  The DAILY AGENCY maintained another office in Lowell on Pawtucket Boulevard at Middlesex Street, and also a main office at 24 Norfolk Street in Easton, Massachusetts.

TRIEU and VAN SON were the only two employees working out of the Lowell offices.  Each had the same duties, that of finding workers and making them available for various jobs.  In addition, TRIEU and VAN SON were responsible for paying employees their weekly salaries.  Initially, VAN SON's friend, HARRY THACH, brought the payroll, in large amounts of cash, up from the Easton office to Lowell.  TRIEU and VAN SON sometimes divided up the payroll for each employee, while on other occasions, the money would already be divided.  The money was placed into envelopes which were labeled with each employee's name.  Employees came to the Lowell office to collect their pay where they were required to sign for the money.

Employee payroll amounts were determined based upon the time slips received from the client companies.  Employees were generally paid $6.50 to $7.00 per hour.  Weekly salaries were determined by multiplying the hourly rate times the number of hours worked.  The payroll sheets, along with the employees signatures acknowledging receipt of payment were returned to

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                                    , On  8/7/01      , Page    3

WALLACE in the Easton office.

After THACH left, TRIEU and VAN SON were responsible for not just distributing the payroll, but also for obtaining it from Easton.  MCELROY asked TRIEU and VAN SON to come to Easton in order to collect the payroll money.  Most employees were paid in cash, so the bulk of payroll collected was in cash.  A few employees received checks.  Only employees who specifically requested check payments received a check.  TRIEU was not sure why certain employees needed to be paid by check.  If an employee requested to be paid by check, TRIEU would first talk with MCELROY, whom he described as his boss, to get MCELROY's okay.

Prior to obtaining the money for the payroll, TRIEU or VAN SON reported the amount of money needed to either WALLACE or MCELROY.  The amount of money needed was normally requested via telephone.  TRIEU advised that he was not able to determine how much each employee should be paid on his own.  Rather, he had to listen to MCELROY who told him how much each employee should be paid.

The offices in Lowell were rented by MCELROY/DAILY A. KING.  The name of the company appeared on the office.  Prior to renting the offices, MCELROY came up to Lowell to look at and approve the locations which had been located by VAN SON.  Only after MCELROY gave his approval, were the locations secured.  Neither TRIEU nor VAN SON paid rent for the offices.  TRIEU was uncertain as to how the rent was paid.  Other expenses, such as furniture, telephone, fax machine and copier, were all paid by MCELROY.

TRIEU's starting salary for his first five to six months of employment was approximately $250.00 per week.  His salary progressively increased to a high of $750.00 per week when he was involved with an affiliate company known as the PRO TEMP COMPANY (PRO TEMP).  TRIEU was paid in cash, although he initially believed he was going to be paid in check.  TRIEU believed MCELROY increased his pay because he was a good worker who found a lot of employees for PRO TEMP and also because TRIEU agreed to put the company in his name.

TRIEU advised that while PRO TEMP was listed in his

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU _____ , On 8/7/01 , Page  4

name, the company was actually MCELROY's.  MCELROY merely "used my
name for his business."  TRIEU claimed he reminded MCELROY to be
sure and pay the taxes, and MCELROY assured him that he would and
told him not to worry.  TRIEU advised that he respected MCELROY,
and all Americans for that matter, and believed that MCELROY
would take care of paying the taxes for PRO TEMP.

        TRIEU was asked how it came to be that PRO TEMP was put
in his name.  TRIEU responded that MCELROY called him one day and
asked him to come to MCELROY's home in Sharon, Massachusetts.
Once there, MCELROY asked TRIEU if he wanted to earn a little
more money.  MCELROY told TRIEU that they would work together,
and asked TRIEU for his driver's license and Social Security
Account number.  TRIEU visited MCELROY at his home a second time.
MCELROY asked TRIEU to sign some forms and paperwork, and told
TRIEU that he would pay him $300.00 more per week than he had
previously been earning.  TRIEU was still concerned about taxes,
and raised the issue again.  MCELROY again reiterated that he
would pay the taxes, and TRIEU should not worry.

        TRIEU was asked by MCELROY to obtain cash on his
behalf.  MCELROY would claim that there was not enough money at
time to meet the payroll.  Both MCELROY and WALLACE gave TRIEU
large checks, normally in amounts of $5,000.00 to $7,000.00, to
cash at the company's bank.  TRIEU never went to the bank alone;
he was always accompanied by either MCELROY or WALLACE.
Occasionally, TRIEU would take two checks to the bank and cash
them.  TRIEU cashed a number of PRO TEMP checks.  He believed he
also cashed one check for PRECISSION TEMP, another affiliate
company of DAK.  TRIEU did not continue to cash checks for
PRECISSION TEMP after he told WALLACE that he no longer wanted to
this.

        The PRO TEMP checks were signed in TRIEU's name.  TRIEU
occasionally signed some of the checks directly, but more often a
signature stamp was used.  TRIEU believed WALLACE had the stamp
made up with his signature.  The teller at the bank knew both
TRIEU and WALLACE.  Some of the checks which he cashed were for
amounts of $60,000.00 or $70,000.00.

        TRIEU owns his own home, which is located in Lowell,
Massachusetts.  He saved for a long time and had approximately
$20,000.00 saved at the time of the purchase.  The price of the

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                                    , On 8/7/01        , Page    5

home at the time of the purchase was $43,000.00.  TRIEU spoke
with both MCELROY and WALLACE, and showed them a photograph of
the house he was planning to purchase.  MCELROY and WALLACE told
TRIEU that they would "take care of it," and would allow TRIEU to
borrow $20,000.00 to put towards purchasing the home.  TRIEU was
concerned about paying back the money, and a repayment plan was
arranged.  TRIEU was required to pay $500.00 per month on the
loan.  The payment was taken directly out of his weekly salary.
TRIEU has paid back all the money and owes nothing on the house.

        TRIEU described DAN MCELROY as the "big boss" of both
PRO TEMP and PRECISSION TEMP.  He described AMY KING MCELROY as
the owner of DAILY A. KING LABOR, although he never took orders
directly from her.  TRIEU advised that he has worked for both PRO
TEMP and PRECISSION TEMP.  TRIEU described VAN SON as being the
owner of PRECISSION TEMP in the same way that he was the owner of
PRO TEMP.  VAN SON is simply the listed owner, and not the
actually owner.

        TRIEU stated he does not, nor did he ever, make any
decisions on behalf of the company other than things like buying
paper or other office supplies.  MCELROY makes the decisions, and
takes care of what is needed.  TRIEU is reimbursed for any
expenses he incurs in connection with the business.  TRIEU
purchased his own car, but MCELROY pays for his gas, which
normally runs approximately $50.00 per week.  Workers'
compensation insurance for the company was handled by WALLACE.
TRIEU does not understand insurance issues, and brings all mail
related to insurance to WALLACE.

        TRIEU has no capacity to set prices with the client
companies.  TRIEU never sees checks from the client companies.
TRIEU believed that price setting was controlled by the
salespeople who contacted potential clients on behalf of the
company's Easton office location.  Once client companies are
secured and specific employee requests are established, the
information is faxed to TRIEU in the Lowell office, telling him
who to call at the client company, and what the client company is
expecting.  TRIEU recalled the first names of two salesmen, that
of a MICHAEL and a JOHN.  Salesmen are assigned to various areas.
Salesmen change often.  TRIEU has minimal contact with the
salesmen.  Most of TRIEU's contacts are with either WALLACE or
MCELROY.  They call each other on cellular phones or at the

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU _____ .On 8/7/01 ____ . Page   6 __

    office, or speak in person when he goes to the Easton office.

        TRIEU hand carriers/returns the previous week's signatures for payroll to WALLACE, and occasionally to MCELROY, to the Easton office, usually on Fridays. He obtains the payroll for the next week at the same time. TRIEU's trips to the bank to cash checks are on different days. TRIEU often goes to Easton one to three days per week. In addition to Fridays, TRIEU is in Lowell often on Tuesdays or Wednesdays.

        TRIEU believed that PROTEMP was replaced by PRECISSION TEMP, and that his name was no longer associated with PRECISSION TEMP. TRIEU does not go to Easton as frequently since PROTEMP shutdown.

        TRIEU was asked if he was aware of the search conducted by the Federal Bureau of Investigation (FBI), to which he responded no. He claimed he was aware that people were being subpoenaed, but that MCELROY did not say anything to him about the investigation. VAN SON told him that federal investigators had been around the Easton building. After receiving his subpoena, TRIEU spoke with WALLACE about it. WALLACE advised TRIEU to obtain a lawyer. Subsequently, a lawyer for DAILY A. KING called TRIEU to help him find an attorney. TRIEU advised the company is not helping him pay for his attorney. Further, no one from the company was aware that TRIEU was meeting with federal authorities today, and he has not discussed this meeting with anyone.

        TRIEU advised that PROTEMP "disappeared" approximately two years ago. He was not sure why. The company had been in business for approximately three to four years.

        TRIEU estimated the payroll for the Lowell area alone to be approximately $8,000.00 to $9,000.00 per week. TRIEU has had no problems with individuals attempting to rob him or break into his home or office. He advised that he is very careful, and locks his doors. He does not pay anyone for protection. TRIEU advised that at the current time, he earns approximately $450.00 per week. TRIEU is also paid a bonus at the Christmas/New Year's time of approximately $1,000.00 to $2,000.00.

        TRIEU files personal taxes which are prepared by

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU _____  , On 8/7/01 _____ , Page  7 ____

WALLACE. TRIEU does not earn income from any other employment, other than his employment with MCELROY. TRIEU has been separated from his wife for approximately 20 years.

TRIEU advised that there were occasions when he was taken to more than one bank with smaller checks to be cashed. He was driven to each of the banks by either WALLACE or MCELROY. He was accompanied into the bank by one of these individuals as well.

At this time, there was a break in the interview, and both TRIEU and his attorney stepped out of the interview room.

TRIEU advised that after being served with his Federal Grand Jury subpoena in the parking lot of DAILY A. KING LABOR, he brought the subpoena inside and showed it to WALLACE. TRIEU told WALLACE that he was sad and worried. TRIEU knew that there was a problem, and thought it might be connected to his taxes having not been paid. He told WALLACE that WALLACE needed to help him. TRIEU did not have any records, and does not understand English all that well. TRIEU explained that WALLACE works directly for MCELROY, and that they were responsible for this situation, and therefore needed to help him. TRIEU went to a lawyer himself before receiving a call from DAILY A. KING's lawyer.

TRIEU advised that he depended on WALLACE for a lot. MCELROY treated him like family, even stating words to the effect, "Your family is my family."

TRIEU was shown a copy of an insurance questionnaire pertaining to PRECISSION TEMP. TRIEU advised that his signature was on the bottom of the questionnaire dated 6/15/2000. TRIEU advised that he never went to the insurance company, but may have signed this document at DAILY A. KING's offices. He may have signed the document because WALLACE asked him to do so. Both MCELROY and WALLACE asked TRIEU to sign documents on several occasions, and for several different reasons. TRIEU was shown the second page of the questionnaire, indicating that he was a 50% owner of PRECISSION TEMP. TRIEU advised that he was never aware that he was a 50% owner of PRECISSION TEMP. TRIEU believed he was only ever listed as an owner of PROTEMP. TRIEU acknowledge working for PRECISSION TEMP at the current time, but did not acknowledge having any ownership interest.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU _____ , On 8/7/01 _____ , Page    8

     TRIEU's job responsibilities for PRECISSION TEMP include finding workers for the company. As with PROTEMP, all paperwork is returned to WALLACE. No records are maintained at either TRIEU's home or the Lowell office. The paperwork TRIEU completes is either handwritten or typed, but not done on the computer.

     TRIEU advised that an application, a form W-4, and an Immigration form I-9, are completed for all employees. TRIEU fills these forms out himself, and sends them to WALLACE. TRIEU does not give them an employee number. The job applications are not for any specific company, and therefore an employee could work for PRO TEMP, DAILY A. KING, or PRECISSION TEMP. TRIEU does not know which company the employee will be working for until he speaks with WALLACE.

     DAILY A. KING LABOR, THE DAILY AGENCY, PROTEMP, and PRECISSION TEMP, all operate out of a single office in Easton. TRIEU considers all these companies to be the same.

     TRIEU was unable to provide the names of other employees. When he goes to the Easton office, he often meets with other employees, several of them American males who are also waiting for WALLACE. He does not know them by name, or that much about, buy merely says hello.

     TRIEU currently resides with his girlfriend and son in Lowell. He has a computer in his home which he purchased from WALLACE for approximately $700.00. He uses the computer to listen to Radio Free Asia, a news program in his own language.

     WALLACE prepared all of TRIEU's tax returns. WALLACE did not review the returns with TRIEU prior to having TRIEU sign the returns.

     TRIEU was asked who owns the vans which are used to transport workers to and from their work sites. TRIEU advised he was not sure if PROTEMP or PRECISSION TEMP owned any of the vans, or whether the drivers used vans they owned themselves.

     TRIEU believed that WALLACE and MCELROY maintained insurance for the various companies in the event that someone got hurt. He believed that the insurance companies took care of

FD-302a (Rev. 10-6-95)


196B-BS-86742


Continuation of FD-302 of  DICH TRIEU _____ , On 8/7/01 _____ , Page ___ 8 ___

TRIEU's job responsibilities for PRECISSION TEMP
include finding workers for the company.  As with PROTEMP, all
paperwork is returned to WALLACE.  No records are maintained at
either TRIEU's home or the Lowell office.  The paperwork TRIEU
completes is either handwritten or typed, but not done on the
computer.

TRIEU advised that an application, a form W-4, and an
Immigration form I-9, are completed for all employees.  TRIEU
fills these forms out himself, and sends them to WALLACE.  TRIEU
does not give them an employee number.  The job applications are
not for any specific company, and therefore an employee could
work for PRO TEMP, DAILY A. KING, or PRECISSION TEMP.  TRIEU does
not know which company the employee will be working for until he
speaks with WALLACE.

DAILY A. KING LABOR, THE DAILY AGENCY, PROTEMP, and
PRECISSION TEMP, all operate out of a single office in Easton.
TRIEU considers all these companies to be the same.

TRIEU was unable to provide the names of other
employees.  When he goes to the Easton office, he often meets
with other employees, several of them American males who are also
waiting for WALLACE.  He does not know them by name, or that much
about, buy merely says hello.

TRIEU currently resides with his girlfriend and son in
Lowell.  He has a computer in his home which he purchased from
WALLACE for approximately $700.00.  He uses the computer to
listen to Radio Free Asia, a news program in his own language.

WALLACE prepared all of TRIEU's tax returns.  WALLACE
did not review the returns with TRIEU prior to having TRIEU sign
the returns.

TRIEU was asked who owns the vans which are used to
transport workers to and from their work sites.  TRIEU advised he
was not sure if PROTEMP or PRECISSION TEMP owned any of the vans,
or whether the drivers used vans they owned themselves.

TRIEU believed that WALLACE and MCELROY maintained
insurance for the various companies in the event that someone got
hurt.  He believed that the insurance companies took care of

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                                    , On  8/7/01        , Page    9

      injuries incurred by employees hurt or injured on the job.

