UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 05-10019-RGS |
| | ) | |
| DANIEL W. McELROY and | ) | |
| AIMEE J. KING McELROY | ) | |

### DEFENDANTS, DANIEL W. MCELROY AND AIMEE J. KING MCELROY MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT OF OF ACQUITTAL

The Defendants, Daniel W. McElroy and Aimee J. King McElroy, submit the following

Memorandum in Support of Their Renewed Motion for Judgment of Acquittal on all counts.

**A)  The Evidence was Insufficient to Show that Daniel and Aimee McElroy Were Members of the "Klein" Conspiracy that was Alleged in Count One of the Indictment.**

At trial the government failed to introduce any direct evidence that the Defendants,

Daniel and Aimee McElroy knew and/or approved of the agreement not to pay the appropriate

employment taxes for the workers of Daily A. King, Pro Temp and Precision Temp Corp.  There

was no evidence introduced about either Defendant participating in any conversation that taxes

were not being withheld and/or paid for the employees of Daily A King, Pro Temp or Precision

Temp Corp.

The government's only attempt to prove this essential element was evidence, that taken in

the light most favorable to the government, showed that the Defendants only knew that there was

a cash payroll.  However, the Court instructed the jury that paying workers in cash was not

{K0365568.1}

illegal.  Consequently this circumstantial evidence was insufficient to prove the Defendants made an agreement to participate in a "Klien" Conspiracy.

**B)     The Proof of The Mail Fraud Conspiracy Alleged in Count One of the Indictment Failed to Proved The Defendants Made an Agreement To Fraudulently Reduce the Premiums for Workers Compensation Insurance for Daily A King, Pro Temp, and Precision Temp Corp.**

The evidence at trial to prove the Defendants' agreement and participation in the mail fraud conspiracy came from the testimony of Charles Wallace ("Wallace").  On February 7, 2008 on direct examination Wallace testified about this issue in pages 81 through 94.  The testimony is attached hereto as Exhibit One.  This testimony in the light most favorable to the government only shows that both Defendants discussed workers compensation premiums with Wallace about Daily A King and that the Defendant, Daniel McElroy, had discussions with Wallace separately about workers compensation premiums for Pro Temp.  In none of this testimony does Wallace allege that the McElroys knew he would be submitting false payroll tax information to the insurance companies.

During cross-examination on February 8, 2008 on pages 41 through 47, attached hereto as Exhibit Two, Charles Wallace testified that he initiated the idea to provide false tax returns to insurance companies to reduce the workers compensation premiums and that Wallace testified that during and after this conversation Aimee McElroy and Daniel McElroy said nothing. Wallace only testified that Daniel McElroy nodded his head.

This evidence take in the light most favorable to the government is insufficient as a matter of law to demonstrate the agreement prong of the mail fraud conspiracy.

### C)    The Evidence Offered Against Aimee McElroy in Counts Two and Three is Insufficient.

Count Two is an alleged mail fraud concerning Pro Temp and Count Three is an alleged mail fraud concerning Precision Temp Corp. Charles Wallace never testified he had any conversations with Aimee McElroy about either Pro Temp or Precision Temp workmans compensation insurance premiums. On this fact alone there was insufficient evidence for Counts Two and Three to show that Aimee McElroy was part of any substantive mail fraud crime for either Pro Temp or Precision Temp.

### D)    There was Insufficient Evidence Introduced at Trial to Show That The Mailings Alleged in Counts Two, Three and Four Were Mailed.

Exhibit 228B represents the mailing for Count Two and Exhibit 229A represents the mailing for Count Three. These Exhibits were introduced through Michael Hayes; however Mr. Hayes testified that he had no personal knowledge whether these exhibits were mailed. In order to overcome this failure of proof the government never introduced any evidence that the exhibits were received and/or found at the offices of Daily A King during the search. Also, the insurance broker never testified that these documents were received via the mail.

Exhibit 207C represents the mailing for Count Four. This exhibit was introduced through Joseph Dirico. Mr. Dirico never testified that he or anybody else mailed the exhibit and the government introduced no evidence that the exhibit was received via the mail by Daily A King.

Clearly, the element of the mailings was not met for Courts Two through Four.

**E)    The Evidence was Insufficient to Show for Counts Two through
Four that the Defendants, Daniel and Aimee McElroy Participated
in a Scheme to Defraud.**

For the reasons set forth in Section B above, there was insufficient evidence as a matter of

law to demonstrate the Defendants participated in a scheme to defraud as alleged in Counts Two

through Four.

**F)    The Evidence was Insufficient to Show that the Defendants,
Daniel and Aimee McElroy for Counts Five through Twelve
Willfully Aided and Assisted and Procured False 941
Tax Returns for Daily A King.**

For the reasons set forth in Section A above the evidence was insufficient to prove the

Defendants aided or assisted in the procuring of false 941 tax returns for Daily A King because

there was no evidence introduced at trial that the Defendants knew that the 941 returns for Daily

A King were false.  Charles Wallace was the central witness who testified about this issue.  His

transcripts from February 7 (page 45) and 8, 2008 (pages 48 through 61) are attached hereto as

Exhibits Three and Four.  This testimony clearly reflects that all of Daily A King's cash

payments were reflected on its corporate returns as contract labor.  Wallace also testified that

these amounts were supposed to be accounted for in the 941 tax returns of Pro Temp and

Precision Temp Corp.

Also, the IRS summary witness, Joseph Guidoboni, agreed that the amounts of the

contract labor payments reflected on Daily A King corporate tax returns were properly accounted

for, and therefore should have been reflected on the 941 tax returns for either Pro Temp or

Precision Temp Corp.

For all of these reasons it is clear that the evidence as a matter of law on Counts Five

through Twelve was insufficient.