           TRIEU stated that he was aware that all people are
required to pay taxes but further stated that because MCELROY
used his name for MCELROY's business, MCELROY and/or WALLACE were
required to pay the taxes.  TRIEU recalled being given checks in
the amount of $3,000.00 or $4,000.00 and being directed to take
them to the bank for the purpose of paying taxes.

           TRIEU did not know anything about a Department of Labor
investigation into the payment of cash to employees.  He knew an
individual by the name of GEORGE to be a salesman, and claims to
have met GEORGE once a week when he was at the Easton office.  He
knew MARTA to be a woman who also went to the Easton office, but
was not sure what her job was.  At this time, the interview was
terminated.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA            )
                                    )
v.                                  )        CASE NO. 05-10019-RGS
                                    )
DANIEL W. McELROY,                  )
AIMEE J. KING McELROY, and          )
XIEU VAN SON                        )
                                    )
```

## DEFENDANTS DANIEL W. McELROY'S AND AIMEE J. KING McELROY'S OBJECTIONS TO UNITED STATE MAGISTRATE JUDGE'S ORDER ON DEFENDANTS' MOTION TO COMPEL DISCLOSURE OF DOCUMENTS AND INFORMATION REGARDING THE ACCESS OF INSURANCE FRAUD BUREAU PERSONNEL TO GRAND JURY MATERIAL AND REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 2(b) of the Rules for United States Magistrate Judges in the United

States District Court for the District of Massachusetts, defendants Daniel W. McElroy ("Mr.

McElroy") and Aimee J. King McElroy ("Ms. King") object to United States Magistrate Judge

Collings' ruling on Defendants' Motion to Compel Disclosure of Documents and Information

Regarding the Access of Insurance Fraud Bureau Personnel to Grand Jury Material

("Defendants' Motion to Compel Discovery") dated October 14, 2005. For the reasons set forth

fully below, Mr. McElroy and Ms. King submit that they are entitled to the requested discovery

and that the Magistrate's ruling is contrary to controlling case law, the Local Rules, and is clearly

erroneous. Attached to this motion as Exhibit "A" is Defendants' Motion and Memorandum of

Law to Compel Discovery; as Exhibit "B" is the Government's Opposition to the Defendants'

Motion to Compel Discovery; and as Exhibit "C" is Magistrate Judge Collings' Memorandum

and Order on Defendants' Motion for Discovery. In addition to the arguments contained herein,

Mr. McElroy and Ms. King incorporate by reference the arguments set forth in Defendants'

Motion and Memorandum of Law to Compel Discovery.

## PROCEDURAL HISTORY

On January 26, 2005, the Grand Jury of the United States District Court, District of

Massachusetts, returned indictments against Mr. McElroy and Ms. King charging them with one

count of conspiracy (18 U.S.C. §371), three counts of mail fraud (18 U.S.C. §1341), and fourteen

counts of procuring false tax returns (26 U.S.C. §7206).

On July 12, 2005, counsel for Mr. McElroy, Ms. King and Xieu Van Son submitted a

discovery letter to the government pursuant to Local Rule 116.3 and the Scheduling Order

entered by Magistrate Judge Collings on April 6, 2005, requesting specific information and

material critical to the preparation of the defense of this case including documents and

information regarding the access of IFB personnel to grand jury material. Specifically, the

defendants' discovery letter set forth the following request:

> Provide pursuant to Rule 6 of the Federal Rules of Criminal Procedure all
> applications, affidavits and briefs filed by the United States Attorney's Office
> with the United States District Court for the District of Massachusetts concerning
> this case and all Court Orders relating thereto, regarding the access of Insurance
> Fraud Bureau ("IFB") personnel to grand jury material. Also, describe the nature
> and circumstances of each and every IFB personnel involvement with grand jury
> materials.

Defendants' Discovery Letter at ¶ 33.

Discovery materials previously provided by the government, which included the

government's affidavit in support of the search warrant, as well as multiple interview summaries,

demonstrated that the IFB played a critical role in the investigation of this case. For example,

the information set forth in the affidavit in support of the search warrant was derived from a joint

investigation involving agents from the FBI, IRS, and IFB. See Government's Affidavit at ¶3.

{K0312481.1}                                    2

In addition, according to the affidavit in support of the search warrant, the investigation in this case began after Michael Powers reported information to the IFB regarding an alleged insurance fraud scheme and the IFB subsequently made a referral to the FBI and an investigation into Mr. Powers' allegations commenced. Id. at ¶¶15, 17. Finally, FBI and IRS interview summaries provided by the government also revealed that IFB Deputy Chief of Investigations Anthony DiPaolo participated in witness interviews with Assistant United States Attorney Paul Levenson, as well as IRS and FBI agents. When IFB Investigator DiPaolo and other government agents introduced themselves to witnesses they sought to interview in this case, the agents told the witnesses that they were assisting in a grand jury investigation.

The government orally responded to the defendants' discovery letter and asserted that the defense was not entitled to the requested documents and information relating to access of IFB personnel to grand jury materials. Consequently, Mr. McElroy and Ms. King filed a motion to compel disclosure of all documents and information regarding the access of IFB personnel to grand jury material in order to determine whether the government violated the well-established grand jury secrecy requirements set forth by Fed. R. Crim. P. 6(e). The government opposed the motion, arguing, in essence, that the request for discovery was based on "mere curiosity" and amounted to nothing more than "an open-ended fishing expedition." See Government's Opposition at 2. Following a hearing on the motion, United States Magistrate Judge Collings denied the defendant's request for discovery, ruling that Mr. McElroy and Ms. King failed to demonstrate that they were prejudiced by any Rule 6(e) violation that may have occurred.

## ARGUMENT

The Magistrate's Order of October 14, 2005 should be reconsidered and reversed. First, the ruling ignores the fact that the information that Mr. McElroy and Ms. King seek falls

{K0312481.1}                                      3

squarely within the category of discovery that the government is required to produce. Specifically, Local Rule 116.2(B)(1)(b) expressly states that the government must produce to the defendant exculpatory information that would cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief and that could be subject to a motion to suppress or exclude. Information or documents that reveal that the government failed to secure court authorization before disclosing grand jury materials to IFB personnel in this matter would demonstrate a blatant violation of the grand jury secrecy requirements under Fed. R. Crim. 6(e) and the First Circuit's unambiguous directive set forth in United States v. Pimental, 380 F.3d 575, 596 (1st Cir. 2004), and, consequently, would "cast doubt on the admissibility of evidence" and trigger evidentiary and case dispositive motions contemplated by Local Rule 116.2(B)(1)(b).

It is well-settled that the grand jury secrecy requirements prohibit certain individuals including "attorney[s] for the government" from disclosing "a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). Although Rule 6(e)(3)(A)(ii) sets forth exceptions to the grand jury secrecy requirement, including allowance of "[d]isclosure of a grand jury matter" to "any government personnel -- including those of a state or state subdivision...that an attorney for the government considers necessary to assist in performing the attorney's duty to enforce federal criminal law," the First Circuit has refused to categorically find that all IFB personnel fit the definition for governmental personnel within the exception to the grand jury secrecy rule. United States v. Pimental, 380 F.3d at 596. Most importantly, the First Circuit has determined that the prosecution does not have self-executing powers under Rule 6(e)(3)(A)(ii) to designate IFB personnel as recipients of grand jury material, and has specifically directed prosecutors to seek authorization from the court where "quasi-governmental agencies such as the IFB are involved and make a functional showing that the individual involved is within this rule." Id.

{K0312481.1}                                        4

Clearly, the IFB played an integral role in the investigation of the charges brought against Mr. McElroy and Ms. King. Multiple FBI and IRS summaries of witness interviews, as well as the affidavit in support of the application for the search warrant, demonstrate the high level of participation of IFB personnel throughout the investigation of this case. As a result, the defense has a good faith basis to believe that IFB personnel would be the logical recipients of any grand jury material provided by the prosecution. If the requested discovery reveals that the attorneys for the government failed to obtain authorization from the court before providing access of grand jury material to IFB personnel, such disclosure would be in violation of Rule 6(e) and in contradiction of controlling case law and would, therefore, provide the basis for Mr. McElroy and Ms. King to pursue appropriate evidentiary or case dispositive motions.

To date, the government has failed to demonstrate that it made the required "functional showing" that the IFB personnel who presumably received grand jury information and materials in this matter qualified as governmental personnel within the exception to the grand jury secrecy rule or that it secured the necessary court authorization before disclosing such materials and information to IFB personnel. Until the government makes such a showing, the defense has a duty to investigate whether the government has complied with Rule 6(e), as well as the First Circuit's clear directive set forth in Pimental. As the Magistrate Judge Collings acknowledged, "absent the discovery, the defendants would find it difficult to be able to challenge whether the government acted properly or not..." See Magistrate's Order at 3. Through their discovery request, Mr. McElroy and Ms. King seek the requested information so that they can determine whether the government violated the grand jury secrecy rule embodied in Fed. R. Crim. P. Rule 6(e) and, consequently, whether a motion to dismiss the indictment or any other evidentiary or case dispositive motions should be filed. Clearly, Mr. McElroy and Ms. King have demonstrated

{K0312481.1}                                          5

a particularized need for the requested discovery that outweighs any need for continued secrecy. In re Grand Jury Subpoena, 103 F.3d 234, 239 (2nd Cir. 1996) citing Douglas Oil Co. of California v. Petrol Stops Northwest, 441 U.S. 211, 222 (1979) (finding that a party makes a showing of particularized need by proving "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy and that their request is structured to cover only material so needed.").

Contrary to the Magistrate Judge's ruling, the unauthorized disclosure of grand jury materials and information to IFB personnel and the potential misuse of such materials and information by IFB personnel would clearly result in prejudice to Mr. McElroy and Ms. King. Specifically, the grand jury information and materials could have been used by IFB personnel to influence witnesses and develop additional evidence that resulted in the indictments. Consequently, if such an unauthorized disclosure occurred, the legitimacy of the ultimate charging decision in this matter would be, at the very least, cast in doubt and would provide Mr. McElroy and Ms. King sufficient grounds to seek evidentiary and case dispositive motions.

In addition, as the indictments have already been brought in this matter, there are no issues of confidentiality in disclosing the requested discovery. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 234 (1940) (finding that "after the grand jury's functions are ended, disclosure is proper where the ends of justice require it."). The defendants' request for copies of applications which the United States Attorney's Office filed with the Court to obtain permission to disclose grand jury material to IFB personnel and any Court Orders derived therefrom will not result in a breach of grand jury secrecy. Furthermore, the government has failed to identify any potential harm that would arise if Mr. McElroy and Ms. King acquire the requested information.

{K0312481.1}                                         6

United States v. Pimental, 199 F.R.D. at 37 (finding that "the government has not raised any potential damage if the [defendants] acquire the requested information" concerning the disclosure of Rule 6 (e) grand jury material to individuals affiliated with IFB); Church of Scientology International v. United States Department of Justice, 30 F.3d 224, 235 (1st Cir. 1994).

In the alternative, Mr. McElroy and Ms. King submit that the material and information that they seek are not "matters occurring before the grand jury" which would implicate the grand jury secrecy rule pursuant to Rule 6(e). In fact, the government provided indirect support for this position in its Opposition when it stated, "It is debatable whether the materials defendants request are themselves grand jury materials, in which case their motion would be directly governed by Fed. R. Crim. P. 6(e)(2)(E)(ii), or whether they are merely analogous to such materials." See Government's Opposition at 1-2. Without providing any legal basis for its argument, the government concluded, "Either way, the same rule should apply." Id. at 2. Despite the government's misguided argument, it is well-settled that Rule 6(e) governs "matters occurring before the grand jury." Courts have held that Rule 6(e) is designed to protect from disclosure "only the essence of what takes place in the jury room, in order to preserve the freedom and integrity of the deliberative process." In re Grand Jury Investigation, 630 F.2d 996, 1000 (3d Cir. 1980). Through their discovery request, Mr. McElroy and Ms. King seek copies of the documents which the prosecutor filed with the Court to disclose grand jury material to IFB personnel and any orders which the Court issued on the basis of the prosecutor's submissions. Clearly, such ministerial documents, unlike copies of grand jury testimony, would not disclose the essence of what took place before the grand jury and their release would not violate the freedom and integrity of the deliberative process of the grand jurors. Furthermore, the

{K0312481.1}                                  7

government and the Magistrate failed to articulate any specific or substantive reason that would militate against such disclosure. In re Grand Jury Investigation, 903 F.2d 180, 184 (3d Cir. 1990).

In addition, the discovery that Mr. McElroy and Ms. King seek is not analogous to the type of grand jury materials that were sought in the cases cited by the government and in the Magistrate's Order. Specifically, in United States v. Mazzola, 183 F. Supp. 2d 195 (D. Mass. 2001), which the Magistrate and counsel for the government place significant emphasis, the requested discovery did not involve information and documents relating to the government's authority to disclose grand jury materials to IFB personnel, but rather the broad disclosure of witness testimony and other evidence provided to the grand jury relating to the participation of IFB personnel in the grand jury proceedings. Such information that lie at the heart of the grand jury proceeding would clearly qualify as "matters occurring before the grand jury" and would implicate grand jury secrecy protection pursuant to Rule 6(e). In United States v. Llaca Orbiz, 513 F.2d 816 (1st Cir. 1975), another decision cited by the government, the discovery involved an untimely request for grand jury minutes where there was no showing of a particularized need or prejudice. Finally, the government cited Walsh v. United States, 371 F.2d 436 (1st Cir. 1967), where the defendant asked for an opportunity to examine grand jury records without specifying a reason or particularized need. Contrary to the facts of these cases, the ministerial information sought by Mr. McElroy and Ms. King are not within the reach of Rule 6(e) because they reveal nothing of substance about the grand jury's investigation in this matter. In addition, Mr. McElroy and Ms. King have demonstrated that the requested discovery is essential to determine whether to pursue appropriate evidentiary and case dispositive motions in this matter.

{K0312481.1}                          8

## CONCLUSION

For the above reasons, the defendants, Daniel W. McElroy and Aimee J. King McElroy,

request that the October 14, 2005 Order of the United States Magistrate Judge be reconsidered

and reversed and that their motion to compel disclosure of documents and information regarding

the access of Insurance Fraud Bureau Personnel to grand jury materials be granted.