{K0365568.1}

4

G)    **The Evidence was Insufficient For Counts Five Through Twelve
Because the 941 Tax Returns for Daily A King Were True.**

For the reasons set forth in Section F above, the evidence in the light most favorable to

the government demonstrated that Daily A King's 941 tax returns were not false but truthful.

Consequently, the evidence offered at trial on these Counts was insufficient.

H)    **The Evidence Was Insufficient for Counts Thirteen Through Eighteen.**

The evidence introduced at trial was insufficient to sustain a conviction for Counts

Thirteen through Eighteen for the reasons set forth in Sections A, F, and G above.

The evidence is very clear that the Defendants never participated in any conversation

about not paying proper taxes for Pro Temp.  In addition, as Charles Wallace and IRS Agent

Guidiboni testified the corporate taxes of Daily A King properly reflected the cash payments to

Pro Temp and Precision Temp Corp.  Further, the obligation to account for Pro Temp's

employment taxes on its 941 returns was the responsibility of Charles Wallace.  Wallace testified

that he signed all of the 941 returns for these Counts and never consulted the Defendants about

them.  There was no evidence that the Defendants aided or assisted in the procurement of these

false returns.  In addition, there was no evidence that the Defendants knew that Pro Temp's 941

tax returns did not include the entire cash payroll.

In summary, there was no evidence that the Defendants in anyway aided or assisted in the

procuring of the false returns.

## CONCLUSION

For the reasons set forth herein the Defendants assert that the Court, as a matter of law, must enter a Judgment of Acquittal on all counts because the evidence in the case was insufficient to sustain the convictions.

Respectfully submitted:
**AIMEE J. KING McELROY**
By her attorney,

Jack I. Zalkind (BBO# 538840)
One International Place
Boston, MA 02110
Telephone No. (617) 227.3950

DATED:  March 6, 2008

Respectfully submitted
**DANIEL McELROY**,
By his attorney,

Stephen R. Delinsky (BBO# 119120)
**ECKERT SEAMANS, CHERIN & MELLOTT, LLC**
One International Place, 18th Floor
Boston, MA  02110
Telephone No. (617) 342.6800

CERTIFICATE OF SERVICE
I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on  3~6-08
By:_____ S.Delinsky

{K0365568.1}

6

# EXHIBIT ONE

```
 1    A    Yes.

 2    Q    Were those filed every year?

 3    A    Yes.

 4    Q    For company by company -- well, for Daily A. King, were

 5    they filed every year?

 6    A    Yes.

 7              MR. MITCHELL:  May I have one moment, Your

 8    Honor.

 9    Q    One thing to clarify on this Exhibit right here, 122,

10    what does the figure in line 2 represent, the 2 million, 600

11    some odd thousand dollar figure?

12    A    All payroll checks issued by Daily King for the period

13    July 1, of 1998 through September 30, 1998.

14    Q    So it's the check payroll?

15    A    Yes.

16    Q    And is that the way you did it every time with these

17    941s?

18    A    Yes.              Start Here

19    Q    Were you responsible for providing information to the

20    temp company's worker's compensation insurers?

21    A    Yes.

22    Q    Would you describe generally what the responsibilities

23    were?

24    A    To meet with the workman's comp auditor and to give them

25    whatever records that they requested on their initial letter
```



1    or intent to audit.

2    Q    Okay.  And did you provide the auditors complete and

3    accurate information?

4    A    No.

5    Q    What didn't you provide them?

6    A    They were not provided the cash payroll, and they were

7    not provided the full amount of check payroll as well.

8    Q    How did you determine how much payroll information to

9    give them?

10   A    It would be based upon how much insurance premium wanted

11   to be paid that year.

12   Q    Okay.  And how was that determined?

13   A    I was usually given a number.

14   Q    By whom?

15   A    Dan and Aimee.

16   Q    Okay.  And were these in discussions with Dan and Aimee?

17   A    Yes.

18   Q    Was this something that happened every year?

19   A    Yes.

20   Q    For each insurance policy?

21   A    Yes.

22   Q    Were there policies that were taken out separately in

23   the name of Pro Temp?

24   A    Yes.

25   Q    Did you have discussions also about Pro Temp policies?

```
 1    A    Not with Aimee.

 2    Q    Okay.  With whom did you have those discussions?

 3    A    Just with Dan.

 4    Q    So Daily A. King -- excuse me, the discussions

 5    pertaining to Daily A. King's insurance rates were with both

 6    Aimee and Dan?

 7    A    Yes.

 8    Q    And Pro Temp, just Dan?

 9    A    Yes.

10    Q    How were these, how were the figures arrived at,

11    generally?

12    A    Which figures?

13    Q    In any given year, was there a certain -- how did they

14    convey the number to you?

15              MR. ZALKIND:  Objection, Your Honor.  He keeps

16    on using the word "they."  If these were joint

17    conversations, I have no objection.

18              THE COURT:  Good point.

19    Q    In joint conversations you had, how was the figure

20    conveyed to you?

21    A    Conveyed to me?

22    Q    Yeah.  What did, in the joint conversations about Daily

23    A. King's insurance policies, either Dan or Aimee tell you

24    how much they wanted to pay?

25    A    Yes.  If I'm going to bill for, hypothetically,
```

1    $200,000, it will be usually said that's too much money.

2                    MR. ZALKIND:  Excuse me, Your Honor.  Can we

3    find out who said it?

4                    THE WITNESS:  Well, I don't remember which one

5    said it.

6                    MR. ZALKIND:  Then I ask it be stricken, Your

7    Honor.

8                    THE COURT:  I thought you testified it was a

9    joint conversation with all three of them.  Motion to strike

10   is denied.