## REQUEST FOR ORAL ARGUMENT

Mr. McElroy and Ms. King request this Court for oral arguments on their Objections to

United States Magistrate Judge's Order on Defendants' Motion to Compel Disclosure of

Documents and Information Regarding the Access of Insurance Fraud Bureau Personnel to

Grand Jury Material. Mr. McElroy and Ms. King submit that a hearing is necessary because of

the significant issues raised in this motion and oral arguments will assist the Court in resolving

the motion.


Respectfully Submitted,

DANIEL W. McELROY                                   AIMEE J. KING McELROY

By his Attorneys,                                   By her Attorney,


Stephen R. Delinsky  (BBO #119120)                  Jack I. Zalkind (BBO #538840)
Andrew R. McConville (BBO #632804)                  One International Place, 18th Floor
**ECKERT, SEAMANS, CHERIN & MELLOTT, LLC**          Boston, Massachusetts 02110
One International Place, 18th Floor                  Telephone: (617) 227-3950
Boston, Massachusetts 02110                          Facsimile: (617) 342-6899
Telephone No.:  (617) 342-6800
Facsimile No.   (617) 342-6899

DATED:  October 26, 2005

{K0312481.1}                                         9

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
UNITED STATES OF AMERICA          )
                                  )
v.                                )          CASE NO. 05-10019-RGS
                                  )
DANIEL W. McELROY,                )
AIMEE J. KING McELROY, and        )
XIEU VAN SON                      )
                                  )

## MOTION OF DEFENDANTS DANIEL W. McELROY AND AIMEE J. KING McELROY TO COMPEL DISCLOSURE OF DOCUMENTS AND INFORMATION REGARDING THE ACCESS OF INSURANCE FRAUD BUREAU PERSONNEL TO GRAND JURY MATERIAL

Defendants Daniel W. McElroy ("Mr. McElroy") and Aimee J. King McElroy ("Ms.

King") move this Court to direct the government to provide Mr. McElroy and Ms. King with all

applications, affidavits and briefs filed by the United States Attorney's Office with the United

States District Court for the District of Massachusetts concerning this case and all Court Orders

relating thereto regarding the access of Insurance Fraud Bureau ("IFB") personnel to grand jury

material, as well as a description of the nature and circumstances of any involvement of IFB

personnel with grand jury materials. This requested discovery is essential for the defense to

determine whether there is evidence that the government violated the grand jury secrecy

requirements set forth by Rule 6(e) of the Federal Rules of Criminal Procedure by providing IFB

personnel access to grand jury materials without court authorization, and consequently, whether

dispositive motions should be filed. Pursuant to Local Rule 7.1, a good faith attempt was made

to eliminate or narrow the issues raised in this Motion through a conference with counsel for the

government. In further support of this Motion, Mr. McElroy and Ms. King incorporate their

Memorandum of Law filed simultaneously herewith.

Respectfully Submitted,

DANIEL W. McELROY                                    AIMEE J. KING McELROY

By his Attorneys,                                    By her Attorney,

*Stephen R. Delinsky* (mm)                           *Jack Zalkind* (mm)
_____                          _____
Stephen R. Delinsky  (BBO #119120)                   Jack I. Zalkind (BBO #538840)
Andrew R. McConville (BBO #632804)                   One International Place, 18th Floor
ECKERT, SEAMANS, CHERIN & MELLOTT, LLC               Boston, Massachusetts 02110
One International Place, 18th Floor                   Telephone: (617) 227-3950
Boston, Massachusetts 02110                          Facsimile:  (617) 342-6899
Telephone No.:  (617) 342-6800
Facsimile No.   (617) 342-6899


DATED: August 29, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   )
                             )
v.                            )     CASE NO. 05-10019-RGS
                             )
DANIEL W. McELROY,        )
AIMEE J. KING McELROY, and   )
XIEU VAN SON           )
                             )

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS DANIEL W. McELROY AND AIMEE J. KING McELROY TO COMPEL DISCLOSURE OF DOCUMENTS AND INFORMATION REGARDING THE ACCESS OF INSURANCE FRAUD BUREAU PERSONNEL TO GRAND JURY MATERIAL

Defendants Daniel W. McElroy ("Mr. McElroy") and Aimee J. King McElroy ("Ms. King") submit that in accordance with controlling case law and the rules of discovery, this Court should direct the government to provide Mr. McElroy and Ms. King with all applications, affidavits and briefs filed by the United States Attorney's Office with the United States District Court for the District of Massachusetts concerning this case and all Court Orders relating thereto regarding the access of Insurance Fraud Bureau ("IFB") personnel to grand jury material, as well as a description of the nature and circumstances of any involvement of IFB personnel with grand jury materials. This requested discovery is essential for the defense to determine whether there is evidence that the government violated the grand jury secrecy requirements set forth by Rule 6(e) of the Federal Rules of Criminal Procedure by providing IFB personnel access to grand jury materials without court authorization, and consequently, whether dispositive motions should be filed.

## PROCEDURAL HISTORY

On January 26, 2005, the Grand Jury of the United States District Court, District of Massachusetts, returned indictments against Mr. McElroy and Ms. King charging them with one count of conspiracy (18 U.S.C. §371), three counts of mail fraud (18 U.S.C. §1341), and fourteen counts of procuring false tax returns (26 U.S.C. §7206).

The government served its automatic discovery letter on March 15, 2005. On July 12, 2005, counsel for Mr. McElroy, Ms. King and Xieu Van Son submitted a discovery letter to the government pursuant to Local Rule 116.3 and the Scheduling Order entered by Magistrate Judge Collings on April 6, 2005, requesting specific information and material critical to the preparation of the defense of this case including documents and information regarding the access of IFB personnel to grand jury material. Specifically, paragraph 33 of the defendants' discovery letter sets forth the following request:

> Provide pursuant to Rule 6 of the Federal Rules of Criminal Procedure all applications, affidavits and briefs filed by the United States Attorney's Office with the United States District Court for the District of Massachusetts concerning this case and all Court Orders relating thereto, regarding the access of Insurance Fraud Bureau ("IFB") personnel to grand jury material. Also, describe the nature and circumstances of each and every IFB personnel involvement with grand jury materials.

Defendants' Discovery Letter at ¶ 33.

Discovery materials previously provided by the government, which included the government's affidavit in support of the search warrant, as well as multiple interview summaries, demonstrate that the IFB played a central role in the investigation of this case. Specifically, the information set forth in the affidavit in support of the search warrant was derived from a joint investigation involving agents from the FBI, IRS, and IFB. See Government's Affidavit at ¶3.

In addition, according to the affidavit in support of the search warrant, the investigation in this case began after Michael Powers reported information to the IFB regarding an alleged insurance fraud scheme and the IFB subsequently made a referral to the FBI and an investigation into Mr. Powers' allegations commenced. Id. at ¶¶15, 17.

FBI and IRS interview summaries provided by the government also reveal that IFB Deputy Chief of Investigations Anthony DiPaolo participated in witness interviews with Assistant United States Attorney Paul Levenson, as well as IRS and FBI agents. When IFB Investigator DiPaolo and other government agents introduced themselves to witnesses they sought to interview in this case, the agents told the witnesses that they were assisting in a grand jury investigation. See IRS Memorandum of Interview of Charles Wallace attached as Exhibit 1; IRS Memorandum of Interview of Hui Ly attached as Exhibit 2; IRS Memorandum of Interview of Heather Blackwell attached as Exhibit 3; IRS Memorandum of Interview of Meredith Scanlon attached as Exhibit 4. In addition, IFB Investigator DiPaolo participated in an interview of Michael Powers at the U.S. Attorney's Office wherein Mr. Powers was provided with an immunity letter. See FBI 302 Report of Michael Powers attached as Exhibit 5. Investigator DiPaolo also participated in an interview of Dich Trieu after Mr. Trieu signed a proffer letter. See FBI 302 Report of Dich Trieu attached as Exhibit 6.

The government orally responded to the defendants' discovery letter and asserted that the defense was not entitled to the requested documents and information relating to access of IFB personnel to grand jury materials. To date, despite its obligation to produce exculpatory evidence pursuant to Local Rule 116.2, the government has refused to produce any information and documents regarding this highly relevant evidence, leaving Mr. McElroy and Ms. King no alternative but to seek relief from the Court.

## ARGUMENT

I.    **THE GOVERNMENT MUST DISCLOSE DOCUMENTS FILED BY THE UNITED STATES ATTORNEY'S OFFICE WITH THE COURT AND ALL COURT ORDERS REGARDING THE ACCESS OF IFB PERSONNEL TO GRAND JURY MATERIAL**

The government has asserted that Mr. McElroy and Ms. King are not entitled to

discovery relating to the IFB's access to grand jury materials. In denying the defendants'

request, the government ignores the fact that the information that Mr. McElroy and Ms. King

seek falls squarely within the category of discovery that the government is required to produce.

Specifically, Local Rule 116.2(B)(1)(b) expressly states that the government must produce to the

defendant exculpatory information that would cast doubt on the admissibility of evidence that the

government anticipates offering in its case-in-chief and that could be subject to a motion to

suppress or exclude. Mr. McElroy and Ms. King submit that they are entitled to the requested

discovery so that they may determine whether the government violated the grand jury secrecy

rule embodied in Fed. R. Crim. P. Rule 6(e) and, consequently, whether a motion to dismiss the

indictment or any other evidentiary or case dispositive motions should be filed.

The grand jury secrecy requirements are codified in Fed. R. Crim. P. 6(e)(2). Rule

6(e)(2) prohibits certain individuals including "attorney[s] for the government" from disclosing

"a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B). Rule 6(e)(3) sets forth

exceptions to the grand jury secrecy requirement, including allowance of "[d]isclosure of a

grand jury matter" to "any government personnel -- including those of a state or state

subdivision...that an attorney for the government considers necessary to assist in performing the

attorney's duty to enforce federal criminal law." Fed. R. Crim. P. 6(e)(3)(A)(ii). Pursuant to

Rule 6(e)(3)(E), a district court has the power to authorize disclosure in certain situations.

Courts have held that the IFB is a "quasi-governmental entity" that investigates allegations of fraudulent insurance transactions. United States v. Pimental, 380 F.3d 575, 592 (1st Cir. 2004) quoting In re: Justices of the Superior Court, 218 F.3d 11, 13 (1st Cir. 2000). The First Circuit has also found that although the text of Rule 6(e)(3)(A)(ii) provides little guidance on whether IFB employees can be characterized as "government personnel" within the meaning of the Rule, the exception in Rule 6(e)(3)(A)(ii) may extend to "quasi-governmental" investigators of the IFB depending on the facts of the case. Pimental, supra at 594, 596. However, the First Circuit has refused to categorically find that all IFB personnel fit the definition for governmental personnel within the exception to the grand jury secrecy rule. Id. at 596. Most importantly, the First Circuit has concluded that the prosecution does not have self-executing powers under Rule 6(e)(3)(A)(ii) to designate IFB personnel as recipients of grand jury material, and has specifically directed prosecutors to seek authorization from the court where "quasi-governmental agencies such as the IFB are involved and make a functional showing that the individual involved is within this rule." Id.

Through their request for discovery, Mr. McElroy and Ms. King seek information and documents necessary to determine whether the government violated the grand jury secrecy requirements pursuant to Rule 6(e) and the First Circuit's unambiguous directive set forth in the Pimental case. Clearly, the IFB has played an integral role in the investigation of the charges brought against Mr. McElroy and Ms. King. Multiple FBI and IRS summaries of witness interviews, as well as the affidavit in support of the application for the search warrant, demonstrate the high level of participation of IFB personnel throughout the investigation of this case. Consequently, the defense has a good faith basis to believe that IFB personnel would be the logical recipients of any grand jury material provided by the prosecution. If the requested

{K0308668.1}                                    5

discovery reveals that the attorneys for the government failed to obtain authorization from the court before providing access of grand jury material to IFB personnel, such disclosure would be in violation of Rule 6(e) and in contradiction of controlling case law and would provide the basis for Mr. McElroy and Ms. King to pursue dispositive motions. As the indictments have already been brought in this matter, there are no issues of confidentiality in disclosing the requested discovery. By not producing the requested information and material, the government creates a possible inference that it did not obtain the required authorization before providing IFB personnel access to grand jury materials. Consequently, the requested material and information relating to the government's adherence to grand jury secrecy requirements falls squarely within the category of "exculpatory evidence" set forth in Rule 116.2(B)(1)(b), and therefore, obligates the government to make immediate disclosure to Mr. McElroy and Ms. King.

## CONCLUSION

For the above reasons, the defendants, Daniel W. McElroy and Aimee J. King McElroy, request that their Motion to Compel Disclosure of Documents and Information Regarding the Access of Insurance Fraud Bureau Personnel to Grand Jury Material be granted.

Respectfully Submitted,

DANIEL W. McELROY

By his Attorneys,

_Stephen R. Delinsky (am)_

Stephen R. Delinsky (BBO #119120)
Andrew R. McConville (BBO #632804)
ECKERT, SEAMANS, CHERIN & MELLOTT, LLC
One International Place, 18th Floor
Boston, Massachusetts 02110
Telephone No.: (617) 342-6800
Facsimile No.   (617) 342-6899

DATED: August 19, 2005

AIMEE J. KING McELROY

By her Attorney,

_Jack Zalkind (am)_

Jack I. Zalkind (BBO #538840)
One International Place, 18th Floor
Boston, Massachusetts 02110
Telephone: (617) 227-3950
Facsimile:  (617) 342-6899

# EXHIBIT 1

# Internal Revenue Service
# Criminal Investigation Division

## Memorandum of Interview



| | | | |
|---|---|---|---|
| **In Re:** | CHARLES WALLACE | **Location:** | Residence |
| **Investigation #:** | 040130207 | | 253 Harvard ST |
| **Date:** | June 26, 2001 | | East Bridgewater, MA |
| **Time:** | 8:30 a.m. to 8:40 a.m. | | |
| **Participant(s):** | Charles Wallace, Accountant, Daily A King Labor, Pro Temp CO & Precission Temp. CO. | | |
| | Nancy McCormick, FBI, Special Agent | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, IRS, Special Agent | | |

On the above time and date, Special Agent McCormick, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 253 Harvard ST, East Bridgewater, MA to interview CHARLES WALLACE. WALLACE initially was not at his residence. WALLACE was contacted by phone by his wife and spoke to investigator Dipaolo before returning home. Upon his return, Agent McCormick, Agent Demeo and Investigator DiPaolo introduced themselves to WALLACE and displayed their credentials. Agent McCormick explained that they are assisting in a grand jury investigation. Agent McCormick asked WALLACE if he knew why we were there. WALLACE gave the following information:

1. He did not know why we were visiting him but someone told him that temporary employment agencies are being investigated for hiring illegal employees. WALLACE could only recall two temporary employment agencies being investigated, Millennium 2000 Temps and Baystate Temps, of the six companies that were provided to him on a sheet of paper from an unknown source.

2. Agent McCormick told WALLACE that we were there to discuss PRO TEMP, DAILY A KING LABOR, PRECISSION TEMP and PTC. WALLACE stated that PRO TEMP is no longer in business and that PRECISSION TEMP replaced PRO TEMP. PTC is PRECISSION TEMP.