11   Q    Can you resume your answer?

12   A    Around half will be good, half of the 200,000.

13   Q    Okay.  And how did the discussions go when it was just

14   Pro Temp and you were discussing it would Dan McElroy?

15   A    Just Dan.

16   Q    Yeah.

17   A    Just say, we got a bill in for workman's comp.  We would

18   follow the same process of showing what numbers were

19   necessary.

20   Q    Did you discuss with them how you arrived at that

21   target, at a given target figure?

22   A    What I said would be, that we would have to have payroll

23   records to back up whatever numbers we used.

24   Q    Okay.  Did you explain to them how you would arrange

25   those payroll figures to back up the target figure?

1  A    I'm not sure if I discussed that with both of them.  I

2  just don't remember.

3  Q    Okay.  How did you arrange the payroll figures to arrive

4  at the target insurance premium?

5  A    I would figure out on a weekly basis, figure out, first

6  of all, how much payroll by category would be needed to

7  generate the kind of premium that wanted to be paid, and

8  then you would break that down further to a weekly basis of

9  payroll to arrive at the number needed for that premium.

10 Q    Is that in the accounting business referred to as

11 backing into a number?

12 A    I suppose.

13 Q    Did you do this for each policy?

14 A    Yes.

15 Q    For both Pro Temp and Daily A. King?

16 A    I don't remember what happened with Pro Temp.

17 Q    Well, let me ask you, let me ask you about Precission.

18 Was Precission Temp insured?

19 A    Yes.

20 Q    Are you sure about that?

21 A    As far as I knew they were, yes.

22 Q    What I'm asking you is the process.  Was the process you

23 used to come up with the figure the same for each of the

24 policies?

25 A    When you sign up for the policies in the beginning, it's

1   an estimate.  Your renewal is also an estimate.

2            MR. DELINSKY:  I'm sorry, I didn't hear that.

3   A    Your renewal is also an estimate, and the renewal is

4   usually based upon the previous years.  So starting with

5   which company you want me to talk first?

6   Q    Talk Daily A. King.

7   A    All right.  Originally, the first year we gave an

8   estimate on the premium -- on the payroll, as far as what it

9   would be for the year.

10  Q    You gave an estimate?

11  A    And then we usually, they would come out and do an

12  audit.  I use the word usually because there are some

13  insurance companies that sent you a mail questionnaire to

14  fill out, and you responded back about your payroll numbers

15  through the mail.

16            I don't remember if that ever happened with Daily

17  King or not.

18  Q    Do you remember it happening with Pro Temp?

19  A    I believe it happened one year with Pro Temp.  I could

20  be wrong.  I just don't remember.

21  Q    Okay.  Again, coming up with the payroll figures, would

22  you document it somehow?

23  A    Yes.  I would set up a spreadsheet by week that would

24  fall into the time period of the policy.  If the policy ran

25  from 9/6/98 to 9/6/98, then that's how the spreadsheet would

1    have been made up on a weekly basis.

2    Q    Okay.  I'll have you -- I'm going to have you take a

3    look at some Exhibits.  352, 352A-E.  Can you find those?

4             Have you had a chance to look at those documents?

5    A    Yes.

6    Q    Okay.  Do you recognize those documents?

7    A    Yes.

8    Q    What are they?

9    A    The first two Exhibits, 352 and 352A represent a

10   reproduction of the summary totals by quarter of the

11   spreadsheets that I would have created for the workman's

12   comp policy.

13   Q    Okay, and what about the other documents?

14   A    Exhibits 352B, C, D and E are copies of 941s for Daily

15   King Labor for the period third quarter '98, fourth quarter

16   '98, first quarter '99 and second quarter '99.

17   Q    Do those 941s relate to the two payroll sheets that are

18   Exhibits 352 and 352A?

19   A    These quarterlies tie out to the payroll summaries that

20   were in the first two Exhibits.

21             MR. MITCHELL:  At this time, Your Honor, the

22   government would offer Government Exhibits 352, 352A-E.

23             MR. DELINSKY:  No objection.

24             MR. ZALKIND:  No objection, Your Honor.

25             (Government's Exhibit No. 352, 352A-E received in

1          **evidence.**)

2      Q    In coming up with these payroll sheets, did you also

3      create other documents to substantiate the lower payroll

4      that you were submitting to the auditors?

5      A    It would be a spreadsheet with like 52 weeks on it,

6      similar to Exhibit 352.

7      Q    Okay.  Did you provide the insurance auditors with 941s?

8      A    Yes.

9      Q    Okay.  Were those the same 941s you filed with the IRS?

10     A    I'm sorry, I didn't hear you.

11     Q    Were those the same 941s that you filed with the

12     Internal Revenue Service?

13     A    No.

14     Q    They were different.

15     A    Yes.

16     Q    Were the figures in the 941s you submitted to the

17     insurers, lower or higher than those on the ones you filed

18     with the Internal Revenue Service?

19     A    Lower.

20              MR. MITCHELL:  Your Honor, at this time I'd

21     like to read a stipulation.

22              THE COURT:  All right.

23              MR. MITCHELL:  "Stipulation 18, Government's

24     Exhibits 352 and 352A-E are two spreadsheets labeled Daily

25     A. King Labor of Worker's Comp 1998, 1999, and IRS Forms 941

1    for Daily A. King Labor, Inc. for the quarters ending in

2    9/30/98, 12/31/98, 3/31/99, 6/30/99 that were found attached

3    together in Aimee King McElroy's office, Room C at 14EG

4    Bristol Drive, Easton, Mass. on June 26, 2001."

5    Q    Now, the 941s that are labeled Exhibits 352B-E, are

6    those, the payroll figures on those, lower than the ones

7    that you filed for those corresponding months with the IRS?

8    A    Yes.

9    Q    I'll have you look at two documents.

10             Displayed on the screen is Exhibit 122.   Remember

11    that 941 that you just walked us through a few minutes ago?