3. Agent McCormick told WALLACE that we were offering him an opportunity to cooperate in the investigation of the aforementioned companies. Agent McCormick discussed that we were aware that workers compensation insurance premiums had been understated by DAILY A KING LABOR as evidenced by the false quarterly employment tax returns form 941 and 1120S which had been provided to various insurance auditors. Agent McCormick stated that the tax returns provided to the IRS did not match the quarterly employment tax returns form 941 and 1120S provided to insurance auditors. In addition, agent McCormick explained that with respect to PROTEMP, we were aware that the quarterly employment tax returns filed with the IRS were not accurate. WALLACE did not respond.

4. Agent McCormick stated that we were aware of his previous conviction. WALLACE stated that it was "no hidden issue." McCormick told WALLACE that he would not be in a

good position if he had tax issues all over again. WALLACE replied "Of Course Not."

5. WALLACE was asked whether he would agree to contact DAILY A KING employees and record the conversation. WALLACE stated that he would like to talk to an attorney before deciding anything. Agent McCormick replied "O.K. that's Fine" and stopped asking questions.

6. WALLACE then asked what opportunity was being presented. Agent McCormick explained to WALLACE that the FBI & IFB were investigating insurance issues and the IRS was investigating employment tax issues. Referring to his request for an attorney, Agent McCormick stated "I don't want to cross any lines". WALLACE replied that the insurance was based on a Retro Plan and past claims. WALLACE continued to explain that there shouldn't be an employment tax issue because they paid subcontractors and deducted them on the return. Agent McCormick commented on the cash payroll to which WALLACE made no response.

7. Agent McCormick told WALLACE, she could show him some of the records, including a draft indictment naming WALLACE and others. In response WALLACE stated "I don't need to know who the others are." WALLACE was not shown any documents.

8. WALLACE stated his attorney was located in Boston but, it was too early to reach him. WALLACE did not give a name because he was unsure as to which of two possible attorneys he was going to use.

9. Agent McCormick stated that this was WALLACE'S chance to "spread the blame", that we were looking for his assistance in determining who else was involved. She stated that we were not going away even if the company paid off Reliance as it did Liberty. The investigation was continuing with or without his assistance.

10. Agent McCormick issued WALLACE subpoenas to which Wallace responded, "All I have are the (1120's) tax returns". Then Agent McCormick, Agent Demeo and Investigator DiPaolo thanked WALLACE for his time and asked him to contact his attorney and then contact us, preferable within the next few hours. The interview concluded at approximately 8:40a.m.

11. At approximately 9:20a.m., WALLACE paged Agent McCormick. Agent McCormick called WALLACE who stated that he spoke to his attorney and that his attorney referred him to another attorney whom would not be in until the early afternoon.

12. At approximately 9:30a.m., Agent McCormick called WALLACE back and informed him that a search warrant was being executed on DAILY A KING LABOR. She told him that if he was contacted by anyone about the search, he was free to "do what you want."

No further contact was made for the remainder of the day.

Thomas Demeo
Special Agent

I prepared this memorandum on July 03, 2001, after refreshing my memory from notes made during and immediately after the interview with Charles Wallace.

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Charles Wallace on June 26, 2001.

Nancy McCormick
FBI Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Charles Wallace on June 26, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 2

# Internal Revenue Service
## Criminal Investigation Division

## Memorandum of Interview



| | | | |
|---|---|---|---|
| **In Re:** | DAILY A KING LABOR INC | **Location:** | Residence |
| **Investigation #:** | 040130259 | | 22 Iron Drive |
| **Date:** | July 18, 2001 | | West Warwick, RI 02893 |
| **Time:** | 8:00 a.m. to 8:50 a.m. | | |
| **Participant(s):** | HUI LY, Interviewee | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, IRS, Special Agent | | |

On the above time and date, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 22 Iron Drive, West Warwick, RI 02893 to interview HUI LY. LY did not open the door until the local police arrived and confirmed his safety. Agent Demeo and Investigator DiPaolo introduced themselves to LY and displayed their credentials. Agent Demeo explained that they are assisting in a grand jury investigation. LY gave the following information:

1. His name is Hui LY. His social security number is 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. His current residence is 22 Iron Drive, West Warwick RI. He is married to Sophin and has three children; Lyathane, Lysatha and Rhonda.

2. Virak In is his brother in law and is married to Stephanie. They reside on Greenbush Ave in Warwick, RI.

3. LY stated that he started working at DAILY A KING (DAK) in June of 2000. LY stated that he was not working previously because of a disability from a gunshot wound in 1994. LY stated that Aimee King hired him as a driver. LY stated that his supervisors are Aimee King, Dan McElroy and Charlie Wallace.

4. LY stated that is was his job to pick up and drop off employees at certain client sites. In addition, LY stated that he would pick up payroll checks from the DAK office located in Easton on Thursdays or Fridays to disburse among the employees that he was in charge of transporting.

5. LY stated that George Wallace would give him weekly payroll checks to be delivered and a sign out sheet. George Wallace took over for a woman called Meredith. Charlie Wallace would give him envelopes containing cash to be delivered to employees at DAI in Dedham where his wife, Sophin is a supervisor of the temporary employees at DAI. Sophin receives a payroll check.

6. LY would receive a phone call via Nextel requesting a certain number of employees to be transported to a client. LY stated that in turn he would contact two other drivers, Charm and Sophan to assist him. Sophan just moved back to Cambodia. Charm lives in

Providence and is married to a Spanish lady. Charm transports mostly Spanish employees. LY was unsure of Charms last name but said he was Asian.

7.  After a dispute, LY did not speak to Charm. LY works out of his house. LY stated that he approached Charlie Wallace requesting additional work for fear of being laid off. Charlie Wallace told LY to come to the office once a week and cash a check for him. LY was and is paid a weekly salary of $550.00 via payroll check from DAK.

8.  Once a week LY would go to Charlie Wallace, at DAK and pick up a check to be cashed. The check was usually in the name of Precission. LY would go to Eastern Bank located a block from the DAK office and cash the check. LY stated that the check amounts were always less than $10,000.00 probably to avoid the filing of any forms. LY had personal knowledge of the filing requirements as a result of winning various Baccarat Tournaments at Foxwoods Casino, RI.

9.  LY stated that immediately after cashing the check he would give the currency to Charlie. Michelle would accept the currency if Charlie were absent.

10. LY was not allowed to spend much time in the office. Employees were kept from the office in fear of overhearing the amount of income being generated and therefore starting their own temporary employment agency as former employees Mike Powers, John Mahan, Mark Russo and Joe of New Bedford.

11. LY stated there were other drivers but he could not remember their names. Agent Demeo asked LY if he new Sotha Khuth, Alfredo Pratts, Robert Munrayos and Richard Casemiro. LY stated that he did not recognize these people.

12. LY stated that there was an office in Chelsea but he did not know who worked there. LY stated that he has seen a heavyset woman outside DAK on Fridays who he thinks works for the Chelsea office. After being mentioned, LY stated that Marta was the woman's name. LY stated that Marta usually arrived on Thursday or Fridays in a Lincoln Town Car or a Van.

13. LY'S responsibilities decreased to virtually none. LY, in fear of losing a job asked Charlie for additional work and suggested getting clients in Rhode Island. Charlie Wallace told LY that DAK did not have a license to work in Rhode Island. Charlie than asked LY to cash a weekly check.

14. LY stated that a lady named Meredith in billing, Brian Ferrar and Michelle Ferrar are former employees.

15. LY stated that in March of 2000 while living at 392 Webster Ave, Cranston RI, he was the victim of a home invasion. LY stated that $30,000.00, jewelry and legal documents were all stolen from a safe in his home. LY stated that he saved the $30,000.00 over the past 10 years.

16. LY stated that a few months later his was the victim of another home invasion. This time only a few thousand dollars and some jewelry were taken but he and his family were tied up

and the house was burned. The suspects were caught and LY is currently in the middle of court proceedings.

The interview was concluded. LY had to go to court. LY stated that he did not want Charlie Wallace to know that he spoke to Agent Demeo and Investigator DiPaolo. Agent Demeo stated that he had no intention to inform Charlie Wallace of the interview.

Thomas Demeo
Special Agent

I prepared this memorandum on July 27 & 30, 2001, after refreshing my memory from notes made during and immediately after the interview with Hui Ly.

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Hui LY on July 18, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 3

**Internal Revenue Service**
**Criminal Investigation Division**

**Memorandum of Interview**



---

| | | | |
|---|---|---|---|
| **In Re:** | DAILY A KING LABOR INC | **Location:** | Residence |
| **Investigation #:** | 040130259 | | 19 Davis St. |
| **Date:** | July 30, 2001 | | Taunton, MA 02780 |
| **Time:** | 1:10 p.m. to 3:30 p.m. | | |
| **Participant(s):** | Heather Blackwell, Interviewee | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, Special Agent | | |

On the above time and date, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 19 Davis St., Taunton, MA 02780 to interview Heather BLACKWELL. Agent Demeo and Investigator DiPaolo introduced themselves to BLACKWELL and displayed their credentials. Agent Demeo explained that they are assisting in a grand jury investigation and would like to ask her some questions. BLACKWELL gave the following information:

1. Her name is Heather BLACKWELL. Her current residence is 19 Davis Street, Taunton MA. Her home telephone number is (508) 880-7351. She is married to Bruce and has two children.

2. BLACKWELL stated that she started working at DAILY A KING (DAK) in September of 1996. She previously worked out of the same office but worked for Mariah's, a chain of gift shop stores owned by Aimee KING. Her friend Jennifer Wilson Bradley referred her to KING in September of 1994. Bradley currently lives in Texas with her husband. Their cell phone number is (512) 250-9411.

3. BLACKWELL started working for Mariah's as a file clerk at $6.50 per hour. Her manager was Jennifer Bradley. BLACKWELL eventually took over for Karen Farrell, in charge of the client accounts and received a raise to $15.00 per hour.

4. Mariah's gift shops were operated by the gift shop managers and they hired their own employees. No temporary employees were provided to Miriahs. BLACKWELL stated that she prepared income and expense spreadsheets for the gift shops. The spreadsheets she prepared did not match the figures that WALLACE computed. When questioned WALLACE said not to worry.

5. Only a few of the thirteen Mariah's gift shops generated a profit. In concern for her job BLACKWELL asked KING how long she planed on continuing her hobby, Mariahs gift shops. Shortly thereafter, at various times throughout 1996 Mariahs gift shops were sold. BLACKWELL took a pay cut and went to work at a local animal hospital.

6. After a few months at the animal hospital, BLACKWELL spoke to KING, the President of DAK. KING hired BLACKWELL to work for DAK in September of 1996. Her duties were to prepare payroll for various client accounts. During 1998 BLACKWELL went on maturity leave. In August of 1998 she returned part-time. After a few weeks BLACKWELL was asked to increase her availability. BLACKWELL chose to be unemployed.

7. One of BLACKWELL'S first duties was to file Immigration form I-9's for new employees. BLACKWELL stated that she was instructed to sign and file these forms. Eventually, BLACKWELL learned that her signature verifies that the employee presented two forms of identification for her inspection. Upon this discovery, BLACKWELL stopped randomly signing the forms I-9. All forms I-9 without signatures were given back to the recruiter for signature. The recruiter would return shortly with a signed form I-9 stating he/she has seen two forms of identification for the employee.

8. BLACKWELL stated the forms I-9 were not accurate. Many forms had the same address or a similar name. She stated that the form represented an employee, a human being but the identification was not correct. BLACKWELL believes this was done because the employees were illegal immigrants.

9. BLACKWELL stated that she was in charge of preparing payroll sheets for a few DAK clients. Over time she started preparing payroll sheets for PROTEMP. Most of the payroll sheets for the DAK clients were prepared and dumped to the main server.

10. BLACKWELL was instructed by KING'S husband, DANIEL MCELROY or WALLACE to prepare a few of DAK payroll sheets and all of the PROTEMPS payroll sheets on excel or off the system. None of the payroll sheets prepared off the system were saved. BLACKWELL would print the weekly payroll in duplicate. The accountant, Charles WALLACE, would get a copy and a copy would be sent to the client for billing.

11. BLACKWELL stated that the employees identified, on the excel payroll sheets were paid in either cash or some form of barter. BLACKWELL stated that the total amount of compensation identified on the payroll sheets was for employees' wages only.

12. On three separate occasions, BLACKWELL stated that a manila envelope was accidentally placed on her desk. BLACKWELL stated that she opened the manila envelope and found various white envelopes inside. BLACKWELL stated that she could see cash through the white envelopes and an amount with an employee's name was printed on the outside of the envelope. The manila envelope was resealed and given to Bob Hunt or Bob Ballestri for delivery to employees.

13. On various occasions Mike Powers, WALLACE'S assistant told BLACKWELL that she was not allowed in his office. BLACKWELL stated that MCELROY, WALLACE and Powers would stuff the envelopes in Powers's office. BLACKWELL stated that she was not allowed to stuff envelopes.

14. BLACKWELL stated that various people would arrive on Friday, met with MCELROY, WALLACE or Powers and shortly leave with a satchel of cash. BLACKWELL stated that

Hui Ly, Sotha Khuth, Marta Rodriguez, Marco Rodriguez, Dich Trieu and Xieu Van Son are some of their names. BLACKWELL knows that the satchels contain cash because on occasion Ly will ask for an empty envelope box to hold the cash.

15. BLACKWELL stated that Marco's is married to Marina and Marta is his daughter. They run the Chelsea office. BLACKWELL stated that sometimes Marco uses the name Ronnie and Marina uses the name Candida.

16. Ly and a partner ran the Rhode Island office. Ly's partner shot Ly over a gambling situation and is now in jail. Khuth covers employees from the Fall River area. Trieu and Van Son are partners. Trieu is the owner of PROTEMP.

17. A computer sales man named Rick Goldman was hired to teach BLACKWELL how to use one write plus. Goldman was a wealth businessman that KING and MCELROY chose to be friends with because of his status.

18. KING was the only one allowed access to the computer until sometime in 1996. The billing was done on disk and given to WALLACE or Powers. KING was involved in everyday transactions. Michelle Pauliks, KING'S daughter took over for KING but, Pauliks does not do anything with out KING'S approval.

19. DAK depends on Khuth to provide employees from Fall River. BLACKWELL stated that the rumor that Khuth accidentally falling off the roof was really a threat from KING and MCELROY to Khuth regarding a dispute.

20. In 1996 KING and MCELROY had a party at their residence on Cow Hill Rd, Sharon. All business associates were invited. There were three bartenders hired for the evening. BLACKWELL stated that KING only wants to be seen with prosperous people. The party was to show her associates she was prosperous.

21. BLACKWELL stated that KINGS residence has many renovations including a pool. BLACKWELL described KING and MCELROY as very secretive. BLACKWELL stated that KING and MCELROY had a shredder in their locked bedroom.

22. Investigator DiPaolo explained workman's compensation insurance to BLACKWELL. BLACKWELL explained that she did not prepare any workpapers for worker's compensation insurance or any workpapers for an audit of worker's compensation insurance. BLACKWELL was unsure if DAK had an insurance audit. BLACKWELL did know that auditors came by but she was not sure what they were auditing.