12    A    Yes.

13    Q    Okay.   Is that the one you filed with the Internal

14    Revenue Service?

15    A    Yes.

16    Q    Again, which quarter?

17    A    Quarter ending September 30, 1998.

18    Q    That's the third quarter of the year, right?

19    A    Yes.

20    Q    Going to show you -- do you see the other document that

21    I've flashed up on the screen, Mr. Wallace?

22    A    Yes.

23    Q    That's Exhibit 352B?

24    A    Yes.

25    Q    Is that a 941 for the same quarter?

1   A    Yes.

2   Q    That the one that you submitted to the insurers?

3   A    Yes.

4   Q    Okay.  Can you read the -- you testified earlier that

5   item 2 on the first one is $2,661,238.95; is that right?

6   A    Yes.

7   Q    And could you read for us what item 2 says in the

8   version you submitted to the worker's comp insurer?

9   A    $959,222.12.

10  Q    Did you submit, each time you submitted 941s to

11  insurers, was the figure lower as it is in these two

12  Exhibits?

13  A    Yes.

14  Q    In this instance, it's lower by about what percentage

15  roughly?

16  A    Sixty.

17  Q    Sixty percent.

18       When you received phone calls -- well, I believe

19  you testified earlier that the auditors would call you,

20  contact you about audits, is that correct?

21  A    The normal procedure is they would send a letter to

22  Daily King, Pro Temp or Precission Temp, being whichever

23  respectively, stating they want to come out and do an audit.

24  They give you on that same letter, the policy year, they

25  give you the date and time that they want to come out, and

1   they give you a list of documents that they would like

2   available to them at the audit.

3   Q   Okay.  Where were the audits performed?

4   A   Most of the audits were performed in my house.

5   Q   Was there a reason for that?

6   A   Yeah.  We didn't want the auditors to be in the

7   building.

8   Q   Who didn't want them to be in the building?

9   A   Dan.

10  Q   Is that something Dan told you?

11  A   Yes.

12  Q   Were there ever delays in setting up these audits?

13  A   Yes.

14  Q   Okay.  What were the reasons for the delays?

15  A   To make sure all the records were ready for them to look

16  at.

17  Q   Because of that, did you ever have to call the auditors

18  to postpone the audit?

19  A   I'm sure I did.

20  Q   Now, this process of submitting lower 941s to the

21  auditors that tied out to the lower payroll figures you gave

22  them, is that something that continued right up until the

23  point that the FBI and IRS searched Daily A. King's offices?

24  A   Yes.

25  Q   Did the auditors ever ask you about workers who were

1    injured on the job?

2    A    Yes.

3    Q    Okay.  What kinds of questions did they ask you about

4    that?

5    A    Well, part of the audit was to verify the person that

6    filed a claim for injury was actually working where they

7    said they were working on that specific day.

8         So they would look to find a portion of a payroll

9    check or something for that person on that particular week's

10   payroll when they got hurt.

11   Q    What would you do to respond to those inquiries?

12   A    When the numbers were prepared for the insurance

13   company, you'd make sure that there was payroll listed for

14   that particular week for that particular company where the

15   person was working and filed the claim.

16   Q    Did you have to fabricate documents to do that?

17   A    Did I?  No.

18   Q    Okay.  Did anyone else?

19   A    One time.

20   Q    Who was that?  Who did that?

21   A    Aimee King.

22   Q    All right.  And to whom did she present those documents?

23   A    Who did she give them to?

24   Q    Yes.

25   A    Michael Powers.

1    Q    Okay.  And that was in connection with what?

2    A    An injury at a company in Plymouth.

3    Q    Were there -- did you ever make arrangements to have

4    injured workers treated without making insurance claim?

5    A    Yes.

6    Q    How did that work?

7    A    In the New Bedford area, there were two clinics that we

8    made arrangements to bring any of the workers that may have

9    cut their finger or injured themselves for minor issues to

10   these clinics to get medical treatment.

11   Q    Okay.  Was there a reason insurance claims weren't made?

12   A    The reason the claims wouldn't be made is so that the

13   calculation of the premium would not be modified or impacted

14   by the frequency of occurrences.

15           So by paying your claims, small ones like that

16   directly, the frequency does not change your workman's comp

17   rate.

18   Q    Did you have discussions with either Dan or Aimee about

19   this?

20   A    I don't recall.

21   Q    You've testified at length about the false IRS documents

22   that you filed, the false documents that you submitted to

23   worker's comp insurers.  For whose benefit did you file

24   those, file and submit those documents?

25   A    The company's benefit.

1    Q    Okay.  And the owners of the company?

2    A    Who are they?  The one who owns Daily King Labor is

3    Aimee King.

4    Q    You filed documents in Daily A. King's name?

5    A    Yes.

6    Q    And did you file false, file and submit false documents

7    on behalf of Pro Temp?

8    A    Yes.

9    Q    And who again is the boss of Pro Temp?

10   A    Dan and I.

11              MR. MITCHELL:  That's all; Your Honor.

12              THE COURT:  Okay.

13                      CROSS-EXAMINATION

14   BY MR. DELINSKY:

15   Q    Do you want any water, Mr. Wallace?  Are you all set?

16   A    I'm all set right now, thank you.

17   Q    Before you testified --

18              MR. DELINSKY:  Could you remove the items on

19   the screen?

20              MR. MITCHELL:  Just hit escape right there.

21   Q    Mr. Wallace, before you testified yesterday, did you

22   have any meetings with the government to prepare for your

23   testimony?