23. BLACKWELL stated that the employees were not allowed to answer the phone or say anything about PROTEMP. They would state that PROTEMP was a different company than DAK and they do not have the telephone number for PROTEMP. KING wanted to keep DAK more pure than PROTEMP. Therefore, she paid most of the employees requesting to be on the payroll from the DAK account and paid the cash payroll from PROTEMPS account. In addition, KING had a payroll system for DAK but used disks for the PROTEMP payroll.

24. BLACKWELL knew that many professionals met with WALLACE but she did not know why. BLACKWELL did state that she overheard the words "Getting ready for" the day before WALLACE and/or Powers met with the professionals.

25. BLACKWELL took over some of PROTEMPS accounts that Powers could not get too. To help Powers, BLACKWELL imputed the coding on the insurance claims. BLACKWELL would sort through the pile of claims, remove any duplicates and open the bills from the clinics.

26. BLACKWELL stated that she would generate weekly list of payables for Mariahs. BLACKWELL thought it was strange that KING bragged about having a large cash flow but would instruct her not to pay certain bills each month ultimately generating finance charges.

27. After Powers left, Pauliks assisted WALLACE with PROTEMP. Pauliks turned KING into the Department of Labor for not paying her employees' minimum wage and for not paying extra for overtime in the early 1990's.

28. BLACKWELL stated that WALLACE, MCELROY and KING all knew the extent of the cash payroll. BLACKWELL stated that WALLACE was the financial man but answers to MCELROY and there is a power trip between KING and MCELROY.

29. Since training Pauliks, KING only works a few hours a day. Mainly KING prepares the administrative or office payroll. BLACKWELL stated that KING is always going to a personal appointment i.e. facial, massage, hair dressers or spinning class. MCELROY just started playing golf and does not belong to a country club. BLACKWELL stated that all three of KING'S daughters confided in BLACKWELL regarding MCELROY making a pass to them. KING is in denial about the issue.

30. BLACKWELL stated that employees that receive a payroll check have an employee number assigned when their job application is processed. BLACKWELL was unsure if the employees paid in cash filed a job application.

31. BLACKWELL stated that the weekly time sheets are reviewed by the clients and signed. Once the time sheets are signed the client is not allowed to dispute the number of employees and the number of hours worked for that week.

32. BLACKWELL recalled on occasion, a client would complain about over billing. She was unsure of the number of times and frequency of the complaints.

33. BLACKWELL provided Agent Demeo a list of employee contact telephone numbers, a billing schedule for clients, whose temp employees are paid in cash, a letter to BLACKWELL from KING, and an employee evaluation of BLACKWELL signed by KING.

Agent Demeo told BLACKWELL to call if she recalls any additional information. Agent Demeo and investigator DiPaolo thanked BLACKWELL for her time and cooperation. The interview concluded at approximately 3:30 p.m.

Thomas Demeo
Special Agent

I prepared this memorandum on August 2, & 6 2001, after refreshing my memory from notes made during and immediately after the interview with Heather Blackwell.

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Heather Blackwell on July 30, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 4

### Internal Revenue Service
### Criminal Investigation Division

## Memorandum of Interview



| In Re: | DAILY A KING LABOR INC | **Location:** | Residence |
|---|---|---|---|
| **Investigation #:** | 040130259 | | 45 Crescent St. |
| **Date:** | July 27, 2001 | | Franklin, MA 02038 |
| **Time:** | 9:08 a.m. to 11:40 a.m. | | |
| **Participant(s):** | Meredith Scanlon, Interviewee | | |
| | Anthony DiPaolo, Insurance Fraud Bureau Investigator | | |
| | Thomas Demeo, Special Agent | | |

On the above time and date, Special Agent Demeo and Insurance Fraud Bureau Investigator DiPaolo drove to 45 Crescent ST, Franklin, MA 02038 to interview Meredith Scanlon. Agent Demeo and Investigator DiPaolo introduced themselves to SCANLON and displayed their credentials. Agent Demeo explained that they are assisting in a grand jury investigation and would like to ask her some questions. SCANLON gave the following information:

1. Her name is Meredith SCANLON. Her current residence is 45 Crescent Street, Franklin, MA. Her home telephone number is (508) 520-4110.

2. SCANLON started working at DAILY A KING (DAK) in September of 1996. Aimee KING hired SCANLON to run payroll. SCANLON was friends with KING'S daughter Aimee. SCANLON replaced Kim Brown.

3. SCANLON stated that Michelle Pauliks, KING'S daughter, trained her. KING was her supervisor from 1996 until 1999 or 2000 when Pauliks took over for KING.

4. KING worked everyday from 8:00 a.m. to 5:00 p.m. Then KING started babysitting her grandchild over the past two years. Currently, KING does not have a set schedule.

5. SCANLON stated that Mike Powers helped train her. Powers was computer literate. Powers was the assistant to the controller until Powers left in May of 1998.

6. Charles WALLACE is the controller. Dan MCELROY, KING'S husband walked around the office to monitored what went on. MCELROY was not involved with the employees but constantly talked to WALLACE.

7. SCANLON stated that PRECISSION TEMP was a sister company of DAK which, is not in WALLACE'S name but he controls everything.

8. The workload decreased as DAK was losing accounts and SCANON was eventually laid off.

9.  WALLACE sent out a letter to all of DAK'S accounts stating the minimum wage was increasing. Therefore, their rates will be adjusted. One of DAK'S biggest accounts, North Coast Seafood was upset and stopped doing business with DAK in October of 2000. SCANLON stated that approximately 100 temporary employees were provided to North Coast. North Coast found their own workers and sent the employees' employment applications and identification to DAK for processing.

10. Miguel, a DAK employee was a recruiter who provided a set of about 50 workers to Homer Wharf Seafood, New Bedford. SCANLON stated that Miguel would send employment applications and identification to DAK for the workers.

11. SCANLON stated her duties included working on certain accounts. Hours would be faxed in and she would input them into the computer and produce an invoice. The information would be then downloaded to the main computer that is located in Pauliks office.

12. Young Aimee and Pauliks processed the payroll checks. SCANLON would get the payroll checks for her accounts. SCANLON would put the checks into envelopes, verify the amount and make a sign sheet. George Wallace would bring the payroll to each company on various dates and return the sign sheets. SCANLON stated that the sign sheets were stored in a file cabinet in the storage area.

13. SCANLON stated that a backup copy of all accounts were made using Quickbooks software. An accounts receivable overage report was prepared by SCANLON and reported to Pauliks, Young Aimee and MCELROY.

14. SCANLON stated that in May of 1998 Mike Powers and John Mahan left DAK and started Commonwealth Temps. Powers left DAK on bad terms. SCANLON stated that KING and MCELROY are very bitter at Powers and said he is stealing their clients.

15. Two other ex-employees, Bob Ballesterci and Bob Hunt started their own temporary employment agency, BJ Temps in early 1998. BJ Temps operates out of the New Bedford Area.

16. SCANLON entered hours worked by employees for each client onto DAK'S computer system. The hours worked were use to generate invoices. SCANLON stated she would occasionally help Pauliks input data for PRECISSION onto floppy disks and hand the disks to WALLACE. Pauliks assisted WALLACE with the books and records of PRECISSION. Michelle Ferrara took over for Pauliks while she was on maturity leave.

17. SCANLON stated that PRO TEMP, PTC and PRECISSION are the same business. Sometime in the year 2000 PRO TEMP became PRECISSION. SCANLON stated that Dich Trieu was name associated with PRO TEMP and Xieu Van Son was the name associated with PRECISSION. WALLACE operates both entities for KING and MCELROY.

18. SCANLON stated that the office workers answered the phones for DAK but denied any knowledge of PRO TEMP and PRECISSION. All calls for PRO TEMP and PRECISSION were directed to a different phone number. The office workers told callers, especially calls

relating to workers compensation issues, that WALLACE worked for another temp agency. PRECISSION maintained a cell phone number addressed to 448 Turnpike ST Stoughton.

19. SCANLON stated that the day before a worker's compensation insurance audit people would scurry around the office and met in secrecy, doors were always locked. The audit took place with WALLACE and MCELROY behind closed doors.

20. SCANLON stated that MCELROY is "the man behind the curtain. Nothings done with out MCELROY or KING knowing." SCANLON stated that MCELROY may have the title of vice president but he does not take any calls or interact with the office staff regularly. MCELROY keeps his name unknown.

21. PRO TEMP provided employees to clients in Rhode Island but DAK did not. PRO TEMP stopped servicing Rhode Island before it changed to PRECISSON. PRECISSION did not operate in Rhode Island. PRECISSION had more clients than DAK. PRECISSION and DAK used the same employees. Only Christine from Northern Wind and Rich from Gateway Seafoods knew that DAK and PRECISSION were related and that WALLACE worked for both.

22. SCANLON stated that every Friday WALLACE and MCELROY would met Trieu, Van Son, Sotha Khuth and Charm. WALLACE would escort either Trieu or Van Son to the bank to get cash. SCANLON stated that MCELROY would meet WALLACE in the conference room or in WALLACE'S office when WALLACE returned from the bank with the cash. Charm and Khuth did not go to the bank.

23. SCANLON stated that John Warren is a salesman for DAK and has signed as vice president but he has no decision-making authority.

24. SCANLON stated that J.Baker is a client of DAK that has a cash payroll except for Hubert Vesquez. George Wallace delivers the payroll to J.Baker.

25. SCANLON stated that the payroll records for PRECISSION are stored on floppy disks. Each disk contains one client. SCANLON stated that PRECISSION payroll was primarily cash. She was unsure if any payroll checks were prepared.

26. Agent Demeo showed SCANLON a few documents. SCANLON identified WALLACE'S handwriting on the yellow sheets provided. SCANLON stated that WALLACE prepared spreadsheets that contained hidden columns.

27. SCANLON stated that Candida a/k/a Marina and Marco a/k/a Ronnie Rodriguez are married and run the Chelsea DAK office. SCANLON stated that Marco and Candida use different names on their payroll checks and also receive cash. Marta Rodriguez is Marco's daughter. She runs an office in Chelsea for PRO TEMP. Marta drives to DAK in S. Easton on Fridays to pick up payroll.

28. SCANLON stated that Hui Ly has worked for MCELROY and KING for over 10 years. Ly worked for the DAN Agency and DAILY Agency. Ly traveled to New York once a week. SCANLON stated she saw Ly folding a check and put it into his pocket as he was

exiting WALLACE'S office. Ly has been seen in MCELROYS office.

29. Ly operated an office in Rhode Island with a man named Harry. Harry had a gambling problem and used Ly's name for gambling. In an effort to erase his gambling debt Harry shot Ly 5 times.

30. In January of 2000 Ly was the victim of a home invasion. A gang of kids stole $100,000.00. A second invasion was made in March of 2000 and $30,000.00 was stolen.

31. SCANLON stated that Ly's wife works for DAK at Sarah Michael's and thinks her name is Rhonda. Rhonda Ly gets paid by check.

32. SCANLON stated that KING and MCELROY met in Providence RI. KING was MCELROY'S secretary. They got married sometime in 1995. SCANLON stated that KING and MCELROY have a timeshare in Aruba and Florida and they are investors in the Rack Ltd. A pool hall in Boston.

Agent Demeo told SCANLON to call if she recalls any additional information. Agent Demeo and investigator DiPaolo thanked SCANLON for her time and cooperation. The interview concluded at approximately 11:40 a.m.

Thomas Demeo
Special Agent

I prepared this memorandum on September 27, 2001, after refreshing my memory from notes made during and immediately after the interview with Meredith SCANLON.

Thomas Demeo
IRS Special Agent

I certify that this memorandum contains all pertinent facts discussed during the interview with Meredith SCANLON on July 27, 2001.

Anthony DiPaolo
Insurance Fraud Bureau Investigator

# EXHIBIT 5

FD-302 (Rev. 10-6-95)



- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____ 4/26/00

      MICHAEL F. POWERS, JR., date of birth June 1, 1964, Social Security Account Number 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, and residing at 59 Tickle Road, Westport, Massachusetts (MA) 02790, telephone number (508) 951-0981, was interviewed at the UNITED STATES ATTORNEY'S OFFICE in the presence of his attorney, GEORGE GARFINKLE. Participating in the interview were Assistant United States Attorney (AUSA) PAUL LEVINSON and INSURANCE FRAUD BUREAU OF MASSACHUSETTS Deputy Chief of Investigations, ANTHONY DIPAOLO. POWERS was advised of the official identities of the interviewing parties. Further, he was provided with an Immunity Letter which he read and signed. AUSA LEVINSON went through the Immunity Letter, paragraph by paragraph, to ensure all points were understood by POWERS, after which POWERS provided the following information:

      POWERS has a Business Administration/Management Degree from STONEHILL COLLEGE. In 1996, POWERS was an Administrator for an ambulatory clinic. The clinic's accountant was CHARLIE WALLACE. In May, 1996, WALLACE approached POWERS about going to work for one of WALLACE's other clients located on the South Shore, closer to POWERS' home. POWERS, tired of his commute to the ambulatory clinic, met with the client's principals, AIMEE KING and DAN MCELROY. During this meeting, POWERS learned that KING and MCELROY were WALLACE's prime clients and operated a temporary labor service, as well as a gift shop and dry cleaner. Although the job represented a cut in pay for POWERS, he accepted the position as it would be a shorter commute and more "family friendly." POWERS began working for KING and MCELROY, doing business as DAILY A. KING LABOR, INC. (DAK), on June 3, 1996.

      By way of background, POWERS advised that MCELROY originally owned a temporary labor agency known as the DAN AGENCY. The DAN AGENCY had customers in Rhode Island and New Jersey. The company got "into trouble" and closed up. MCELROY met and married KING and opened a successor company known as the DAILY AGENCY. The company used a Lowell Post Office Box as its address. The DAILY AGENCY also ran into trouble and closed up. Subsequently, the company reopened under the name of DAILY A. KING LABOR, INC. A subsidiary or shell company by the name of PRO TEMP was opened up in the name of DICK TRIEAU. Despite the fact that TRIEAU is listed as the "Principal" of PRO TEMP and

---

Investigation on _____ 4/10/00 _____ at Boston, Massachusetts

File # 196B-BS-86742 _____ Date dictated _____ 4/24/00

by _____ SA NANCY L. MCCORMICK:alc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___MICHAEL F. POWERS, JR.___ , On 4/10/00 , Page   2

KING as the "Principal" of DAK, MCELROY actually "calls all the shots" for both agencies.

POWERS' initial duties were not too difficult. He was mainly responsible for data input of invoices. The administrative staff was very disorganized, possibly due to the nepotism of the company. At that time, there were three clerical employees doing the billing for DAK. KING had a very hands-on role. WALLACE was also involved in billing and administrative actions for PRO TEMP. POWERS assisted WALLACE in entering time sheet data associated with PRO TEMP. Over time, POWERS became more involved in all aspects of DAK's business. He met with customers and performed a sales function as well. He continued having a hand in the billing process and also in PRO TEMP's business.

POWERS advised DAK had problems with LIBERTY INSURANCE at the time he began his employment. LIBERTY had canceled DAK's insurance and had sent cancellation notices to DAK's customers. DAK sent form letters to customers holding Certificates of Insurance through LIBERTY INSURANCE, advising their customers that DAK would have the appropriate insurance coverage despite the cancellation notices. DAK set up a contingency plan to move its employees from DAK to PRO TEMP.

POWERS recalled speaking with WALLACE in the Fall of 1996, regarding LIBERTY MUTUAL. LIBERTY Auditor RICH DIORIO of LIBERTY's Westwood, MA, office, conducted the 1995 audit for DAK's policy. DIORIO wanted to correlate an injury claim to DAK's payroll list. The injured employee's name did not appear on the payroll. DIORIO attempted to set up a meeting with DAK, wherein he could review their bank records and 941's. POWERS commented that this would have been more comprehensive than most audits. POWERS recalled a conversation with WALLACE, wherein WALLACE told POWERS that they had "played around with trying to secure the auditors cooperation with a bribe." The decision was made not to attempt to bribe the auditor, due to his good reputation. Instead, WALLACE prepared week-by-week worksheets which he gave to DIORIO. DIORIO did not accept these as a substitute to the bank records and 941's.