24   A    Yes.

25   Q    Okay.  How many meetings?

# EXHIBIT TWO

```
 1    with you.

 2    A    Okay.

 3    Q    And it states that Paul Levenson was present?

 4    A    Yes.

 5    Q    Can you read paragraph 1 to yourself.

 6    A    (Witness complies.)

 7          Okay.

 8    Q    Now, after reading paragraph 1 to yourself, isn't it

 9    true that you told the Internal Revenue Service that you did

10    not understate the payroll amounts during this period that

11    you were supplying tax returns to Reliance?

12    A    Yes.

13    Q    That's what you said to the Internal Revenue Service?

14    A    Yes.

15    Q    Was that the truth?

16    A    I believe it was.

17    Q    Yesterday you were asked questions by the prosecutor

18    about workmen's compensation insurance, correct?

19    A    Yes.

20    Q    Previously to working for the McElroys commencing

21    sometime in early 1991, had you participated in thousands of

22    workers' compensation insurance audits?

23    A    I don't know about thousands, but there would have been

24    numerous in the course of my prior employments.

25    Q    So you had experience then with workmen's compensation
```

1   insurance audits, correct?

2   A   Yes.

3   Q   And you had participated in lots of them on behalf of

4   the clients that you were representing?

5   A   The accounting firm I was representing, yes.

6   Q   Well, the accounting firm was representing --

7   A   Various people.

8   Q   -- people, and they had workmen's compensation

9   insurance; and there was an audit by their company, and you

10  would participate in that audit on behalf of the client of

11  the accounting firm?

12  A   Yes.

13  Q   And you knew, as a result of that participation, that

14  insurance auditors rely on 941 returns provided by the

15  client and do not match them with 941s filed with the

16  Internal Revenue Service?

17  A   Is that a question?

18  Q   Well, is that what you knew?

19  A   Yes.

20  Q   As a result of participating in these audits?

21  A   I didn't know what the insurance company does at their

22  end with the copies of the 941s.

23  Q   Well, did you ever tell the Internal Revenue Service on

24  or about November 13, 2007, that Wallace knew insurance

25  auditors rely on 941 returns provided by the client and do

1    not match them with 941s filed with the IRS?

2    A    I remember saying that.

3    Q    Now, you had, prior to the time you began working with

4    the McElroys, as you said, experience with these workmen's

5    compensation audits, workmen's compensation insurance

6    audits, correct?

7    A    Yes.

8    Q    And you knew the process by which premiums were

9    calculated, the -- like you testified to, the initial

10   estimated payroll amount of premium, then the

11   end-of-the-year premium, and then the audit and things like

12   that.  Do you remember?

13   A    Yes.

14   Q    Because you had participated in those, correct?

15   A    Yes.

16   Q    Do you remember -- isn't it a fact, sir -- is it true

17   that on one occasion you met with the McElroys and that you

18   told them that you recommended creating fictitious 941s to

19   show the insurance auditors in order to reduce insurance

20   premiums?  Did you tell that to the McElroys, that that's

21   what your recommendation was?

22   A    That's not what I said.

23   Q    Well, did you meet with Mr. and Mrs. McElroy at their

24   house on occasion and have coffee and talk about business?

25   A    Yes.

```
 1   Q   And at one of these coffees did you mention that you had

 2   been through thousands of workers' compensation insurance

 3   audits, and with that experience he recommends creating

 4   fictitious 941 returns to show the insurance auditors and

 5   reduce insurance premiums?

 6   A   I can't answer that with a simple yes or no.

 7   Q   Did you say that, though, to the Internal Revenue

 8   Service?

 9   A   I don't know the exact words that I used, but I did talk

10   about it with them.

11               MR. DELINSKY:  May I approach, Judge?

12               THE COURT:  You may.

13   Q   This reflects an interview of you by the Internal

14   Revenue Service on November 13, 2007; isn't that correct?

15   A   That's what's it says, yes.

16   Q   And in attendance at that was yourself, your attorney,

17   Assistant United States Attorney, Sarah Walters and

18   Assistant United States Attorney Jon Mitchell, Special Agent

19   Nancy McCormick of the FBI, Thomas Demeo of the IRS, Anthony

20   DiPaulo [ph.] insurance fraud investigator, and Kate

21   Mulligan of the Insurance Fraud Bureau, investigator.

22               Is that what this reflects?  All those people were

23   all there?

24   A   That's what it says.

25   Q   Big, big meeting.  Two Assistant United States
```

1    Attorneys, the FBI and IRS there, correct?

2    A    That's what it says.

3    Q    And your attorney was there, correct?

4    A    That's what it says.

5    Q    Can you read paragraph 11 to yourself, and read it on

6    this page and go to the next page.

7    A    (Witness complies.)

8         Okay.

9    Q    Did you read that?

10   A    Yes.

11   Q    Okay.

12        Now, you agree November 13, 2007, is approximately

13   three months ago?

14   A    Yes.

15   Q    During that meeting with all those law enforcement

16   agents, did you state that you told the McElroys that you

17   had been through thousands of workmen's compensation

18   insurance audits?

19   A    Yes.

20   Q    And that with that experience you recommended creating

21   fictitious 941 returns to show the insurance auditors and

22   reduce insurance premiums?  Is that what you said to the

23   IRS?

24   A    Yes.

25   Q    Now, with that presentation that you made with to the

1    McElroys, did you also tell them at that time that Wallace

2    knew insurance auditors rely on 941 returns provided by the

3    client and do not match them with 941s filed with the IRS?

4    A    That was my correct statement there.

5    Q    That's what you had said to them?

6    A    Yes.

7    Q    And after that presentation, you told the IRS the

8    McElroys said nothing; isn't that correct?

9    A    I can't answer that with a simple yes or no.

10   Q    You didn't report at that meeting with the Internal

11   Revenue Service and that whole bevy of federal law

12   enforcement agents that either Mr. McElroy or Mrs. McElroy

13   said anything, correct?