At the same time, DAK was referred to an insurance agent by the name of HAROLD KNIGHT, who specialized in hard-to-

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of   MICHAEL F. POWERS, JR.                    , On 4/10/00   , Page   3

insure risks.  KNIGHT found insurance coverage for DAK with
RELIANCE NATIONAL INSURANCE (RELIANCE) and an insurance program,
wherein premium was based on the company's actual losses times a
thirty-seven percent profit multiplier.   POWERS also believed
that DAK started another corporation by the name of D.W.M., INC.,
which could serve as a "safe harbor" because they believed they
were "in a box."

        In 1997, litigation and discovery with LIBERTY MUTUAL
was on-going.  DAK retained BURNS and LEVINSON to represent them
in their case with LIBERTY.  MCELROY is good friends with GEORGE
TOBIA (phonetic), who recommended BURNS and LEVINSON because of
an attorney there who is very knowledgeable in insurance matters.
DAK settled it's case with LIBERTY for the estimated premium
amount of $735,000.  POWERS believed DAK was required to pay
LIBERTY $700,000 of the $735,000, in an agreed upon installment
plan.  It was costly litigation for DAK.

        POWERS never participated in any LIBERTY audits and was
unsure if DAK ever provided LIBERTY with any 941's.  An auditor
from LIBERTY called DAK looking for information.  WALLACE
provided the auditor with some information, but not all of it.
WALLACE withheld information regarding a $200,000 customer known
as AVID THERMAL TECH.  POWERS called the LIBERTY auditor after he
left DAK to report this information.  PRO TEMP also had insurance
coverage with LIBERTY's New Hampshire office.  New Hampshire
shares information with DET and the Workers' Compensation Board.

        POWERS had an "inclination" that there were problems at
DAK, particularly with their financial statements, when DAK was
asking for a $250,000 Letter of Credit (LOC) from the bank.
POWERS observed two sets of financial statements, each with
different numbers.  The numbers used for the bank were high, so
that the company would be approved for their LOC.  The numbers
used for insurance purposes were low, so as to keep premiums low.
In connection with obtaining the LOC, WALLACE asked POWERS to
draft up some stationery for him with WALLACE's name followed by
"CPA" on it.

        POWERS was not sure if the financial records presented
to the bank were accurate, but the ones presented to DAK's
insurance carriers were not.  WALLACE altered and prepared
financial records for the insurance auditors based upon the

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of    MICHAEL F. POWERS, JR.                    , On 4/10/00    , Page    4

amount of money DAK wanted to pay for workers' compensation
insurance premiums. The premium amount was "backed into" by
putting together a spreadsheet containing only partial
information from DAK's true payroll. The premium amounts changed
from year to year.

Ninety-five percent of DAK's business was in the fish
processing industry. The fish industry is a notoriously high
risk industry with low payoffs. A number of DAK's deals with
fish industry customers were completely nonsensical, as there
would have been no way DAK could have legitimately or legally
completed the job based upon the dollar amount of the contract.
DAK was accepting jobs with customers that were only a $1.25 over
minimum wage. That $1.25 was insufficient to cover workers'
compensation expenses, let alone all the other expenses.

POWERS' first insurance audit at DAK occurred after the
company switched to RELIANCE. RELIANCE Auditor GARY SCRANTON set
up an appointment to come to DAK's office and review their
records, including 941's. The night before SCRANTON's visit,
POWERS, WALLACE and MCELROY spent the night at DAK's office
"selectively culling payroll records" in preparation for their
meeting with SCRANTON. Fabricated and/or incomplete 941's were
provided to SCRANTON during his visit. Other "real" spreadsheets
and records were offered to SCRANTON auditor merely to add
legitimacy to what had been provided. True records were never
actually provided to SCRANTON. POWERS advised he did not "lose
sleep" over their actions because the premium was based on DAK's
loss history and claims and not on their payroll.

DAK employs many ethnic minorities. W-3's are
prepared, but are most likely not being forwarded to Social
Security. POWERS recalled receiving blank 941's, some of which
may have been completed and filed. DAK made lots of "off-the-
books" payments and cash payments to their employees. The
majority of DAK's and PRO TEMPS' payroll was in cash. POWERS
estimated that DAK paid between $150,000 and $200,000 per week in
payroll. He estimated yearly clerical payroll at approximately
$100,000.

The various Cambodian, Puerto Rican and other ethnic
minorities who work for DAK are often transported to job sites in
vans. POWERS described the van drivers as "entrepreneurial",

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of    MICHAEL F. POWERS, JR.                    . On 4/10/00    . Page    5

getting paid a certain dollar amount per mile for gas and also
collecting five dollars per passenger from the riders.  POWERS
described the Cambodian community as "very tight-lipped."

DAK kept bank withdrawal amounts to a minimum, normally
under $10,000, to avoid the generation of suspicious activity
reports (SARs) by the bank.  This was a cumbersome activity which
POWERS was chosen to complete.  POWERS cashed numerous checks for
the company at the bank.  KING did not handle cash because of a
signed agreement she had with the DEPARTMENT OF WAGE AND LABOR.
KING had been in trouble before for paying employees in cash.  As
part of this agreement, she agreed not to no longer pay her
employees with cash.  MCELROY handled cash and cash disbursements
and maintained a "little ledger" to document cash transactions.

DAK formerly did their banking with QUINCY SAVINGS
BANK.  There were employees of QUINCY SAVINGS BANK who would
allow DAK to cash checks in excess of $10,000 without filing
currency transaction reports (CTRs).  QUINCY SAVINGS BANK was
subsequently taken over by CITIZENS BANK.  DAK was still able to
cash checks with CITIZENS BANK.  The bank is now operated by
FLEET BANK and POWERS is unsure as to whether or not the same
arrangement still exists.  The branch used by DAK is located in
the STONEHILL COLLEGE area.

POWERS advised that funds were gathered throughout the
week as DAK's customers paid their bills.  On either Thursday
evenings or Fridays, MCELROY filled envelopes with cash for
disbursement to the employees.  MCELROY did not distribute the
cash himself, but had "Lieutenants" to do that for him.  A
Cambodian by the name of HUI LEE from Providence, Rhode Island
(RI), was one of these Lieutenants and SOTHA KHUTH from Fall
River, MA, was another.  POWERS advised that LEE was a recent
victim of a home invasion and KHUTH was recently charged with
Statutory Rape of a fourteen year old.  WALLACE was responsible
for distributing cash to MARCO RODRIGUEZ at DAK's Chelsea
facility.  POWERS believed that the Chelsea facility was raided
by the IMMIGRATION AND NATURALIZATION SERVICE (INS) in 1998.

DAK also did work in New Jersey.  To get the cash to
these employees, LEE drove money to an individual in New York who
in turn, brought the to New Jersey.  POWERS estimated the overall
cash payments by DAK to be in the vicinity of $150,000 to

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ____MICHAEL F. POWERS, JR._____, On _4/10/00_____, Page ___6___

$160,000 per week on a low week, and $250,000 to $260,000 per week on a high week.

At the end of 1997, POWERS noticed a lot of cash being paid out for other reasons and commented to WALLACE that the business did not appear to be profitable because of all of these cash payments. In early 1998, KING had a line of gift shops at various hotels throughout the country. The bills for these shops were not being paid. POWERS made a decision to leave DAK after "two shake down events." One was the reconciling of the 1997 books, after which it appeared that the blame was being placed on POWERS. KING "bitched out" POWERS and WALLACE for the gift shop bills which were not being paid. The second was a call from the Massachusetts DEPARTMENT OF REVENUE (DOR) regarding withholdings which had not been paid for two months in 1996 and all of 1997, resulting in over $600,000 in unpaid withholdings. No one seemed to care.

In May, 1998, POWERS told MCELROY and KING that he was leaving. They did nothing to stop him from leaving and gave him four paychecks. POWERS contacted someone from Massachusetts DOR after he left DAK. He also called GARY SCRANTON at RELIANCE to advise him that RELIANCE needed to take a longer look at DAK. After POWERS had given his notice and had left DAK to pursue other employment opportunities, he was approached by a sales associate about starting a temporary service agency of their own. POWERS and his partner now operate their own temporary agency but do not get involved in work within the fish industry.

POWERS helped WALLACE with data input for tax purposes in 1998. WALLACE had an old computer which he gave to POWERS in lieu of payment. POWERS advised that he later did an inventory of the hard drive and found information relating to DAK. The records include Excel worksheets and invoices regarding cash payments to customers not on any 941's. POWERS kept one of the hard drives and gave the second, along with the computer, to his mother. POWERS advised that with a subpoena, he would provide the computer hard drive and any other records regarding DAK, in his possession.

KING and MCELROY live in a house owned by the "COW HILL TRUST", which they purchased for $350,000 cash. They conveyed this property to their daughter, HEATHER KUKSTIS. When it came

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___MICHAEL F. POWERS, JR._____ , On 4/10/00___ , Page ___7___

time to purchase the home, MCELROY told WALLACE that he needed cash and told him to do whatever he needed to do to make that cash available. Both KING and MCELROY have a license to carry a handgun. WALLACE also carries a gun, which POWERS has observed.

At one point, the INTERNAL REVENUE SERVICE (IRS) began making inquiries of PRO TEMP's alleged owner DICK TRIEAU. TRIEAU owed approximately $500,000 in back payments to the IRS. The repayment plan required TRIEAU to make $10,000 per week payments to the IRS. TRIEAU's partner, XIEU VAN SON, set up a second company known as PTC COMPANY, to replace PRO TEMP in the event it had to fold quickly. A new bank account was established in the name of PTC COMPANY. At the same time this was occurring, DAK tried to "appease" TRIEAU by purchasing his home at 41 Clair Street, Lowell, MA, for him.

MCELROY also operates a company known as POWER-IT, a battery recharge product, and a dry cleaning business. POWER-IT charges $59.00 for a product which costs them only $8.00 to produce. They do this by using "Do Not Recharge" batteries and repackaging them.

DAK paid WALLACE $3,000 per month, but WALLACE most likely received additional cash payments. WALLACE was formerly employed at ABRAHAM COHEN, CPA. WALLACE has a rather radical appearance and had the reputation for turning a lot of people off. WALLACE has a Federal Criminal Record.

POWERS suggested matching up DAK's tax information to their reports. Although they never claimed cash, cash payments would be found on the line item entitled "Contract Labor". This was done so that DAK could take a deduction. The line item known as "Outside Service Agencies" reflected cash and/or payments to PRO TEMP. Although this information is present on DAK's filed tax records, it will not show up on the records presented in connection with their workers' compensation insurance. Because the IRS is not interested in insurance issues, DAK and PRO TEMP were able to get away with the conflicting reports/numbers.

POWERS claimed that the financial statements supplied to the RELIANCE auditor in December, 1996, were "pure fiction", created from made-up numbers and strictly for the consumption of DAK's targeted audience. To lend credibility to the financial

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ____MICHAEL F. POWERS, JR._____ , On _4/10/00_____ , Page ___8___

statements, DAK was able to show copies of 941's created to match
the financial data.  DOR and DET records are the most accurate.

Records pertaining to the companies are stored in two
self-storage facilities, EASY MINI STORAGE, located on Route 140
in Taunton, and SELF STORAGE U.S.A., located on Route 138 in
Easton.  There is also storage within the DAK facility.  The
office space at 24-D Norfolk Street, Easton, MA, houses DAK,
POWER-IT and PRO TEMP.  Boxes of records are maintained on the
mezzanine level of that office space.  Personal tax records are
maintained in the home of WALLACE.

DAK and PRO TEMP have an arrangement with METRO MEDIC
WALK-IN to treat employees who get hurt on the job.  This
arrangement allows DAK to circumvent RELIANCE and the submission
of injury claims.  POWERS believed that DAK spent approximately
$50,000 on bills to METRO MEDIC WALK-IN.

ROBERT BALESTRACI, the Operational Chief of the
"fishing world" in New Bedford, and ROBERT HUNT, a former New
Bedford State Senator, formed their own temporary service agency
called B.J.'S SERVICES.  B.J.'S SERVICES is also "in tight with"
METRO MEDIC WALK-IN.

DAK and PRO TEMP "used" each other when they got
audited by their insurance carriers.  DAK used PRO TEMP to
explain their lack of employees and low payroll; PRO TEMP claimed
DAK as their subcontractor.

POWERS advised that it may be difficult to tie MCELROY
to the various companies.  POWERS has at least one contract with
SARAH MICHAELS, the maker of bath items, which MCELROY signed.
MCELROY has also represented himself as the Principal of DAK, to
ALAN LEPPO of HONOR ROLL, INC., Liberty Street, Brockton.

POWERS advised that MCELROY grew up in Dorchester and
is a "street kid".  MCELROY has donated/invested money into the
Boston bar known as "THE RACK".  One of the salesmen for MCELROY's
company, POWER-IT, is JOE SAMPSON.  SAMPSON is the nephew of
JERRY ANGUILO.  MCELROY often bragged about having an open ticket
to Aluthra, a small island in the Bahamas.

# EXHIBIT 6

FD-302 (Rev. 10-6-95)



- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  8/30/01

          DICH TRIEU, date of birth: May 31, 1948, Social
Security Account number: 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, residing at 36 Clare
Street, Lowell, Massachusetts 01854, telephone number: (978) 453-
9017, was interviewed at the United States Attorney's Office in
the presence of his attorney, JOHN PALMER, and after reviewing
and signing a proffer letter.  Participating in the interview
were Special Agent (SA) NANCY L. MCCORMICK, Assistant United
States Attorney (AUSA) PAUL LEVENSON, AUSA JENNIFER BOAL,
Internal Revenue Service (IRS) SA TOM DEMEO, Insurance Fraud
Bureau of Massachusetts Investigator ANTHONY DIPAOLO, and United
States Attorney's Office law clerk, REBECCA GREGORY.  After being
advised of the official identities of the interviewing parties,
and after reviewing the proffer letter, signing it, and
acknowledging that he understood the implications of the letter,
TRIEU provided the following information:

          TRIEU is a Cambodian who was born in Vietnam, but
escaped to the United States through the Philippines.  TRIEU
spent approximately four months in the Philippines before coming
to the United States (U.S.) in November of 1981.  He stayed with
friends in the U.S. whom he had known in Cambodia, and found work
through a Cambodian refugee program.  He was laid off from his
position at this program approximately three years later.  He
accepted work and moved to Lowell, Massachusetts in approximately
1990.  Friends in the Lowell area helped him find work at a
number of different places, including the NATIONAL INSTITUTE OF
LOWELL, where he worked for approximately 1 ½ years; CMMA, the
Cambodian Association where he worked for approximately 1 ½
years, and finally the DAILY AGENCY (later named DAILY A. KING
LABOR) where he has worked for the past six to seven years.
TRIEU was introduced to the DAILY AGENCY by XIEU VAN SON.  VAN
SON was also born in Vietnam, and was familiar with TRIEU and his
family.

          The DAILY AGENCY was operated by DAN MCELROY.  MCELROY
worked out of the 24 Norfolk Street location.  TRIEU first met
MCELROY in Lowell while MCELROY was in Lowell visiting with some
of TRIEU's friends, including VAN SON.  VAN SON had advised
MCELROY that he could introduce him to many people in the Lowell
area who were available to work.  TRIEU was one of those
individuals, and MCELROY offered TRIEU more money than he was

| Investigation on  8/7/01 | at Boston, Massachusetts |
|---|---|

File # 196B-BS-86742                              Date dictated  8/15/01

by   SA NANCY L. MCCORMICK/krs

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                          , On 8/7/01        , Page    2

making with the Cambodian Association.  Therefore TRIEU accepted
a position, and began working for the DAILY AGENCY.

        TRIEU's starting salary at the DAILY AGENCY was $250.00
per week.  He was responsible for contacting people to work for
the temporary employment agency.  TRIEU gave applications to the