14              MR. MITCHELL:  I'm objecting, your Honor.

15   This is mischaracterizing the statement.

16              THE COURT:  Correct it on redirect.

17   Q    Can you answer my question?

18   A    What was the question again.

19              MR. DELINSKY:  Mr. Stenographer, would you be

20   so kind as to read it back?

21         (Question read.)

22   A    I can't answer that with a simple yes or no.

23   Q    All you said, sir, was, McElroy approved Wallace's idea

24   with a nod of the head?

25   A    That's what I said.

```
 1   Q    That's what you said?

 2   A    Yes.

 3   Q    A nod of the head isn't talking, is it?

 4   A    No.

 5   Q    So after this presentation, neither Mr. McElroy nor

 6   Mrs. McElroy said anything, correct?

 7   A    Correct.

 8   Q    And all you said is that Mr. McElroy made a nod of the

 9   head?

10   A    Yes.

11   Q    And as a result of that, you then went out and started

12   to fabricate 941s, correct?

13   A    I can't answer that with a simple yes or no.

14   Q    You did fabricate 941s, didn't you?

15   A    I did do that, yes.

16   Q    Now, I just want to -- Precission Temp Corp had its own

17   clients, correct?

18   A    Yes.

19             You mean customers?

20   Q    Yes.

21   A    Yes.

22   Q    These would be customers who Precission Temp Corp billed

23   directly, correct?

24   A    They had those, yes.

25   Q    So, in other words, Precission Temp Corp would employ
```

# EXHIBIT THREE

```
1    your Honor?

2              (Pause in proceedings.)

3              MR. MITCHELL:  You can put 314 aside.

4         May I just have a moment to get -- so we don't get

5    the exhibits shuffled, your Honor?

6              THE COURT:  Yes.

7              (Pause in proceedings.)

8    BY MR. MITCHELL

9    Q    Turn to Exhibit 410.

10             By the way, before we leave 314, the cash payroll

11   that's laid out there that's accounted for in that exhibit,

12   any of that cash reported to the IRS?

13   A    The cash payroll?

14   Q    Yes.

15   A    It was reported for contract labor on the tax returns.

16   Q    Was it reported on the 941s?

17   A    No.

18   Q    Was it reported to the workers' comp insurers?

19   A    No.

20   Q    Do you have 410 in front of you?

21   A    Yes.

22   Q    Would you take a moment to look at that?

23             You can take it out of the sleeve.

24   A    Okay.

25   Q    Do you recognize 410?
```

# EXHIBIT FOUR

```
 1    the workers, place them with a company, bill the company on

 2    Precission Temp Corp letterhead, and receive a check from

 3    the company and deposit it in a Precission Temp Corp bank

 4    account, correct?

 5    A    Yes.

 6    Q    And that was true also of Pro Temp, correct?

 7    A    Yes.

 8    Q    And Pro Temp and Precission Temp Corp individually had

 9    numerous clients?

10    A    Yeah, okay.

11    Q    Well, is it true, they had numerous clients that they

12    did the direct billing for?

13    A    Yes.

14    Q    And then for some clients that were Daily A. King

15    clients, Daily A. King would pay directly Pro Temp or PTC

16    for subcontracting with PT or PTC's employees, correct?

17    A    They would pay some monies over, yes.

18    Q    Those monies that Daily A. King paid over to either Pro

19    Temp or to PTC, those amounts were reflected on Daily A.

20    King's tax returns, correct?

21    A    Which tax returns?

22    Q    Their, I think, 1140S or 1040S?

23    A    I don't believe they ever filed those.

24    Q    Let me get the correct file for you.

25    A    Okay.
```

```
 1    Q    1120Ses?

 2    A    1120S, yes.

 3    Q    Tell me what an 1120S is?

 4    A    It is a form of a corporation.  The correct full name if

 5    it is subchapter s corporation.

 6    Q    And on behalf of Daily A. King, every year you would

 7    file one of these tax returns?

 8    A    Yes.

 9    Q    And on these tax returns you would reflect the amount of

10    money that Daily A. King provided to either Pro Temp or PTC

11    or both, correct?

12    A    Yes.

13    Q    And those numbers that you reflected on those tax

14    returns were correct?

15    A    They were based upon the checkbooks of Daily A. King.

16    Q    Correct.

17            And these were checks that you said that were

18    either made out directly to PTC, Pro Temp, or to specific

19    individuals, correct?

20    A    Correct.

21    Q    And you would add all those up, and you would reflect

22    those on Daily A. King's tax returns, correct?

23    A    On their corporate return, correct.

24                MR. DELINSKY:  May I approach, Judge?

25                THE COURT:  You may.
```

```
 1              (Counsel conferred.)
 2    Q    I'm going to show you, sir, what's been marked as
 3    Exhibit 135, which is an income tax form 1120S filed on
 4    behalf of Daily A. King; is that correct?
 5    A    That's correct.
 6    Q    And your signature is on it?
 7    A    Yes.
 8    Q    And Mrs. King's signature is on it, correct?
 9    A    Yes.
10    Q    She's signing as President?
11    A    Yes.
12    Q    And you prepared this tax return?
13    A    Yes.
14    Q    You gave it to her, correct?
15    A    Yes.
16    Q    And it shows for calendar year 1994 Daily A. King had
17    gross sales of $7,730,729, correct?
18    A    Yes.
19    Q    Now, on page -- on a separate page, referring to
20    line 19, "other deductions," you put "outside agency fee,"
21    $1,520,806, correct?
22    A    Correct.
23    Q    And that figure for 1994 represents the checks that
24    Daily A. King issued to Pro Temp and to individuals on
25    behalf of Pro Temp, correct?
```

1    A    And on behalf of themselves, too, yes.

2    Q    Well, you said that there were checks cut to yourself,

3    to Mr. Trieu, and to other individuals.  That's what I was

4    referring.  Those checks were counted in there?