potential workers, and arranged for them to be brought to work in
vans.  TRIEU also located the van drivers to perform this task.
In addition to locating employees, TRIEU also completed paperwork
on behalf of the employees which he submitted to either MCELROY
or CHARLIE WALLACE.

        Salesmen associated with the DAILY AGENCY were
responsible for locating the client companies.  TRIEU maintained
a waiting list of workers from which he could draw when he
received orders from the salesmen for workers to be sent to
various companies.  TRIEU also visited the client companies and
interacted with the supervisors.  After arranging for workers to
fill each day's/week's staffing requirement, TRIEU either went
home or to a DAILY AGENCY office located in Lowell on 287
Appleton Street.  The DAILY AGENCY maintained another office in
Lowell on Pawtucket Boulevard at Middlesex Street, and also a
main office at 24 Norfolk Street in Easton, Massachusetts.

        TRIEU and VAN SON were the only two employees working
out of the Lowell offices.  Each had the same duties, that of
finding workers and making them available for various jobs.  In
addition, TRIEU and VAN SON were responsible for paying employees
their weekly salaries.  Initially, VAN SON's friend, HARRY THACH,
brought the payroll, in large amounts of cash, up from the Easton
office to Lowell.  TRIEU and VAN SON sometimes divided up the
payroll for each employee, while on other occasions, the money
would already be divided.  The money was placed into envelopes
which were labeled with each employee's name.  Employees came to
the Lowell office to collect their pay where they were required
to sign for the money.

        Employee payroll amounts were determined based upon the
time slips received from the client companies.  Employees were
generally paid $6.50 to $7.00 per hour.  Weekly salaries were
determined by multiplying the hourly rate times the number of
hours worked.  The payroll sheets, along with the employees
signatures acknowledging receipt of payment were returned to

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of ___DICH TRIEU_____ , On _8/7/01_ , Page __3__

WALLACE in the Easton office.

After THACH left, TRIEU and VAN SON were responsible
for not just distributing the payroll, but also for obtaining it
from Easton.  MCELROY asked TRIEU and VAN SON to come to Easton
in order to collect the payroll money.  Most employees were paid
in cash, so the bulk of payroll collected was in cash.  A few
employees received checks.  Only employees who specifically
requested check payments received a check.  TRIEU was not sure
why certain employees needed to be paid by check.  If an employee
requested to be paid by check, TRIEU would first talk with
MCELROY, whom he described as his boss, to get MCELROY's okay.

Prior to obtaining the money for the payroll, TRIEU or
VAN SON reported the amount of money needed to either WALLACE or
MCELROY.  The amount of money needed was normally requested via
telephone.  TRIEU advised that he was not able to determine how
much each employee should be paid on his own.  Rather, he had to
listen to MCELROY who told him how much each employee should be
paid.

The offices in Lowell were rented by MCELROY/DAILY A.
KING.  The name of the company appeared on the office.  Prior to
renting the offices, MCELROY came up to Lowell to look at and
approve the locations which had been located by VAN SON.  Only
after MCELROY gave his approval, were the locations secured.
Neither TRIEU nor VAN SON paid rent for the offices.  TRIEU was
uncertain as to how the rent was paid.  Other expenses, such as
furniture, telephone, fax machine and copier, were all paid by
MCELROY.

TRIEU's starting salary for his first five to six
months of employment was approximately $250.00 per week.  His
salary progressively increased to a high of $750.00 per week when
he was involved with an affiliate company known as the PRO TEMP
COMPANY (PRO TEMP).  TRIEU was paid in cash, although he
initially believed he was going to be paid in check.  TRIEU
believed MCELROY increased his pay because he was a good worker
who found a lot of employees for PRO TEMP and also because TRIEU
agreed to put the company in his name.

TRIEU advised that while PRO TEMP was listed in his

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                                        , On 8/7/01    , Page    4

name, the company was actually MCELROY's. MCELROY merely "used my
name for his business." TRIEU claimed he reminded MCELROY to be
sure and pay the taxes, and MCELROY assured him that he would and
told him not to worry. TRIEU advised that he respected MCELROY,
and all Americans for that matter, and believed that MCELROY
would take care of paying the taxes for PRO TEMP.

TRIEU was asked how it came to be that PRO TEMP was put
in his name. TRIEU responded that MCELROY called him one day and
asked him to come to MCELROY's home in Sharon, Massachusetts.
Once there, MCELROY asked TRIEU if he wanted to earn a little
more money. MCELROY told TRIEU that they would work together,
and asked TRIEU for his driver's license and Social Security
Account number. TRIEU visited MCELROY at his home a second time.
MCELROY asked TRIEU to sign some forms and paperwork, and told
TRIEU that he would pay him $300.00 more per week than he had
previously been earning. TRIEU was still concerned about taxes,
and raised the issue again. MCELROY again reiterated that he
would pay the taxes, and TRIEU should not worry.

TRIEU was asked by MCELROY to obtain cash on his
behalf. MCELROY would claim that there was not enough money at
time to meet the payroll. Both MCELROY and WALLACE gave TRIEU
large checks, normally in amounts of $5,000.00 to $7,000.00, to
cash at the company's bank. TRIEU never went to the bank alone;
he was always accompanied by either MCELROY or WALLACE.
Occasionally, TRIEU would take two checks to the bank and cash
them. TRIEU cashed a number of PRO TEMP checks. He believed he
also cashed one check for PRECISSION TEMP, another affiliate
company of DAK. TRIEU did not continue to cash checks for
PRECISSION TEMP after he told WALLACE that he no longer wanted to
this.

The PRO TEMP checks were signed in TRIEU's name. TRIEU
occasionally signed some of the checks directly, but more often a
signature stamp was used. TRIEU believed WALLACE had the stamp
made up with his signature. The teller at the bank knew both
TRIEU and WALLACE. Some of the checks which he cashed were for
amounts of $60,000.00 or $70,000.00.

TRIEU owns his own home, which is located in Lowell,
Massachusetts. He saved for a long time and had approximately
$20,000.00 saved at the time of the purchase. The price of the

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                                    , On  8/7/01        , Page    5

home at the time of the purchase was $43,000.00.  TRIEU spoke
with both MCELROY and WALLACE, and showed them a photograph of
the house he was planning to purchase.  MCELROY and WALLACE told
TRIEU that they would "take care of it," and would allow TRIEU to
borrow $20,000.00 to put towards purchasing the home.  TRIEU was
concerned about paying back the money, and a repayment plan was
arranged.  TRIEU was required to pay $500.00 per month on the
loan.  The payment was taken directly out of his weekly salary.
TRIEU has paid back all the money and owes nothing on the house.

TRIEU described DAN MCELROY as the "big boss" of both
PRO TEMP and PRECISSION TEMP.  He described AMY KING MCELROY as
the owner of DAILY A. KING LABOR, although he never took orders
directly from her.  TRIEU advised that he has worked for both PRO
TEMP and PRECISSION TEMP.  TRIEU described VAN SON as being the
owner of PRECISSION TEMP in the same way that he was the owner of
PRO TEMP.  VAN SON is simply the listed owner, and not the
actually owner.

TRIEU stated he does not, nor did he ever, make any
decisions on behalf of the company other than things like buying
paper or other office supplies.  MCELROY makes the decisions, and
takes care of what is needed.  TRIEU is reimbursed for any
expenses he incurs in connection with the business.  TRIEU
purchased his own car, but MCELROY pays for his gas, which
normally runs approximately $50.00 per week.  Workers'
compensation insurance for the company was handled by WALLACE.
TRIEU does not understand insurance issues, and brings all mail
related to insurance to WALLACE.

TRIEU has no capacity to set prices with the client
companies.  TRIEU never sees checks from the client companies.
TRIEU believed that price setting was controlled by the
salespeople who contacted potential clients on behalf of the
company's Easton office location.  Once client companies are
secured and specific employee requests are established, the
information is faxed to TRIEU in the Lowell office, telling him
who to call at the client company, and what the client company is
expecting.  TRIEU recalled the first names of two salesmen, that
of a MICHAEL and a JOHN.  Salesmen are assigned to various areas.
Salesmen change often.  TRIEU has minimal contact with the
salesmen.  Most of TRIEU's contacts are with either WALLACE or
MCELROY.  They call each other on cellular phones or at the

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU                                   . On 8/7/01       . Page    6

office, or speak in person when he goes to the Easton office.

        TRIEU hand carriers/returns the previous week's
signatures for payroll to WALLACE, and occasionally to MCELROY,
to the Easton office, usually on Fridays. He obtains the payroll
for the next week at the same time. TRIEU's trips to the bank to
cash checks are on different days. TRIEU often goes to Easton
one to three days per week. In addition to Fridays, TRIEU is in
Lowell often on Tuesdays or Wednesdays.

        TRIEU believed that PROTEMP was replaced by PRECISSION
TEMP, and that his name was no longer associated with PRECISSION
TEMP. TRIEU does not go to Easton as frequently since PROTEMP
shutdown.

        TRIEU was asked if he was aware of the search conducted
by the Federal Bureau of Investigation (FBI), to which he
responded no. He claimed he was aware that people were being
subpoenaed, but that MCELROY did not say anything to him about
the investigation. VAN SON told him that federal investigators
had been around the Easton building. After receiving his
subpoena, TRIEU spoke with WALLACE about it. WALLACE advised
TRIEU to obtain a lawyer. Subsequently, a lawyer for DAILY A.
KING called TRIEU to help him find an attorney. TRIEU advised
the company is not helping him pay for his attorney. Further, no
one from the company was aware that TRIEU was meeting with
federal authorities today, and he has not discussed this meeting
with anyone.

        TRIEU advised that PROTEMP "disappeared" approximately
two years ago. He was not sure why. The company had been in
business for approximately three to four years.

        TRIEU estimated the payroll for the Lowell area alone
to be approximately $8,000.00 to $9,000.00 per week. TRIEU has
had no problems with individuals attempting to rob him or break
into his home or office. He advised that he is very careful, and
locks his doors. He does not pay anyone for protection. TRIEU
advised that at the current time, he earns approximately $450.00
per week. TRIEU is also paid a bonus at the Christmas/New Year's
time of approximately $1,000.00 to $2,000.00.

        TRIEU files personal taxes which are prepared by

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU _____ , On 8/7/01 ____ , Page ___7___

      WALLACE.  TRIEU does not earn income from any other employment,
other than his employment with MCELROY.  TRIEU has been separated
from his wife for approximately 20 years.

      TRIEU advised that there were occasions when he was
taken to more than one bank with smaller checks to be cashed.  He
was driven to each of the banks by either WALLACE or MCELROY.  He
was accompanied into the bank by one of these individuals as
well.

      At this time, there was a break in the interview, and
both TRIEU and his attorney stepped out of the interview room.

      TRIEU advised that after being served with his Federal
Grand Jury subpoena in the parking lot of DAILY A. KING LABOR, he
brought the subpoena inside and showed it to WALLACE.  TRIEU told
WALLACE that he was sad and worried.  TRIEU knew that there was a
problem, and thought it might be connected to his taxes having
not been paid.  He told WALLACE that WALLACE needed to help him.
TRIEU did not have any records, and does not understand English
all that well.  TRIEU explained that WALLACE works directly for
MCELROY, and that they were responsible for this situation, and
therefore needed to help him.  TRIEU went to a lawyer himself
before receiving a call  from DAILY A. KING's lawyer.

      TRIEU advised that he depended on WALLACE for a lot.
MCELROY treated him like family, even stating words to the
effect, "Your family is my family."

      TRIEU was shown a copy of an insurance questionnaire
pertaining to PRECISSION TEMP.  TRIEU advised that his signature
was on the bottom of the questionnaire dated 6/15/2000.  TRIEU
advised that he never went to the insurance company, but may have
signed this document at DAILY A. KING's offices.  He may have
signed the document because WALLACE asked him to do so.  Both
MCELROY and WALLACE asked TRIEU to sign documents on several
occasions, and for several different reasons.  TRIEU was shown
the second page of the questionnaire, indicating that he was a
50% owner of PRECISSION TEMP.  TRIEU advised that he was never
aware that he was a 50% owner of PRECISSION TEMP.  TRIEU believed
he was only ever listed as an owner of PROTEMP.  TRIEU
acknowledge working for PRECISSION TEMP at the current time, but
did not acknowledge having any ownership interest.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of  DICH TRIEU _____ , On 8/7/01 _____ , Page  8

      TRIEU's job responsibilities for PRECISSION TEMP include finding workers for the company.  As with PROTEMP, all paperwork is returned to WALLACE.  No records are maintained at either TRIEU's home or the Lowell office.  The paperwork TRIEU completes is either handwritten or typed, but not done on the computer.

      TRIEU advised that an application, a form W-4, and an Immigration form I-9, are completed for all employees.  TRIEU fills these forms out himself, and sends them to WALLACE.  TRIEU does not give them an employee number.  The job applications are not for any specific company, and therefore an employee could work for PRO TEMP, DAILY A. KING, or PRECISSION TEMP.  TRIEU does not know which company the employee will be working for until he speaks with WALLACE.

      DAILY A. KING LABOR, THE DAILY AGENCY, PROTEMP, and PRECISSION TEMP, all operate out of a single office in Easton.  TRIEU considers all these companies to be the same.

      TRIEU was unable to provide the names of other employees.  When he goes to the Easton office, he often meets with other employees, several of them American males who are also waiting for WALLACE.  He does not know them by name, or that much about, buy merely says hello.

      TRIEU currently resides with his girlfriend and son in Lowell.  He has a computer in his home which he purchased from WALLACE for approximately $700.00.  He uses the computer to listen to Radio Free Asia, a news program in his own language.

      WALLACE prepared all of TRIEU's tax returns.  WALLACE did not review the returns with TRIEU prior to having TRIEU sign the returns.

      TRIEU was asked who owns the vans which are used to transport workers to and from their work sites.  TRIEU advised he was not sure if PROTEMP or PRECISSION TEMP owned any of the vans, or whether the drivers used vans they owned themselves.

      TRIEU believed that WALLACE and MCELROY maintained insurance for the various companies in the event that someone got hurt.  He believed that the insurance companies took care of

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of __DICH TRIEU_____ , On _8/7/01__ , Page __8__

      TRIEU's job responsibilities for PRECISSION TEMP include finding workers for the company. As with PROTEMP, all paperwork is returned to WALLACE. No records are maintained at either TRIEU's home or the Lowell office. The paperwork TRIEU completes is either handwritten or typed, but not done on the computer.

      TRIEU advised that an application, a form W-4, and an Immigration form I-9, are completed for all employees. TRIEU fills these forms out himself, and sends them to WALLACE. TRIEU does not give them an employee number. The job applications are not for any specific company, and therefore an employee could work for PRO TEMP, DAILY A. KING, or PRECISSION TEMP. TRIEU does not know which company the employee will be working for until he speaks with WALLACE.

      DAILY A. KING LABOR, THE DAILY AGENCY, PROTEMP, and PRECISSION TEMP, all operate out of a single office in Easton. TRIEU considers all these companies to be the same.

      TRIEU was unable to provide the names of other employees. When he goes to the Easton office, he often meets with other employees, several of them American males who are also waiting for WALLACE. He does not know them by name, or that much about, buy merely says hello.

      TRIEU currently resides with his girlfriend and son in Lowell. He has a computer in his home which he purchased from WALLACE for approximately $700.00. He uses the computer to listen to Radio Free Asia, a news program in his own language.