5    A    They were part of that number, yeah.

6    Q    Yes, yes.

7    A    Not those checks, because those would be '99 and '98.

8    Q    But in 1994, whatever checks you found in the checkbook,

9    you reflected them here --

10            Correct?

11    A    That's correct.

12    Q    -- to the Internal Revenue Service that Daily A. King

13    paid in outside agency fees the amount of $1,520,000,

14    correct?

15    A    That's correct.

16    Q    Now, the monies that Daily A. King issued to Pro Temp in

17    1994, it was the responsibility of Pro Temp to reflect that

18    $1,500,000 on Pro Temp's tax returns, wasn't it?

19    A    If it was all for Pro Temp.

20    Q    If it was all for Pro Temp, Pro Temp had a

21    responsibility to reflect that, didn't it?

22    A    That's correct.

23    Q    And you prepared Pro Temp's tax returns, didn't you?

24    A    I believe I did one year, maybe two.

25    Q    Didn't you prepare the tax returns --

```
 1   A    No.   That was a sole proprietorship owned by Dich Trieu.
 2   So there would not be a separate corporate tax return like
 3   this.
 4   Q    I know, but wouldn't it reflect the gross sales of a
 5   sole proprietorship where Dich Trieu would have to report
 6   the gross sales of his sole proprietorship?
 7   A    He would.
 8   Q    So it should be been reflected on his personal return,
 9   correct?
10   A    Whatever monies Pro Temp got out of the million five,
11   yes.
12               MR. DELINSKY:   I would like to just offer
13   Exhibit 135.
14               MR. MITCHELL:   No objection.
15               MR. DELINSKY:   It's already in --
16          (Counsel conferred.)
17               THE COURT:   This has been previously marked by
18   the government?
19               MR. DELINSKY:   Yes, but it hasn't been put
20   into evidence yet.
21               MR. MITCHELL:   Correct.
22               MR. DELINSKY:   So I'm now the moving the
23   Government's Exhibit 135 into evidence.
24               THE COURT:   Very well.
25          (Government's Exhibit No. 135 received in
```

1            evidence.)

2    BY MR. DELINSKY

3    Q    Let me ask you, sir.  Exhibit 136, is that Daily A.

4    King's 1120S tax return for the year ending in 1995?

5    A    Yes.

6    Q    And it's signed by both you and Mrs. King, correct?

7    A    Correct.

8    Q    And you're signing as tax preparer, correct?

9    A    Correct.

10   Q    And for 1995, Daily A. King's gross sales were

11   $11,825,516, correct?

12   A    Correct.

13   Q    And in getting that figure, you included in that gross

14   figure initially to calculate that amount of money that was

15   subsequently deducted for contract labor, correct?

16   A    That was made up of bank deposits.

17   Q    Let me just ask you, sir.

18            On the last page of the return under "outside

19   service agencies," it reflects payments of $1,346,900,

20   correct?

21   A    Correct.

22   Q    That million three -- that $1,346,000 is included in the

23   $11,825,000, correct, because that was money coming into

24   Daily A. King?

25   A    No.  The 1,346,900 was an expense.

1    Q    That's right.

2    A    It wasn't an income.  It was an expense.

3    Q    That's right.  It became a deduction off of that

4    $11 million?

5    A    That's correct.  It became a deduction.

6    Q    In other words, they have to have the million

7    300-some-odd thousand dollars in their possession in order

8    to pay it out, correct?

9    A    Absolutely.

10   Q    And they paid it out in the form of outside agency fees

11   to Pro Temp?

12   A    And others.

13   Q    And you reflected that on that return, correct?

14   A    In the 1,346,900.

15   Q    You reflected that?

16   A    Yes, correct.

17              MR. DELINSKY:  I'm going to move this into

18   evidence, 136, Government's Exhibit 136.  It's already

19   premarked.

20              **(Government's Exhibit No. 136 received in**

21              **evidence.)**

22   BY MR. DELINSKY

23   Q    With respect to, sir -- the next tax return is an 1120S

24   for Daily A. King for the year 1996, correct?

25   A    Correct.

```
 1    Q    Again signed by you and Mrs. King, correct?

 2    A    Correct.

 3    Q    And it shows gross sales of 14,568,550, correct?

 4    A    Correct.

 5    Q    And on "other deductions - outside services" it reflects

 6    $1,662,516, correct?

 7    A    Correct.

 8    Q    And those were reflected in those checks which you've

 9    previously described, correct?

10    A    Some of those checks were that, yes.

11    Q    Well, I thought you said you added up all the checks,

12    and you got that figure of all the checks that were made out

13    to these individuals?

14    A    I thought you meant the checks that were entered by

15    Mr. Mitchell in front of me the other day.

16    Q    Oh, no, no.

17              I am sorry, sir.

18    A    That's what I --

19    Q    Let me clarify it.

20              So in order for you to get that million --

21              I'm sorry, my memory --

22    A    That's okay.

23    Q    Thank you.

24              (Laughter.)

25    Q    Outside expense, $1,662,516.  You took the Daily A. King
```

1    checkbook and added up all the checks that were issued to

2    Pro Temp and to individuals who you said would get these

3    checks and cash them, correct?

4    A    Not necessarily me saying, Go cash them.

5    Q    No, no, no.  I understand that.  It was the checks.

6    A    It was all checks that were classified as contract --

7    Q    -- labor?

8    A    Correct.

9    Q    And those checks -- and the total amount of those checks

10   were reflected on Daily A. King's tax returns, correct?

11   A    On the corporate returns, yes.

12   Q    Yes, yes.

13   A    Yes.

14   Q    And Daily A. King was saying on those tax returns, this

15   is the amount of money we are sending out as an agency to

16   other agencies or agencies for contract labor services,

17   correct?