      WALLACE prepared all of TRIEU's tax returns. WALLACE did not review the returns with TRIEU prior to having TRIEU sign the returns.

      TRIEU was asked who owns the vans which are used to transport workers to and from their work sites. TRIEU advised he was not sure if PROTEMP or PRECISSION TEMP owned any of the vans, or whether the drivers used vans they owned themselves.

      TRIEU believed that WALLACE and MCELROY maintained insurance for the various companies in the event that someone got hurt. He believed that the insurance companies took care of

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of __DICH TRIEU__ _____ , On __8/7/01__ ____ , Page ___9__

injuries incurred by employees hurt or injured on the job.

       TRIEU stated that he was aware that all people are required to pay taxes but further stated that because MCELROY used his name for MCELROY's business, MCELROY and/or WALLACE were required to pay the taxes. TRIEU recalled being given checks in the amount of $3,000.00 or $4,000.00 and being directed to take them to the bank for the purpose of paying taxes.

       TRIEU did not know anything about a Department of Labor investigation into the payment of cash to employees. He knew an individual by the name of GEORGE to be a salesman, and claims to have met GEORGE once a week when he was at the Easton office. He knew MARTA to be a woman who also went to the Easton office, but was not sure what her job was. At this time, the interview was terminated.

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 05-10019-RGS |
| ) | |
| DANIEL W. McELROY, ) | |
| AIMEE J. KING McELROY, and ) | |
| XIEU VAN SON, ) | |
| ) | |
| defendants. ) | |

### UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCLOSURE OF MATERIALS REGARDING ACCESS OF INSURANCE FRAUD BUREAU PERSONNEL TO GRAND JURY MATERIAL

The United States, by its undersigned counsel, opposes defendants' motion to compel

disclosure of court orders, together with various other information, pertaining to the participation

by investigators from the Insurance Fraud Bureau of Massachusetts ("IFB") in the conduct of the

grand jury investigation in this case.

In a discovery letter, the Defendants demanded disclosure of:

" . . . all applications, affidavits and briefs filed by the United States Attorney's
Office concerning this case and all Court Orders relating thereto, regarding the
access of Insurance Fraud Bureau ("IFB") personnel to grand jury material. Also
describe the nature and circumstances of every IFB personnel involvement with
grand jury materials."

Defendants now move for an order compelling such production, for the reasons set forth in the

Memorandum of Law in Support of Motion of Defendants Daniel W. McElroy and Aimee J.

King McElroy to Compel Disclosure of Documents and Information Regarding the Access of

Insurance Fraud Bureau Personnel to Grand Jury Material, August 29, 2005 ("Defendants'

Memorandum").     It is debatable whether the materials defendants request are themselves

grand jury materials, in which case their motion would be directly governed by Fed. R. Crim. P. 6(e)(2)(E)(ii), or whether they are merely analogous to such materials. Either way, the same rule should apply. Criminal discovery is not an occasion for open-ended fishing expeditions. The defendants' mere curiosity or desire to see if they can find something to help their cause is no basis for ordering disclosure.

Under Rule 6(e)(2)(E)(ii), a defendant seeking disclosure of grand jury materials must show "that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." As the First Circuit has noted, a defendant's right to disclosure of grand jury material "depend[s] on showing that some possible grounds for dismissal would be produced." United States v. Llaca Orbiz, 513 F.2d 816, 818 -819 (1st Cir. 1975) (addressing request of grand jury minutes); cf. Walsh v. United States, 371 F.2d 436, 437 (1st Cir. 1967) (applying earlier version of the pertinent Federal Rules of Criminal Procedure and finding that, where defendant "merely asked [for] an opportunity to examine the [grand jury] records without specifying any reason," there was no abuse of discretion in denying request).

The gist of defendants' motion is that they want to comb through the United States's submissions to the Court, and they want to review the entire history of IFB involvement in the grand jury investigation, to see if they can identify any procedural misstep with respect to the disclosure of 6(e) materials to IFB investigators. Defendants contend that if the United States failed to secure advance permission before making a disclosure to an IFB investigator, or if there were some other misstep in the process, this would constitute a breach of grand jury secrecy.

Absent some showing that there has actually been a violation, however, there is a presumption of regularity in grand jury proceedings and with it a concomitant presumption against open-ended disclosure of such matters. See Llaca Orbiz. 513 F.2d at 819 (affirming

2

district court's denial of discovery request where, "[a]nother allegation was that there was a breach of grand jury secrecy, but here again no showing was proffered and the presumption of regularity obtained.").

Defendants offer no evidence to support their conjecture that there has been some improper disclosure or other failure by the government to comply with its obligations with regard to grand jury investigations. There is nothing even to suggest that there has been any government misconduct or that further disclosures are necessary to uncover such misconduct. The defendants are simply asking to go fishing, in hopes that they might uncover some peccadillo which could be turned to their advantage. As the First Circuit has noted, in approving the district court's exercise of discretion to limit the scope of inquiry into the government's conduct of its investigation:

> In the absence of a particularized showing that the government was not turning square corners, the district court acted well within its discretion in refusing to let defense counsel embark on a fishing expedition.

United States v. Zaccaria, 240 F.3d 75, 81 (1st Cir. 2001) (citation omitted).

Defendants' acknowledge, as they must, that the First Circuit has now explicitly approved the procedure whereby the United States Attorney seeks prior court approval for disclosures to IFB investigators of information that may be protected from disclosure under Rule 6(e) of the Federal Rules of Criminal Procedure. See United States v. Pimental, 380 F.3d 575, 592 (1st Cir. 2004). Thus there is nothing surprising or untoward about the fact that IFB personnel were involved in the investigation of this case. The chief IFB investigator assigned to the matter was not only identified in discovery materials that were disclosed to the defendants, he was introduced to defense counsel during pre-indictment discussions.

3

Nor is there any substance to defendants' suggestion that even a "successful" fishing expedition would yield a legitimate basis for dismissal. Defendants assert that, if they were to identify some misstep in the handling of Rule 6(e) material, this could occasion the filing of dispositive motions. Memorandum at 1. Defendants fail, however, to explain what such "dispositive" motions might be based on. As noted above, the First Circuit has now rejected those district court decisions which ruled that there was something inherently improper about allowing IFB personnel access to Rule 6(e) materials. See Pimental, 380 F.3d at 594 , n.11 (noting decision of the district court in In re Grand Jury Proceedings, 158 F.Supp.2d 96 (D.Mass. 2001)) & at 590-96 (reversing decision of district court in United States v. Pimental, 204 F.R.D. 223, 226 (D. Mass. 2001). But even at the high-water mark for judicial hostility to IFB involvement in federal investigations, the district court rejected the contention that an improper disclosure of Rule 6(e) materials to an IFB investigator would warrant dismissal of an indictment. See United States v. Pimental, 204 F.R.D. at 226 (Gertner, J.) ("If the Rule 6(e) violation was not a knowing and bad faith violation of the rules, and did not prejudice the defendants, I may not dismiss the indictment against them.").

In this regard, Judge Bowler's decision in United States v. Mazzola, 183 F.Supp.2d 195 (D.Mass. 2001), is directly pertinent. While that decision was premised upon the now-discredited view that disclosure of grand jury materials to IFB investigators constituted a per se violation of Rule 6(e), the court concluded that disclosures akin to those now sought by the defendants in this case were unwarranted. The court in Mazzola "assum[ed] *arguendo* in defendants' favor that . . . identified IFB officials [had] participated in the grand jury proceedings," and that such participation violated Rule 6(e), but found nevertheless that the

4

defendants could not show that there was any ground for a motion to dismiss on this basis,[1] and

therefore rejected the defendants' discovery motion. 183 F.Supp.2d at 200-201.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated: October 7, 2005

By: /s/ Paul G. Levenson
    PAUL G. LEVENSON
    Assistant U.S. Attorney
    John Joseph Moakley United States Courthouse
    1 Courthouse Way, Suite 9200
    Boston, MA 02210
    (617) 748-3147

(

---

[1]     In United States v. Dunham Concrete Products, Inc., 475 F.2d 1241, 1249 (5th
Cir. 1973), the Fifth Circuit ruled that dismissal of an indictment would not be an appropriate
sanction for a claimed violation of grand jury secrecy arising from the disclosure of 6(e)
materials to an expert who was assisting the government's investigation. As the Supreme Court
has subsequently made clear, "as a general matter, a district court may not dismiss an indictment
for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of
Nova Scotia v. United States, 487 U.S. 250, 254 (1988).

# EXHIBIT C

# United States District Court
# District of Massachusetts

UNITED STATES OF AMERICA,
　　　Plaintiffs,

v.

**CRIMINAL NO. 05-10019-RGS-01**
**-02**

DANIEL W. McELROY,
AIMEE J. KING McELROY,
　　　Defendants.

*MEMORANDUM AND ORDER*
*ON MOTION OF DEFENDANTS,*
*DANIEL W. McELROY AND AIMEE J.*
*KING Mc ELROY, TO COMPEL*
*DISCLOSURE OF DOCUMENTS AND*
*INFORMATION REGARDING ACCESS OF*
*INSURANCE FRAUD BUREAU PERSONNEL*
*TO GRAND JURY MATERIAL (#49)*

COLLINGS, U.S.M.J.

　　　The defendants' motion raises the issue of what, if any, showing a

defendant must make to obtain copies of applications which the United States

Attorney has made to the Court pursuant to Rule 6(e)(3)(B), Fed. R. Crim. P.,

to obtain permission to disclose grand jury material to an employee of the

Massachusetts Insurance Fraud Bureau (IFB). It is clear that in certain

circumstances, an employee or employees of the IFB can be granted access to

grand jury material as "government personnel" as provided in Rule

6(e)(3)(A)(ii), Fed. R. Crim. P., but the grant of access for IFB personnel is not

automatic. *United States v. Pimental*, 380 F.3d 575, 596 (1 Cir., 2004), *cert.*

*denied sub nom. Pimental v. U.S.*, 125 S. Ct. 1385 (2005). The United States

Attorney does not have the power to deliver grand jury materials to IFB

personnel *sua sponte*. *Id.* "Rather, the prosecutor must seek court authorization

where quasi-governmental agencies such as the IFB are involved and make a

functional showing that the individual involved is within the Rule." *Id.*

In their motion to compel, defendants seek copies of the documents which

the prosecutor filed with the Court in the instant case to disclose grand jury

material to IFB personnel and any orders which the Court issued on the basis

of the prosecutor's submissions.[1] They argue that under the rationale of the

---

[1]

At the hearing, counsel for the defendants waived their motion to compel to the extent that it can
be read as seeking more than the papers filed by the prosecutor to disclose grand jury material to IFB

2

*Pimental* case, it is not a foregone conclusion that IFB personnel will be permitted disclosure of grand jury material. In these circumstances, they point out that there is no way they can test whether the government acted properly unless they are provided with the discovery sought. While I tend to agree that absent the discovery, the defendants would find it difficult to be able to challenge whether the government acted properly or not, I do not think that that fact alone entitles the defendants to discovery.

The reason is that there are limits to the Court's ability to disclose grand jury material. Rule 6(e)(3)(H)(i), Fed. R. Crim. P., provides that "[t]he court may authorize disclosure...of a grand jury matter...at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter which occurred before the grand jury." The rule clearly puts the burden on the defendant to make a preliminary showing.

The defendants in this case have not made the required showing. To succeed on a motion to dismiss, the defendants must establish prejudice. *United States v. Mazzola,* 183 F.Supp.2d 195, 201 (D. Mass., 2001). It follows that, in the words of Rule 6(e)(3)(H)(i), Fed. R. Crim. P., to make a showing "...that a

---

personnel and any orders issued by the Court in response to the prosecutor's filings.

3

ground may exist to dismiss the indictment because of a matter which occurred
before the grand jury," the defendants must show that there is some factual
basis to believe that the defendants were prejudiced by the asserted Rule 6(e)
errors. "The prejudicial inquiry must focus on whether any violations had an
effect on the grand jury's decision to indict." *Bank of Nova Scotia v. United
States,* 487 U.S. 250, 263 (1988). Put another way, to establish prejudice, the
defendants must show that the "...violations... substantially influence[d] th[e]
decision [to indict], or...[that] there is grave doubt that the decision to indict
was free from...substantial influence..." of the violations. *Id.* In the instant case,
there has been no showing that there is any factual basis whatsoever to a claim
that any Rule 6(e) violations (if, indeed, there were any) prejudiced the
defendants in any way. Since no basis for a dismissal of the indictment has
been demonstrated, disclosure is not permitted. Rule 6(e)(3)(H)(i), Fed. R.
Crim. P.

The Supreme Court has written cogently as to why there is such a high
threshold which must be crossed before an indictment can be dismissed because
a prosecutor has violated Rule 6(e) or otherwise committed misconduct.

> Errors of the kind alleged in these cases can be
> remedied adequately by means other than dismissal.

4

> For example, a knowing violation of Rule 6 may be
> punished as a contempt of court. See Fed. Rule Crim.
> Proc. 6(e)(2). In addition, the court may direct a
> prosecutor to show cause why he should not be
> disciplined and request the bar or the Department of
> Justice to initiate disciplinary proceedings against him.
> The court may also chastise the prosecutor in a
> published opinion. *Such remedies allow the court to
> focus on the culpable individual rather than granting
> a windfall to the unprejudiced defendant.*

*Bank of Nova Scotia,* 487 U.S. at 263 (emphasis added).

Somewhat of an analogy can be found in cases in which a defendant

attacks an indictment on the ground that excessive hearsay was presented to the

grand jury. In the case of *United States v. Jett,* 491 F.2d 1078 (1 Cir., 1974), a

defendant challenged his indictment on the basis that only hearsay evidence

was presented to the grand jury. *Id.* at 1081. The basis for the challenge was

a Second Circuit case, *United States v. Estepa,* 471 F.2d 1132 (2 Cir., 1972), in

which the Court dismissed an indictment because of improper use of hearsay

evidence before the grand jury. The First Circuit declined to state whether it

would follow the *Estepa* case on its facts, but distinguished the facts in *Estepa*

from those in *Jett. Jett,* 491 F.2d at 1081. However, it made a point which is

quite relevant for present purposes. Specifically, the Court said that while it

was better practice to present non-hearsay evidence, it would "...not suggest

5

that a defendant is entitled as of right to demand grand jury minutes to see if he can discover whether hearsay, or only hearsay, was used." *Jett*, 491 F.2d at 1081-2.

The salient point is that to obtain grand jury materials, a defendant must demonstrate something more than that inspection is necessary to see if there were any errors, even when the inspection is perhaps the only way to discover the errors. I rule that in the case of asserted violations of Rule 6(e), Fed. R. Crim. P., a defendant is not entitled to disclosure unless he can make a showing that there is some basis, other than mere conjecture, that a ground may exist to seek to dismiss the indictment based on the defendant having been prejudiced by the Rule 6(e) violation. I further rule that the defendants in the instant case have failed to make such a showing.

Accordingly, it is ORDERED that the Motion of Defendants, Daniel W. Melroy and Aimee J. King McElroy, to Compel Disclosure of Documents and Information Regarding Access of Insurance Fraud Bureau Personnel to Grand Jury Material (#49) be, and the same hereby is, DENIED.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

6

October 14, 2005.