18   A    Correct.

19   Q    That's what the tax return says, right?

20   A    Correct.

21                  MR. DELINSKY:  I would like to move in 137.

22                  MR. MITCHELL:  No objection.

23              (Government's Exhibit No. 137 received in

24              evidence.)

25   BY MR. DELINSKY

1    Q    Now, I'm going to move along, sir.

2    A    Okay.

3    Q    Exhibit 138 is for the year 1997.  Another 1120S signed

4    by you and Mrs. King, correct?

5    A    Correct.

6    Q    And it reflects gross sale of $16,230,457, correct?

7    A    Correct.

8    Q    Okay.

9              Now, outside services, $2,203,890, correct?

10   A    Correct.

11   Q    And that 2-million-plus amount then becomes a deduction

12   off of that $16 million gross sales, correct?

13   A    Correct.

14   Q    Because that money, the tax return reflects, is leaving

15   Daily A. King to another agency, correct?

16   A    Correct.

17              MR. DELINSKY:  I'd like to offer Exhibit 138.

18              **(Government's Exhibit No. 138 received in**

19              **evidence.)**

20   BY MR. DELINSKY

21   Q    I'm now going to show you, sir, Exhibit 139, 140, and

22   141, and 142.

23   A    Okay.

24   Q    Just so I can identify these for the record.

25              Exhibit 139 is the 1120S for 1998 with your

```
 1    signature and Mrs. King's, correct?

 2    A    Correct.

 3    Q    It reflects gross sale of $14,637,508, correct?

 4    A    Yes.

 5    Q    And off of that was deducted outside services of

 6    $2,335,250, correct, for outside agency services, correct?

 7    A    Correct.

 8    Q    With respect to Exhibit 140, taxable year 1999, 1120S,

 9    gross sales for Daily A. King, $10,493,716, correct?

10    A    Correct.

11    Q    Outside agency -- outside services, $2,267,725, correct?

12    A    Correct.

13    Q    And this tax return is also signed by you and Mrs. King,

14    correct?

15    A    Correct.

16    Q    Just to complete this, Exhibit 141 is the 1120S for the

17    year 2000?

18    A    Yes.

19    Q    Signed by you and Mrs. King?

20    A    Yes.

21    Q    Which reflects gross sales of $9,718,521, correct?

22    A    Yes.

23    Q    And it shows under outside services $2,123,396, correct?

24    A    Correct.

25    Q    And Exhibit 142 is the 1120S for 2001, showing gross
```

1    sales for this year of $4,331,980, correct?

2    A    Correct.

3    Q    Signed by both you and Mrs. King, correct?

4    A    Correct.

5    Q    And under outside services, $1,129,091, correct?

6    A    Correct.

7    Q    And in order for you to calculate those outside

8    services, you went to the checkbook, and you calculated the

9    amount of the checks, correct, based on certain categories?

10    A    Correct.

11                MR. DELINSKY:  I would like to move in these

12    exhibits, 139, 140, 141 and 142.

13                **(Government's Exhibit No. 139 received in**

14                **evidence.)**

15                **(Government's Exhibit No. 140 received in**

16                **evidence.)**

17                **(Government's Exhibit No. 141 received in**

18                **evidence.)**

19                **(Government's Exhibit No. 142 received in**

20                **evidence.)**

21                MR. DELINSKY:  Your Honor, I'm about to go

22    onto another topic.  Can we a take the break now?

23                MR. ZALKIND:  Can we take the break a little

24    early, or I'll walk out and come back?

25                MR. DELINSKY:  No.  I don't want you to leave.

1          THE COURT:  Are you moving to another subject?

2          MR. DELINSKY:  Yes.

3          THE COURT:  All right, jurors, we'll take the

4     morning recess.

5          MR. ZALKIND:  Thank you.

6          MR. DELINSKY:  Thank you.

7          THE CLERK:  All rise.

8       Court is in recess.

9       (Whereupon, the jury left the courtroom.)

10      (Recess.)

11      (Whereupon, the jury entered the courtroom.)

12         THE CLERK:  All rise for the Honorable Court.

13      Court is open.  You may be seated.

14         THE COURT:  Mr. Delinsky.

15   BY MR. DELINSKY

16   Q   Now, Mr. Wallace, is it fair to say that the Daily A.

17   King Labor checks to Trieu, Van Son, Wallace, Pro Temp and

18   PTC were deducted on Daily A. King's tax returns as

19   "subcontract labor"?

20   A   As well as others, yes.

21   Q   Daily A. King paid Pro Temp and PTC by check, correct?

22   A   That's correct.

23   Q   And Pro Temp and Precission Temp Corp deposited those

24   checks into their own business accounts and included the

25   income in their gross receipts computation?

1    A    Yes.

2    Q    And the 1120S tax returns that we just reviewed for

3    Daily A. King Labor, you prepared those corporate tax

4    returns and you did not discuss those returns with

5    Mr. McElroy or Mrs. King before they were signed; isn't that

6    correct?

7    A    I can't answer that yes or no.

8    Q    Sir, isn't it fair that on November 13, 2007, you told

9    Special Agent Demeo of the IRS, Wallace also prepared the

10    quarterly employment tax returns -- strike that.

11         Wallace prepared DAK's corporate return 1120Ses.

12    Wallace deducted the cash payroll as outside services or

13    contract labor.  Wallace did not discuss the returns with

14    McElroy or King.

15         Is that --

16    A    That's correct.

17    Q    Is that what you told the government?

18    A    Yes, I did.

19    Q    Now, Mr. Wallace, currently you have unpaid taxes owed

20    to both the State of Massachusetts and to the Internal

21    Revenue Service, correct?

22    A    Yes.

23    Q    And, in fact, there are tax liens on your home by both

24    the state and federal government, correct, for unpaid taxes?

25    A    Correct.